```
 1              IN THE UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                      EASTERN DIVISION

 3
    UNITED STATES OF AMERICA,        )
 4                                   )
                    Plaintiff,       )
 5                                   )
    -vs-                             )  Case No. 18 CR 450
 6                                   )
    DAVID WALSH,                     )  Chicago, Illinois
 7                                   )  October 6, 2020
                    Defendant.       )  10:30 a.m.
 8

 9        TRANSCRIPT OF VIDEOGRAPHIC PROCEEDINGS - Sentencing
            BEFORE THE HONORABLE GARY FEINERMAN
10

11  APPEARANCES:

12  For the Government:      HON. JOHN R. LAUSCH, JR.
                            UNITED STATES ATTORNEY
13  (via video conference   BY:  MR. BRIAN J. KERWIN
    call)                   219 South Dearborn Street, Suite 500,
14                          Chicago, Illinois  60604
                            (312)353-5300
15

16  For the Defendant:      LAW OFFICES OF PATRICK E. BOYLE
                            BY:  MR. PATRICK E. BOYLE
17  (via video conference   155 North Michigan Avenue
    call)                   Suite 562
18                          Chicago, Illinois  60601
                            (312) 565-2888
19

20  Also Present:           MS. KELLY KWONG, U.S. Probation.
                            (via video conference call)
21

    Court Reporter:
22
                   CHARLES R. ZANDI, CSR, RPR, FCRR
23                     Official Court Reporter
                     United States District Court
24          219 South Dearborn Street, Room 2128
                     Chicago, Illinois  60604
25              Telephone:  (312) 435-5387
            email:  Charles_zandi@ilnd.uscourts.gov
```

1      (Proceedings heard via video conference call:)

2              THE COURT:  Good morning, Jackie.

3              THE CLERK:  Good morning, Judge.

4              18 CR 450, USA versus Walsh.

5              THE COURT:  Who do we have for the government?

6              MR. KERWIN:  Good morning, your Honor.  Brian Kerwin

7      for the United States, if you can hear me.

8              THE COURT:  I can.

9              MR. KERWIN:  Okay.  Thanks.

10             THE COURT:  Defense counsel?

11             MR. BOYLE:  Good morning, your Honor.  Patrick Boyle

12     on behalf of Mr. David Walsh, who is joining us via video from

13     the MCC.

14             THE COURT:  And, Mr. Walsh, is that you?

15             THE DEFENDANT:  That's me.

16             THE COURT:  And Probation?

17             MS. KWONG:  Good morning, your Honor.  Kelly Kwong on

18     behalf of the Probation Office.

19             THE COURT:  Good morning.  Are we all ready to

20     proceed with this morning's sentencing hearing?

21             MR. KERWIN:  The government's ready, Judge.

22             MR. BOYLE:  For the defense, we are, your Honor,

23     attorney Boyle.

24             THE COURT:  Okay.  So, let me ask Mr. Walsh, have you

25     had a chance to see the Presentence Investigation Report and

1    review it with your attorney?

2            THE DEFENDANT:  I have.

3            THE COURT:  And let me ask defense counsel, other

4    than what you've set forth in your sentencing brief, do you

5    have any objections or corrections to anything in the PSR?

6            MR. BOYLE:  No, your Honor.

7            THE COURT:  And you've received a copy of the

8    Probation Office's sentencing recommendation?

9            MR. BOYLE:  I have, and I provided that to Mr. Walsh

10   as well.

11           THE COURT:  Okay.  And other than the objections to

12   the proposed conditions of supervised release set forth in

13   your supplemental sentencing memorandum, will you have any

14   other objections to present this morning?

15           MR. BOYLE:  No, your Honor.

16           THE COURT:  All right.  So, government, any

17   objections or corrections that you have to the PSR?

18           MR. KERWIN:  No, your Honor.

19           THE COURT:  All right.  So, there's one Guideline

20   issue that we need to resolve before getting to the other

21   3553(a) factors, and that has to do with the proposed

22   four-level enhancement that the Probation Office and the

23   government believes applies because, in their view, the felon

24   in possession, which is Count 4, and to which Mr. Walsh

25   pleaded guilty, was committed in connection with another

1 | felony offense, the attempted bank robbery on November 24th.

2 | And the defendant, Mr. Walsh --

3 | THE DEFENDANT: Excuse me. July 24th.

4 | THE COURT: Right. July 24th. And the defendant,

5 | through able defense counsel, is arguing that the attempted

6 | bank robbery has not been proved in accordance with the burden

7 | of proof that applies at sentencing, and the government and

8 | the Probation Office argues that the facts do establish

9 | attempted bank robbery, which, by the way, is Count 3, to

10 | which Mr. Walsh has not pleaded guilty.

11 | So, let me ask defendant if there's any points --

12 | defense counsel, I'm sorry, if there's any points that you'd

13 | like to make or emphasize on this particular issue?

14 | MR. BOYLE: No, your Honor. I think I argued it, and

15 | I think I -- beginning essentially on page 2 of our sentencing

16 | memorandum, we discussed this very issue. And I think you've

17 | summarized it.

18 | You know, the standard here is preponderance of the

19 | evidence. It's not probable cause. It's certainly more than

20 | that. And we acknowledge it's less than reasonable doubt,

21 | but the simple fact -- and, you know, we acknowledge the

22 | government did charge him under the second paragraph of the

23 | bank robbery, which I think essentially they're relying upon

24 | the entry or the attempted entry into the bank.

25 | I would just suggest that he was still in a car in a

1    parking lot.  That is still not sufficient evidence of the

2    substantial step that they needed to establish of attempting

3    to enter the bank.  Certainly, he -- you know, they had every

4    right to arrest him and to seize him at that moment and

5    prevent what they thought was going to happen, but he had not

6    made the substantial step yet even to satisfy an attempt by a

7    preponderance.  Thank you.

8              THE COURT:  Thank you.

9              Probation, anything that you'd like to add?

10             MS. KWONG:  Nothing further, your Honor.

11             THE COURT:  Thank you.

12             Government, any points that you'd like to make or

13   emphasize?

14             MR. KERWIN:  Judge, I'd just add that I believe

15   Mr. Boyle, Mr. Walsh, and I are all in agreement as to what

16   the facts are.  We just have a disagreement over what it means

17   to attempt to enter a bank to commit a larceny or another

18   felony.

19             Mr. Boyle's position and Mr. Walsh's position is that

20   effectively, you need to make a literal physical move towards

21   getting through the front door; but the pattern jury

22   instructions tell us what an attempt means, and pattern jury

23   instruction 4.09 defines attempt to be an act that is a

24   substantial step towards committing the crime with the intent

25   to commit it.  It's not a literal step, but an action that

1    strongly corroborates the defendant's intent, something beyond

2    mere preparation, but short of the act itself.

3            Then if you compare the actions that Mr. Walsh took

4    on July 14th, when he did commit a bank robbery, to the many,

5    many steps that he took leading up to the FBI's intervention

6    10 days later, many, many of those actions corroborate his

7    attempt and make clear that if the FBI hadn't stepped in when

8    they did, he would have been inside that bank committing

9    another felony.

10           THE COURT:  All right.  Thanks to both sides for your

11   arguments.  I think the government has the better of the

12   argument, the government and Probation, so I'm going to apply

13   the four-level enhancement.  Both sides are right --

14           THE DEFENDANT:  I would like to say something about

15   that.  The agreement -- okay, the agreement in the plea

16   agreement, that said out of the way, period.  All of that

17   four-level enhancement is not going to apply, which I'm not

18   going to go for.  We can go for a jury trial is what we can

19   do, and I don't care what happens.  Okay?

20           MR. BOYLE:  Well, Mr. Walsh, if I can just try to

21   explain, Mr. Walsh, because the judge is finding that these

22   four levels apply, it's a sentencing issue.  You're not being

23   convicted of the attempted bank robbery.  That -- you did not

24   plead guilty to that count, and at the end of this proceeding,

25   if we finish it, that count will be dismissed.  That's my

1    understanding.

2          THE DEFENDANT:  Well, it should have been that way

3    from the very beginning because that's a plea agreement.

4    That's all I'm saying.  What do I know?  I know if you want to

5    violate the plea agreement or you want to enhance things, we

6    can go for a jury trial.  How about that?

7          MR. BOYLE:  I just want you to understand what's

8    happening today.

9          I don't know if you can assist me, your Honor.  I

10   think I'm summarizing what's actually happening.

11         THE DEFENDANT:  It's all good.  Go ahead and do what

12   you're going to do.

13         THE COURT:  Okay.  Yeah, defense counsel is correct.

14   I'm finding by a preponderance of the evidence for purposes of

15   sentencing that there was an attempted bank robbery.  Count 3

16   will be dismissed as a formal matter at the end of this

17   hearing.

18         So, the standard is preponderance of the evidence.

19   Both sides are right that we're talking about the second

20   paragraph of Section 2113(a) of Title 18.  And the standard

21   set forth in *U.S. versus Muratovic*, 719 F.3d 809 at 815 to

22   816, requires that I find that Mr. Walsh took a substantial

23   step towards committing the bank robbery on July 24th.  And in

24   my estimation, he very plainly did.

25         The story begins about -- a little less than two

1  weeks earlier, when on July 13th, Mr. Walsh attempted to

2  recruit Mr. Slovov to be his driver for the July 24th robbery

3  of the U.S. Bank, and that's Count 1 to which Mr. Walsh has

4  pleaded guilty.  Mr. Slovov turned down Mr. Walsh at that

5  point back on July 13th, but then on July 23rd, Mr. Walsh

6  again attempted to recruit Mr. Slovov to help with another

7  bank robbery the following day.

8  Unbeknownst to Mr. Walsh, Mr. Slovov told the FBI.

9  The FBI outfitted him with a mechanism for oral surveillance,

10  which I imagine was a wire.  And Mr. Slovov drove Mr. Walsh to

11  the TCF Bank parking lot.  They then drove to another parking

12  lot, where Mr. Walsh changed into the clothes that he wore for

13  the July 14th bank robbery, placed a revolver in the front of

14  his pants, a loaded revolver.  They drove back to the TCF

15  Bank, and then Mr. Walsh put up the mask that he had up to his

16  face.

17  At that point, law enforcement, which of course was

18  following because they had spoken with Mr. Slovov, ran up to

19  the car and arrested Mr. Walsh, who was found with the knit

20  cap, the clear plastic gloves, the rubber door stoppers, and

21  the loaded revolver that he had used during the U.S. Bank

22  robbery.

23  The fact that Mr. Walsh was in the car and not

24  walking, you know, on the sidewalk towards the bank or trying

25  to enter the front door doesn't matter.  Obviously, it would

1    be somewhat clearer had Mr. Walsh made it to the door, but he

2    certainly at that point had done more than enough, well more

3    than enough to have taken a substantial step towards

4    committing the bank robbery.

5         And given that, I find by a preponderance of the

6    evidence that he did commit attempted bank robbery under the

7    second paragraph of 2113(a) and, therefore, that the

8    four-level enhancement under 2K2.1(b)(6)(B) applies.

9         So, that finishes up the Guideline issue.  So, I

10   agree that without any departures -- and we'll talk about

11   that.  I'm going to raise a departure issue later on in the

12   hearing.  But without any departures, we have the Advisory

13   Guidelines range for Counts 1 and 4 as 36 to 78 months, the

14   Guidelines --

15             MR. KERWIN:  63 to 78, Judge.

16             THE COURT:  I'm sorry?

17             MR. KERWIN:  63 to 78.

18             THE COURT:  Right.  63 to 78 months for Counts 1

19   and 4.  The Guidelines range is actually a point for Count 2,

20   is 60 months, and that has to be consecutive to whatever

21   sentence is imposed on Counts 1 and 4.

22        So, why don't we talk about the other Guideline

23   issues.  We'll start with defense counsel, turn it over to the

24   government.  Then if Probation has anything to add, I'll give

25   Probation a chance.  And then we'll bring it back to defense

1  counsel to make any reply.

2  And then if Mr. Walsh would like to address the
3  Court, he'll have the opportunity, though not the obligation,
4  to do so.

5  And when defense counsel is done with his
6  presentation, I am going to raise the departure issue with him
7  to get his input on that.

8  Go ahead.

9  MR. BOYLE:  Thank you, Judge.  As we've argued in
10  detail in our written sentencing memorandum, I think the most
11  significant factor is Mr. Walsh is 73 years old.  He has
12  significant health concerns.  He has extensive criminal
13  history.  There's no dispute about that.  But as I argue in
14  our memorandum, he was significantly punished for that,
15  especially the sentence he received for that armed robbery,
16  which almost brought him to where he is at the time of the
17  bank robbery.

18  It is significant that Mr. Walsh -- the period from
19  being released from that sentence and his involvement in the
20  bank robbery was the longest time he had been out perhaps in
21  his adult life.  He was out for, I think, about nine months.
22  I think Mr. Walsh can correct me if I misspeak.

23  THE DEFENDANT:  Nine months and 22 days.

24  MR. BOYLE:  And he was working, and he was working in
25  a difficult job.  He was working essentially in food service

1  going into a freezer, you know, unloading frozen foods and

2  storing them, very difficult work for a man of his age.

3      He has significant degeneration in his knees.  He is

4  hoping that he will get knee replacements.  We talked about

5  and the probation officer reached out to the MCC and got

6  confirmation of the health issues that he is suffering from

7  and that he's getting treatment from, and that's mentioned in

8  the Probation -- the presentence report.

9      And he just couldn't handle it, couldn't take it

10 anymore.  The pain was too much.  And I've spoken to a good

11 friend of Mr. Walsh.  I think he misunderstood my request.  He

12 wrote a letter to me instead of your Honor.  But he talked

13 about how he knew David during this period of time.  He'd be

14 working.  He'd be coming home, I don't know, 2:00 or 3:00 in

15 the morning, exhausted and in pain from that job.  And it

16 frankly led to desperation here.

17     And there's no question.  To Mr. Walsh's credit, this

18 has been an interesting case.  Mr. Walsh is certainly an

19 intelligent, engaged gentleman, and -- but when it really came

20 down to it, Mr. Walsh did the right thing here.  He accepted

21 full responsibility.

22     There really has been no significant dispute about

23 the facts.  Long before I got into the case, I'm sure your

24 Honor will remember that Mr. Walsh said, "Listen, I'm going to

25 plead guilty."  Everyone was trying to say, "Well, Mr. Walsh,

1  take a deep breath.  You really shouldn't be saying these

2  things.  Your case is just getting started."  But he's like,

3  "No, I'm going to plead guilty to bank robbery.  I committed

4  that bank robbery."

5          THE DEFENDANT:  Something happened to the audio.

6          THE COURT:  Right.  We're losing you in the audio.

7          THE DEFENDANT:  We're losing you in the audio.

8          MR. BOYLE:  Me?

9          THE COURT:  Yes, you.

10          MR. BOYLE:  You can't hear me?

11          THE DEFENDANT:  I can hear you now.

12          THE COURT:  Mr. Walsh, let me take care of the audio.

13          THE DEFENDANT:  Okay.

14          MR. BOYLE:  Can you hear me now?

15          THE COURT:  Yes.

16          MR. BOYLE:  Okay.

17          THE COURT:  So, where we lost you -- where we lost

18  you was, you said, quoting Mr. Walsh, or paraphrasing him,

19  "And he said, 'No, I'm going to plead guilty to the bank

20  robbery.  I committed that bank robbery.'"  And then you cut

21  off.

22          MR. BOYLE:  Thank you, Judge.  I think, really, the

23  one issue was the attempted bank robbery, which we briefed,

24  and I think as you accurately described it, it was really a

25  legal dispute.  It really wasn't a factual dispute.

1          And again, because he did the right thing, accepted

2   responsibility, he's getting credit for the acceptance of

3   responsibility.  And at the conclusion of this, that count

4   will be dismissed.  So, I think that's significant.  I think

5   that was pretty telling, that, you know, he can accept

6   responsibility.  He's going to serve his sentence.

7          THE COURT:  You got cut off again, counsel.

8          MR. BOYLE:  Can you hear me now?

9          THE COURT:  Yeah.  You said --

10          THE DEFENDANT:  Yeah, I'd like to -- damn.

11          THE COURT:  Mr. Walsh, let me deal with the audio,

12   please.

13          MR. BOYLE:  Okay.

14          THE COURT:  You said, "I think it's pretty telling,

15   you know, he can accept responsibility," and then you got cut

16   off.

17          MR. BOYLE:  He has demonstrated that he can be

18   perfectly rational about moving forward.  Mr. Walsh is going

19   to serve his sentence.  Unfortunately, we have the 60-month

20   mandatory minimum.  He will serve that time.  He has expressed

21   a desire to take full advantage of any vocational training so

22   that when he completes his sentence, despite his age, he wants

23   to go back to work.  He wants to support himself in a

24   legitimate manner.  And I think he will do that.

25          It's just again, as far as the nature of the offense,

1    there's no question that it was serious; but Mr. Walsh, I

2    think, as the video and the facts suggest, it was very

3    efficient.  He wasn't screaming.  He wasn't threatening.  All

4    he wanted was to get in and out of there as quick as possible

5    with some money.  And when there was a slight hesitation, he

6    displayed the firearm, but that was it.

7           And fortunately, he obtained some money and left as

8    soon as possible.  It was a very -- again, not under -- not

9    suggesting this wasn't serious, but just those simple facts.

10   He didn't go in there screaming, waving a gun around,

11   threatening people.

12          So, again, we've talked about the other issues.

13   We've talked about that he did take advantage of counseling

14   and classes, obtained three certificates while in the MCC.

15   Obviously, at his age in the MCC during this pandemic, it was

16   obviously the last place on Earth anybody would have wanted

17   to be.  He got through that.

18          He will serve his sentence.  He'll take advantage of

19   everything that the Bureau of Prisons offers him.  And he

20   will -- again, you know, we're requesting essentially the

21   60 months and a day for the Counts 1 and 4.  I know that's a

22   big ask; but again, we're doing that because of his age, and

23   because ultimately he did the right thing, he accepted

24   responsibility.  And again, I think when you take all of those

25   factors into consideration, that is a sentence that's

1  sufficient but not greater than necessary to accomplish the

2  various goals that you're grappling with to impose a fair

3  sentence, your Honor.

4       Thank you.

5       THE COURT:  Thank you.  Let me raise one question;

6  and this is not something that either of the parties raised,

7  but it's something that occurred to me.

8       Mr. Walsh has a criminal history category of III, and

9  given his criminal history category, that struck me as not

10  reflective of his actual criminal history.  And the reason --

11  I guess the technical reason why his criminal history category

12  is III rather than something higher is because he did not

13  receive any criminal history points for the armed robbery back

14  in the '60s, which I imagine is because it was so long ago; he

15  did not receive any criminal history points for the unlawful

16  use of a weapon conviction that involved, among other things,

17  a loaded Uzi submachine gun, and that, I believe, was from the

18  '80s; and he didn't receive -- and the reason he didn't

19  receive any criminal history points for that is because the

20  underlying statute was held unconstitutional, the Illinois

21  state statute; and then most significantly, he didn't receive

22  any criminal history points for the murder of the police

23  officer.

24       And given that, I think that's what resulted in the

25  criminal history category being III.  And again, I'm not

1    saying that the Guidelines range was incorrectly calculated --
2    I'm sorry, the criminal history category was incorrectly
3    calculated.  It was as a technical matter.  But
4    Section 4A1.3(a) of the Guidelines allows for an upward
5    departure under these circumstances if reliable information
6    indicates that the defendant's criminal history category
7    substantially under-represents the seriousness of the
8    defendant's criminal history or the likelihood that the
9    defendant will commit other crimes.
10           And in making that evaluation, the Court can consider
11   prior sentences of substantially more than one year imposed as
12   a result of independent crimes committed on different
13   occasions.  And the departure, if there is one, is to be to
14   the criminal history category applicable to defendants whose
15   criminal history or likelihood to recidivate most closely
16   resembles that of the defendant.
17           Given the extreme seriousness of two of those three
18   convictions for which there's no criminal history points, the
19   murder of a police officer and the armed robbery, and the -- I
20   don't want to call it extreme seriousness, but the very
21   serious nature of the UUW, I'm inclined to think, subject to
22   hearing from counsel, that a departure, an upward departure
23   to category V would be appropriate, although I would be
24   inclined to be very conservative and go only up to criminal
25   history category IV, which would be very, very conservative,

1    given -- given the actual criminal history.

2            And if these prior offenses were for serious

3    offenses, but offenses like drug-dealing or burglary, I would

4    just say, "Well, whatever.  That's just how the cookie

5    crumbles with these Guidelines calculations."  But this is an

6    armed robbery, possession of a --

7            THE DEFENDANT:  What prior offenses are you talking

8    about?  The one murder on a police officer, that happened.

9    There was no other armed robbery.  An armed robbery from the

10   '60s was a probational offense. You're making up some

11   nonsense.

12           THE COURT:  And especially the murder of a police

13   officer.

14           THE DEFENDANT:  That happened over 50 years ago, man.

15   That was another century.  I don't take that --

16           MR. BOYLE:  Mr. Walsh, let me -- Mr. Walsh, could you

17   please allow me to respond to the judge?

18           THE DEFENDANT:  Yeah, go ahead.

19           THE COURT:  So, given all that, I'm tentatively

20   inclined, again, subject to hearing from counsel, to make an

21   upward departure under 4A1.3(a) to have Mr. Walsh be a

22   category IV rather than a category III.

23           So, let me ask -- first let me ask Probation for your

24   thoughts and the government for your thoughts; and then I'll

25   turn it over to defense counsel, who then can respond to

 1 | everybody.
 2 |      Probation?
 3 |      MS. KWONG:  Okay.  Do you want me to go first, your
 4 | Honor?
 5 |      THE COURT:  Yeah, if you have any thoughts.  And if
 6 | you don't, that's fine.
 7 |      MS. KWONG:  I just -- I did look at that, and what I
 8 | came up -- what I ultimately decided was not to recommend an
 9 | upward departure because, based on the assignment of the
10 | criminal history points, due to the ages of the case, I think
11 | the Sentencing Guidelines pretty much, you know, reflected the
12 | age of the case.  They were older offenses.
13 |      And the conduct in them, as you said, was serious.
14 | And I took that piece into consideration in making the
15 | sentencing recommendation for this specific case.
16 |      THE COURT:  Okay.  Thank you.
17 |      Government?
18 |      MR. KERWIN:  Judge, I'd just add, similar to what
19 | Probation's expressed, certainly we're in agreement that the
20 | crimes that Mr. Walsh has in his history are jarring and, you
21 | know, form a criminal record that is -- would be difficult to
22 | find in anyone else unless they've lived a lifelong -- an
23 | entire life where they've committed violent crime after
24 | violent crime like this.
25 |      I would just note for the Court for what it's worth,

1 | if Mr. Walsh were to bump up to category IV, the low end of
2 | that Guideline would be 77 months consecutive to the
3 | 60 months.  The high end of the Guideline, which is what the
4 | government has asked for and what Probation has recommended,
5 | is 78 months, consecutive to the 60.

6 | So, at least as to the low end of category IV, we're
7 | talking about something in the same range.  So, I'd just leave
8 | it at that, and that -- you know, submit that that did factor
9 | in to the government's consideration about whether it was
10 | appropriate to go up to a IV or remain at III.

11 | THE COURT:  Okay.  Defense counsel?

12 | MR. BOYLE:  Well, Judge, again, forgive me if you're
13 | getting distortion on my end.  I am getting some distortion
14 | from you guys.  Are you hearing that at all from anybody else?

15 | THE COURT:  No.

16 | MR. BOYLE:  Okay.  Well, unfortunately, I'm using a
17 | phone today instead of a laptop, so that's my fault.

18 | But briefly, your Honor, as we argue in the
19 | memorandum, we're not questioning the seriousness of the
20 | offense.  And I think Mr. Walsh was questioning what armed
21 | robbery you were talking about.  I think you were referring
22 | to the one from 1987 --

23 | THE COURT:  No.

24 | MR. BOYLE:  -- that apparently he went to trial on --
25 | THE COURT:  No, no.

1      MR. BOYLE:  Well, there's the much older one.

2      THE COURT:  Yes.  The one that didn't give him any

3  criminal history points.  It's in paragraph 55 of the PSR on

4  page 11.

5      MR. BOYLE:  Right.  Okay.  And I guess what I was

6  suggesting is that sometimes when a defendant has much older

7  convictions that aren't counted just because of the age of

8  them and so they don't result in criminal history points, I

9  think, you know, the judge can look at that and say, "Well,

10  that's not really fair here," or if someone just was kind of

11  dancing through the raindrops and catching a lot of arrests

12  and convictions and just getting very minor sentences for some

13  reason, probation on probation or something.  Again, as we

14  argue, again, I can't suggest that these aren't serious

15  offenses; but I would suggest that he's been significantly

16  punished for all of these every step of the way.

17      And again, I know you weren't specifically referring

18  to the '87 armed robbery, but that judge, you know, gave him

19  60 years for that offense, which I think is -- obviously, he

20  was punishing him for that case and all of that other -- those

21  prior cases.

22      And so I think he has certainly paid a price for his

23  prior criminal conduct. I think respectfully what your Honor

24  should be focusing on are the specific facts of that bank

25  robbery on that day, which is what he pled guilty to.

1    So, I think certainly with the mandatory minimum 60,

2    and then the additional Guideline range that it calls for even

3    with him remaining in the category III, that is a significant

4    amount of time; and it would just be, I would suggest,

5    re-punishing him for crimes that he's already been

6    significantly punished for.  I think the goal today should be

7    finding the fairest sentence for his conduct in committing the

8    bank robbery.

9    Thank you.

10    THE COURT:  All right.  I appreciate your --

11    everybody's thoughts.  I am going to depart upward under

12    4A1.3(a) and deem Mr. Walsh to have a criminal history

13    category of IV.

14    As I mentioned, there are three very serious crimes

15    for which Mr. Walsh didn't receive any criminal history

16    points, one of them being the murder of a police officer, one

17    of them being an armed robbery.  And let's put aside the armed

18    robbery.  Mr. Walsh is correct.  It was a probationable

19    offense.  I don't know how a stick-up with a gun is a

20    probationable offense, but it was Illinois in the '60s, so

21    maybe that's just what they did at that point.

22    But the murder, for which there's zero criminal

23    history points -- and granted, it was 1968, but still, it was

24    a murder of a police officer, on top of the unlawful use of a

25    weapon, where Mr. Walsh was involved in a traffic accident

1  where he struck some parked vehicles, left his car with a

2  loaded .38-caliber revolver, and then a search of his car

3  revealed a loaded 12-gauge shotgun and a loaded Uzi submachine

4  gun, along with numerous rounds of ammunition, the murder plus

5  that one certainly more than warrant an upward departure of

6  one criminal history category level.

7          So, I'm going to depart upward and consider Mr. Walsh

8  to have a criminal history category of IV, which again, it's

9  an adjusted Guidelines range; and the adjusted Guidelines

10 range is now, as Mr. Kerwin mentioned, 77 to 96 months for

11 Counts 1 and 4, and then Count 2 is an extra 60 months on top

12 of that.

13         All right.  Probation, anything you'd like to add on

14 the 3553(a) factors?

15         MS. KWONG:  Nothing else, your Honor.

16         THE COURT:  Okay.  Government?

17         MR. KERWIN:  Just a few things, Judge.  I mean,

18 you -- you're touching in your discussion on the upward

19 departure about a lot of the things that I wanted to hit on by

20 focusing on some of the acts that -- and convictions that

21 Mr. Walsh has in his past.  Obviously, the seriousness of

22 those offenses are clear.

23         The thing that I think stands out to the government

24 equally are the quick succession and the timing of those

25 different crimes when you compare them to each other, and the

1    recidivist nature of them.  And some of these -- and I'll --

2    I laid it out in the sentencing memo just how quickly after

3    Mr. Walsh was paroled or probationed in some of these

4    instances he then committed the next very serious crime.  It

5    just suggests very strongly that there's a criminal impulse

6    there that's deeply engrained and still very much active from

7    what we've seen in this case.

8            And we go back to the first armed robbery that you

9    alluded to was 1964, and Mr. Walsh somehow received only

10   probation.  Yet a year later, he was charged with and later

11   convicted of burglary and possession of burglary tools.  It

12   was just a few years after, while still on probation in the

13   burglary, that he committed the murder of the Chicago police

14   officer; and the facts of that case are that he shot him five

15   times in the chest.  So, it's a sentence and a conviction

16   that's old, as Mr. Walsh is arguing, but it's deeply

17   disturbing because this case here involves him walking around

18   with a loaded firearm with six bullets.

19           You know, a month after he served his 20 years in

20   prison for that crime, he's convicted of drug distribution.

21   He's paroled in July of 1984, and literally three weeks later

22   is when he had the UUW with the Uzi and the two other firearms

23   that are -- just happen to be with him as he's hitting parked

24   cars.

25           He gets paroled in that case on April 1st, 1987, and

1    it is literally 10 days later that he commits the armed
2    robbery at the restaurant, for which he was sentenced to
3    60 years.  You know, I cut and pasted the statement of facts
4    from the State's Attorney in that case because it provides
5    even more context and reads like it's coming from a horror
6    movie.
7            You know, he goes in -- and Mr. Boyle makes the point
8    that, you know, he's punished very severely for that and
9    suggests that that's sufficient time to sort of right his past
10   wrongs, but Probation very clearly lays out what happens even
11   while he's incarcerated in that case.
12           In 2000, he's prosecuted by the State for obstructing
13   justice because he's in possession of a handcuff key.  He's
14   sanctioned at least 16 other times in prison for fighting,
15   creating a dangerous disturbance, assaulting a prison staff at
16   one point, numerous instances of contraband possession.
17           He serves 30 full years in prison and is paroled in
18   October of 2017, and it's a mere nine months later that he's
19   committing the acts that bring us here today.
20           And I really have to push back on this notion that's
21   being advanced by Mr. Boyle that, you know, Mr. Walsh just
22   wanted to be quick and efficient and not harm anyone and just
23   get some money and leave.  He chose to bring a loaded revolver
24   with six bullets in it, at least to that second bank robbery
25   when the FBI intervened; and it stands to reason, based on the

1    similarities between the two, that the gun was loaded with
2    those same six bullets the first time around.

3         So, there are very real consequences and very real
4    anguish that he's caused everyone that was affected by these
5    events.  You know, Probation mentions in the PSR that one of
6    those bank tellers in that bank robbery had to be taken to a
7    doctor from the robbery before she could even be interviewed
8    by law enforcement because of the stress of the event, and she
9    ultimately miscarried the baby that she was pregnant with.
10   Now, Probation points out that, you know, the doctors were
11   unable to make that connection, you know, that his robbery
12   caused the loss of that child; but regardless, it underscores,
13   you know, that there is a very real and dangerous effect of
14   these acts.

15        So, it's the seriousness of the past conduct that
16   you've highlighted, your Honor.  It's the very quick
17   succession and the pattern over the course of 56 years that
18   continues to play out over and over.  And it's this conduct
19   in this case that's committed in that broader context that
20   informs the government's view that a sentence of at least
21   138 months, which is the top end of the Guidelines if he were
22   in criminal history category III, is -- I certainly don't
23   disagree with your Honor that his criminal history is
24   understated by category III and that IV is equally
25   appropriate; but it's the government's view that 138 months

1   is the minimum sentence necessary to promote respect for the

2   law, frankly, to protect the public from future crimes of

3   Mr. Walsh, as we've seen the public desperately needs, and to

4   hopefully once and for all deter Mr. Walsh from committing

5   future violent crimes when he's ultimately paroled in this

6   case.

7           THE COURT:  Thank you.

8           Mr. Boyle.

9           MR. BOYLE:  Well, Judge, again -- and we've already

10  made our argument, but I know it doesn't seem like a great

11  deal of time; but as the government accurately summarized, the

12  nine months after he was paroled was the longest period of

13  time in Mr. Walsh's adult life where he did stay out of

14  trouble.  He was working.  He was working a difficult job,

15  trying to support himself in a legitimate way.  Because of his

16  age and health concerns and the nature --

17          THE COURT:  Mr. Boyle, you cut out again.

18          MR. BOYLE:  I was just saying that once he receives

19  the vocational training, he will get better jobs.  He'll be

20  able to support himself.  And that is his only intention at

21  this stage.

22          Thank you, Judge.

23          THE COURT:  Okay.  Thank you.

24          Mr. Walsh, if you'd like to address the Court, I'd be

25  very happy to hear from you.  You're not obligated to, but if

1  you would like to, now is your chance.

2  THE DEFENDANT:  Okay.  I was paroled after 30 years
3  and six months.  Okay?  True, I've done extensive time in
4  prisons.  I did try and prove the fact that I could do when I
5  was released.  Okay?  I was working in these temporary labor
6  forces jobs, but I didn't have the vocational training to get
7  a wage that's livable.  Okay?

8  To begin with, when I got out, I didn't go to a
9  regular halfway house.  They sent me to a transition center
10  where they don't feed you.  Okay?  But I had to go to a food
11  pantry to get food to live on.  Okay?

12  They -- you go to these -- by the state.  You go to a
13  transition center.  You're there for 60 days.  If you don't
14  have the money to go to -- get an apartment or have family and
15  friends or anything, then they send you to another transition
16  center.

17  Now, as soon as I -- they paroled me from one alias
18  to another alias, so it was hard for me to get IDs from the
19  very beginning.  I've got my IDs through a social worker.  And
20  I started working immediately.  Actually in November, I
21  started working as a temporary labor services to get money for
22  an apartment.  Okay?  I kept getting food from the food
23  pantries so that I could do so.

24  I managed to save money, and I managed to get a Link
25  card.  Okay?  But as I was working, I was only working

1    maybe -- maybe at tops a month, month and a half, the $192

2    that they did give me for food went to $15.

3         And I did get a Social Security check.  It was for

4    $750.  When I got the check, I was still steadily working.

5    Somehow, they found out under that program, SSI or whatever,

6    and they cut it to 675 and were going to cut it down some more

7    and more.  And I'm working.

8         Now, I have to save enough money to get an apartment.

9    I have to get furniture.  I have to get everything else,

10   clothes and everything else.  I'm steadily working.

11        As I was working in the warmer environment in the

12   plastics, I was doing that, 12-hour jobs, five days a week,

13   making only 12 to $13 an hour.  It's not really a livable

14   wage, and you're not going to live well, and you're really

15   not going to have too much of anything on 12 or $13.  I

16   realize that it's a tough lesson to learn, but it's a lesson

17   that I have learned since being out.

18        True, I did do what I did, but I had no intentions of

19   hurting anyone, period.  That can be provable by looking at

20   the video.  If you looked at the bank robbery, clip one,

21   you'll see how shortly, I did pull out the gun and put it back

22   and was there.

23        Yeah, I said, "I'm not playing," but they closed the

24   drawer.  I didn't point no gun at nobody.  I didn't raise my

25   voice.  I didn't frighten anybody.  There was people in the

1    bank that didn't even know the bank was robbed.  Okay?

2           I realize that it's a serial offense and I'm going to

3    have to pay for the offense, but I don't want to pay for the

4    offense with my life.

5           I have a chance to do what I need to do, and I can do

6    it with vocational training.  I can do something at my age and

7    maintain.  Okay?

8           Here's the deal.  I was working those four -- first

9    four or five months, and these are jobs that really -- how

10    should I say this?  You're almost doomed to failure on them.

11    Okay?  I was -- at the end of a 12-hour shift, I'm on the end

12    of a line, and these machines are steadily pulling out stuff.

13    And I'm loading stuff, and I'm wheeling stuff in; and I threw

14    a pallet down on the floor after 12 hours.  And a female staff

15    unfortunately said to me, "Do not return."  So, that kind of

16    went.

17           Now I go back to the temporary labor service, and

18    they've got me working in freezers.  Well, these freezers

19    have big fans over them, and everything is frozen solid.

20    Okay?

21           I'm working on the lines, and I'm doing stuff; but

22    my hands are feeling it, and my knees are really feeling it.

23    My back is feeling it.  I'm 70-some years old.  I'm not young

24    no more.  I realize that the pain is -- I'm doing this for two

25    or three months.  I can't do it.  Okay?

1          So, I did what I did; but before that, I did seek to

2    get a job as a porter, right?  But they changed up the porter

3    spot at this bakery.  It was through the temp agency.  And

4    then they would put me back in the freezers again, and I

5    can't -- it's the summertime.  See a lot of times in those

6    temporary labor services, they had you working in the freezers

7    in the summertime because people don't want to work in them.

8    All right?

9          So, all I'm saying is that if you give me some type

10   of a chance, I get the 60 months, I take culinary art training

11   and a commercial driver's license training, then either one of

12   these two, I can have a livable wage to live on and live like

13   a normal human being.  You know what I'm saying?  You can't

14   live on that like that.

15         Now, I know people that have done this type stuff,

16   and they do this, but you know what they do?  They have two or

17   three of their family members, right, working the same place,

18   and they stay in one apartment.  That's the only way that

19   they can be able to do this type thing.  I'm telling you what

20   it is.

21         I tried to do the best I could to stay out and stay

22   legitimate.  I fell back on a bad way because I couldn't

23   continue working doing what I was doing and realizing that if

24   I got sick or anything else, I'm not going to be able to

25   maintain.  I'm not going to be able to live.

1      Rent was $700 a month.  Food runs 3, $400 every week

2  or every two weeks or so.  You're only making, like, 12 or

3  $1300 tops after taxes.  And I'm steadily paying in taxes.

4  If I make over $400, I'm only bringing home $320.  12, $1300,

5  700 for rent, they're cutting Social Security down on me.

6  They cut the Link card down to $58 a month.  So, I have to do

7  what I have to do to live.

8      This is what happened.  I did not want to hurt

9  anybody.  My intentions are not to hurt anybody.  I'm well

10  beyond that stage in my life.  Okay?  All I want to do is get

11  vocational training right now as I'm doing this time.

12      I had a -- I took a GED thing.  In fact, it was

13  offered in the state in the '70s.  That's mainly what they've

14  got on the state level right now for education is GED.  I got

15  that.

16      The vocational training wasn't offered to people

17  with a Class X felony, so I didn't have a chance to get any

18  vocational training.  I have a chance to get vocational

19  training now and do something with the remainder of my life.

20  I don't want to finish it out in some prison cell and die in

21  some prison over something like this.  All I want to do is get

22  out and stay out.  I tried my best to stay out.  I did stay

23  out longer than any other time in my life because I wanted to

24  do the right thing.  That was it.

25      That's all I have.  That's -- you know, I mean, I

1    tried to do the best that I could do under the circumstances.
2    You know?  I don't blame anybody for any of the circumstances.
3    I don't blame anybody else.  I'd blame me, but I'm not getting
4    me the vocational training and being able to have a livable
5    wage.

6          If I get that training now, I'll be able to come out,
7    and I'll be able to return to society as a productive person
8    in society.  You know what I'm saying?  I can live on 20, $30
9    an hour a month -- or 20, $30 an hour.  I can't live on no 12,
10   $13, or even $15 like that.  You're not going to have
11   anything.  And God forbid you get sick or anything.

12         But at least with my age, I could be a cook or I
13   could drive a vehicle.  I could drive a cab.  I could drive an
14   Uber.  I could drive a truck.  I could do these -- I could do
15   that in my old age and not return.

16         As is, I will -- the Social Security stopped payment,
17   and they got me down for owing them 1,600-some-odd dollars
18   because I was working.  I didn't have that -- that cushion to
19   lay on.  I just didn't have it.  I didn't have it, and I'm
20   trying to do what I can do.  That's all.  That's it.

21         THE COURT:  Go ahead.

22         THE DEFENDANT:  If I could do it over, I would have
23   had vocational training, and I would have never been in this
24   courtroom.  I would have never been in this situation at this
25   time.  It would have never happened.  It would have never

1   happened.  I was done with all that time and everything else
2   when I came out.

3          I didn't realize the situation the way it is and the
4   way it was, because a lot of times you're shut away in some
5   prison like that, and you don't realize it.  Even when I came
6   out, everything was just completely -- completely different.
7   Just everything changed.  Everything was gone.

8          All I'm asking for is a chance to get vocational
9   training and come out and -- that's all.  That's all I want to
10  do.  That's it, nothing -- nothing crazy.  I'm tired of the
11  craziness.  I've done enough crazy all my life.  Okay?  Too
12  much crazy.

13          That's all.  I'm set.  That's all.  That's it.
14          THE COURT:  Okay.  Thank you, Mr. Walsh.

15          I want to thank counsel for your excellent work
16  throughout this case.  This is a difficult case for any number
17  of reasons, and both lawyers did the absolute best they could
18  with the material that they were given.  So, I want to thank
19  them and compliment them for their work on this case.  I also
20  want to thank Probation for the very comprehensive Presentence
21  Investigation Report and the very helpful sentencing
22  recommendation.

23          In deciding upon a sentence, I'm directed by
24  Section 3553(a) of Title 18 to consider seven factors, and
25  I'll address those in turn.

1       MR. BOYLE:  Judge, I -- your Honor, I don't want to

2   interrupt you.  I'm afraid my technology is about to go off.

3   Can I transition to just a conference call?  Is there a number

4   I can call in on my office landline?

5       THE COURT:  Sure.  Jackie?

6       THE CLERK:  You can use the same telephone number.

7   Just use it on your telephone.  That same number that I sent

8   to your e-mail, just use that same number.

9       MR. BOYLE:  It seems like kind of a strange number,

10  though, 57135, that?

11      THE CLERK:  Yes.

12      MR. BOYLE:  Okay.  That's a landline to do a

13  conference call?

14      THE CLERK:  Yes.  You'll be able to hear us.  You

15  just won't be able to see us.

16      MR. BOYLE:  Okay.  I apologize.  I just know that I'm

17  going to lose this feed, so I will just call in right now.

18      THE COURT:  Okay.  Let us know when you're on.

19      You should just keep the video and then call in -- if

20  you can keep the video, keep the video and then call in by

21  another mechanism.

22      MR. BOYLE:  I've called in.

23      THE CLERK:  You'll need to mute your speaker on your

24  computer.  Okay?

25      MR. BOYLE:  I think it is.  Is that better?

1          THE COURT:  You need to mute your speaker on your

2  computer because otherwise we get feedback because you have

3  two -- actually, you need to mute your mic on your computer.

4  You don't need to mute your speaker.

5          MR. BOYLE:  Is that better?

6          THE CLERK:  You see the video?  You're able to mute

7  yourself.  It's a microphone with a little mark on it.

8          MR. BOYLE:  Yes, I've done that.  It's muted.  What

9  if I just leave this -- the video, and I'll just keep me on

10  the phone; is that fine?

11          THE COURT:  No, just keep -- just keep the video.

12          MR. BOYLE:  Okay.

13          THE COURT:  I think we're fine.

14          So, can you hear us, Mr. Boyle?

15          MR. BOYLE:  I can hear you, Judge.

16          THE COURT:  Okay.

17          MR. BOYLE:  I'm just afraid I'm going to lose the

18  video.

19          THE COURT:  All right.  So, subsection (a)(1)

20  requires me to consider the nature and circumstances of the

21  offense and the history and characteristics of the defendant.

22  The offenses here are very serious.  We have bank robbery in

23  violation of 2113(a).  We have possessing a firearm in

24  furtherance of a crime of violence, a violation of 924(c); and

25  then we have felon in possession of a firearm under 922(g).

1      The bank -- the first two convictions arose from a

2  bank robbery that occurred on July 14th of 2018.  Mr. Walsh

3  robbed the U.S. Bank in Chicago.  He wore a clear plastic

4  mask, Navy knit hat and gloves.  He propped open the door

5  using dark rubber door jams.  He demanded that the tellers

6  give him cash.  When they hesitated, Mr. Walsh showed them his

7  .357 revolver and told them, "I'm not playing."  And then the

8  teller relented.  That was a threat.  That's very clearly a

9  threat.  When you show somebody a gun, that is a threat.

10      And given that the revolver was loaded on July 24th,

11  I think I agree with the government it stands to reason that

12  the revolver was loaded on the 14th.  And while Mr. Walsh may

13  not have wanted to use the revolver, he could have used the

14  revolver.  And we know that he was able -- he had it in him to

15  use the revolver, given that he had put five bullets in

16  somebody's chest in another part of his life.

17      In terms of the felon in possession, Mr. Walsh,

18  10 days later, on July 24th, knowing that he had previously

19  been convicted of a felony, possessed the same .357 revolver.

20  And again, I think by a preponderance of the evidence he

21  committed attempted bank robbery of the TCF Bank; but even if

22  I'm wrong on that, and I don't think I am, he plainly was on

23  his way to rob that bank and had made all the preparations

24  necessary to do so.

25      So, the first robbery and the second, had there been

1    a robbery, they were very, very well-planned.  For the first

2    robbery, Mr. Walsh had hidden a bag between two garbage cans

3    behind an apartment building near the bank.  After the

4    robbery, he retrieved the bag, changed out of his disguise and

5    his clothes, packed his clothes and gun in the bag, and then

6    got on the Brown Line CTA at the Western Avenue station.

7            One of the tellers, who was pregnant at the time, had

8    to leave the bank for medical attention after the robbery.

9    She then suffered a miscarriage shortly after the robbery,

10   unclear, as the government acknowledges and Probation, whether

11   there was a causal connection between the bank robbery and the

12   miscarriage.  But the bank robbery surely did not help the

13   pregnancy.

14           And then I talked about the July 24th incident at the

15   TCF Bank, and I'm not going to repeat myself.

16           These were very, very well-planned events.

17   Oftentimes with bank robberies, you find that they are crimes

18   of opportunity, where somebody's in a bad way, is walking by a

19   bank, and just on the spur of the moment decides to rob the

20   bank.  That is not what happened here.  These were very, very

21   well-planned crimes.  One was completed.  The other one

22   wasn't.  And the second one wasn't only because of the good

23   work of law enforcement.

24           And I hear what Mr. Walsh is saying, what Mr. Boyle

25   said on his behalf about the situation that he was in after

1   his release from prison on the armed robbery charge.  He was

2   in his 70s.  It's tough to get work in any event, but

3   certainly with Mr. Walsh's criminal record.  And it's to his

4   credit that he found work, and it was very tough and hard work

5   working in a freezer in your early 70s when you have knee

6   problems.  And he wasn't making a lot of money.  I understand

7   all of that, and I understand that Mr. Walsh was having a

8   tough time after his release.

9           And had he committed some other kind of crime in

10  those circumstances, this would be a very -- this would be a

11  much different sentencing.  It would be a much different

12  sentencing.  But the crime Mr. Walsh committed was bank

13  robbery, and it was a well-planned bank robbery.  And it

14  wasn't just a bank robbery and a well-planned bank robbery;

15  it was an armed bank robbery.

16          So, Mr. Walsh wasn't walking by a bank and on the

17  spur of the moment went in, wrote down a note, and gave the

18  note to a teller.  This would be a different sentencing had

19  that been the case.  It would have been a serious -- it would

20  have been very serious, no doubt, but it would have been a

21  different sentencing.

22          If Mr. Walsh had even -- and I almost hesitate to say

23  this; but I will say it because it's true, and I'm always

24  100 percent honest at sentencings.  Had it been an unloaded

25  gun, definitely more serious than a note bank robbery; but an

1   unloaded gun, you could say, "You know what, that's extremely
2   serious, but no one was going to get shot, at least."  And it
3   wouldn't be a very, very different sentencing, but it would be
4   a different sentencing than we have right now.

5          But Mr. Walsh had a loaded gun, a loaded gun to a
6   bank robbery, to two of them.  One of them obviously was
7   interrupted, which is why it's an attempted robbery, for which
8   he's not convicted, but which I'm considering the conduct.
9   And that just makes this -- it makes it a different
10  sentencing.  It -- I understand Mr. Walsh's situation that he
11  was in, but under no conceivable set of circumstances can
12  carrying a loaded gun to a bank -- two bank robberies be
13  viewed as anything other than it was, which was Mr. Walsh was
14  in a tough situation, and he was desperate; but he walked in
15  to one bank and was about to walk in to the other bank, not
16  with a note, not with an unloaded gun, but with a loaded gun,
17  which he has shown in his life that he was able to use because
18  he pumped five bullets into that man's chest in the late '60s.

19         And that's why this sentencing hearing is what it is,
20  and that's why I'm listening to Mr. Walsh about his situation,
21  I'm considering it, but it's not moving the needle at all.  It
22  would have moved the needle had it been a note job.  It
23  probably would have moved the needle a little bit had it been
24  an unloaded gun; but the fact that it was a loaded gun, its
25  circumstances no longer move the needle in terms of my

1  sentencing considerations.

2  Mr. Walsh's personal history, I'll start with the

3  criminal history.  It's extensive.  A 1964 armed robbery, for

4  which he received supervision; 1965 possession of burglary

5  tools, 90 days; 1969 conviction for murder of a police

6  officer, indeterminate sentence of 20 to 40 years; 1984

7  marijuana trafficking, I haven't even mentioned that just

8  because it's insignificant, relatively speaking, to the other

9  crimes, six months; 1984 unlawful use of a weapon, that was

10  the Uzi and the shotgun, two years; 1988 armed robbery,

11  60 years, for which Mr. Walsh served day for day, released in

12  October of 2017; and then 2000, as the government pointed out,

13  obstruction of justice, Mr. Walsh possessed a handcuff key in

14  prison and got one year on that.

15  The revolving door is extremely significant here.

16  Mr. Walsh was paroled from his murder sentence on May 11th,

17  1983. He committed the marijuana trafficking on June 17th,

18  1983, just over a month later.

19  He was paroled from the marijuana trafficking on

20  July 17th, 1984, committed the unlawful use of a weapon on

21  August 8th, 1984, about three weeks later.

22  Paroled from that sentence, the weapons sentence, on

23  April 1st, 1987, committed the armed robbery on April 12th,

24  1987.

25  Paroled from that on October 2nd, 2017, and then, as

1    everybody's discussed, nine months later, a little more than
2    nine months later committed the U.S. Bank robbery, which was
3    his longest time out of prison for quite some time.

4              Mr. Walsh was raised in this area.  He's currently
5    73 years old.  He has physical and medical issues that are
6    typical for a man in his 70s.  And by saying that, I don't
7    mean to diminish their importance.  They're important, but
8    they're not atypical.  And we've heard about Mr. Walsh's
9    knees, the degenerative arthritis, and I'm sure that's very
10   painful.

11             Mr. Walsh attended two years of high school and later
12   earned his GED.  And as I mentioned, after he was released
13   from the armed robbery sentence, he did, to his credit, got a
14   job.  It was very difficult work; and I'm sure it was hard on
15   his knees, and I'm sure it was difficult working in a freezer.
16   And I'm certainly considering that.

17             Mr. Walsh has availed himself of various educational
18   programs at the MCC that I am considering, his statement that
19   he would like to get vocational training so that he can be
20   gainfully employed -- get gainful employment upon his release.

21             Mr. Walsh admitted his guilt, he pleaded guilty.  He
22   gets three levels of credit for that.  And as Mr. Boyle said,
23   you're right, Mr. Boyle, Mr. Walsh admitted his guilt before
24   he even entered a plea of guilty, despite our best efforts to
25   stop him from saying what he was saying during those status

1  hearings.

2       MR. BOYLE:  Thank you, Judge.  And again, I apologize

3  for the technology.  If you've lost my video feed, I

4  apologize.  But I can hear everything, so thank you.

5       THE COURT:  Yeah, we can hear you.

6       Subsection (a)(2) requires me to consider the need

7  for the sentence imposed to accomplish the various purposes of

8  criminal punishment.  The first is to reflect the seriousness

9  of the offense and to promote respect for the law and to

10  provide just punishment for the offense.  I've already talked

11  about the offenses and won't repeat myself.

12       The second purpose is to afford adequate deterrence

13  to criminal conduct.  The sentence will do that.  It will

14  hopefully send a message to anybody who's listening that they

15  should not be committing armed bank robbery or, if you're a

16  felon, that you shouldn't be possessing a weapon.

17       The third purpose is to protect the public from

18  further crimes of the defendant, and that, unfortunately, is a

19  very significant factor in this case.  Mr. Walsh has served a

20  lot of time in prison.  He's got a lot of convictions.  And

21  the messages that those convictions were supposed to send were

22  not received by Mr. Walsh.  It's been a revolving door, from

23  prison to outside to prison to outside to prison to outside.

24       And I do understand Mr. Walsh's statement that he

25  would like to chart a different path for himself in the future

1  and get some vocational training and make a better life for

2  himself, but the path he has charted thus far makes me

3  extraordinarily concerned that -- about the very, very high

4  risk that we're going to see more of the same when Mr. Walsh

5  is released.

6           Subsection (a)(3) requires me to consider the kind of

7  sentences available.  There's a 25-year maximum term for bank

8  robbery, which is Count 1.  Count 2, the 924(c), the minimum

9  is five years.  The maximum is life.  And that has to be

10  consecutive to any other sentence imposed.  Count 4, which is

11  the felon in possession, there's a 10-year maximum term, which

12  can be concurrent to the bank robbery term.  It would have to

13  be consecutive to the 924(c).

14           The Guidelines range is subsection (a)(4).  Without

15  the adjustment, the Guidelines range for Counts 1 and 4 is

16  63 to 78 months.  As I explained, I am doing an upward

17  departure under 4A1.3(a), so the Guidelines range for Counts 1

18  and 4 is 77 to 96 months.  And then the Guidelines point for

19  Count 2, which must be consecutive, is 60 months.

20           (A)(5) are Guideline policy statements.  None have

21  been referenced.

22           (A)(6) is the need to avoid unwarranted sentence

23  disparities among defendants with similar records who have

24  been found guilty of similar conduct.  As the Seventh Circuit

25  has held time and again, that weighs in favor of a Guidelines

1   sentence.

2       (A)(7) is restitution, and there is a small

3   restitution aspect of this sentence, the money that was taken

4   from the U.S. Bank, which is about $3700; but that's an

5   insignificant factor, given all the other factors.

6       So, at this point, let me ask Mr. Boyle, are there

7   any main arguments in mitigation that the defendant has made

8   that I have not addressed?

9       MR. BOYLE:  I don't believe so, Judge.  And just so

10  the record is clear, we are objecting to the four-level

11  enhancement, the use of the firearm during the attempted

12  robbery.  We didn't feel that the facts supported that that

13  was determined beyond a preponderance.  And we also are

14  objecting to the category IV upward departure for his criminal

15  history.

16      But I think you've been very patient with us, both in

17  my arguments and Mr. Walsh's arguments.  I think we've made

18  all of our arguments in mitigation, so thank you.

19      THE COURT:  Okay.  Thank you.  And you've waived

20  nothing.  And just because I've addressed everything doesn't

21  mean that you agree with the way in which I've addressed them.

22  And all of those arguments are certainly available to you if

23  Mr. Walsh chooses to appeal the sentence.

24      So, I've considered everything that's been submitted

25  in writing, everything that's been said here at the sentencing

1  hearing.  And it's my obligation to impose a sentence that is

2  sufficient, but no more than necessary, to fulfill the

3  purposes of 3553(a).

4      I'm going to impose a custodial sentence on Mr. Walsh

5  as follows:

6      For Counts 1 and 4, I'm going to impose concurrent

7  sentences of 96 months, which is the top end of the adjusted

8  Guidelines range.  And for Count 2, I'm going to impose a

9  consecutive sentence of 60 months.  And that results in a

10  total sentence of 156 months.

11      Why the top end of the adjusted Guidelines range?

12      THE DEFENDANT:  Because you're a filthy stinking pig,

13  you mother-fucker, and I'd blow your fucking brains out.  That

14  was a fucking -- I not only would blow your fucking brains

15  out, you pig, but I would kill your entire fucking family and

16  torture and murder each and every fucking one of them, you

17  filthy, mother-fucking lying pig mother-fucker, you.

18      Suck my dick, bitch.  Did you get that down on,your

19  fucking little paper?  Eat shit and die, you faggot

20  mother-fucker.  I don't give a fuck what you're gonna do,

21  bitch.  That's what the fucking reason is. I don't give a

22  fuck, and I don't give a fuck about coming home, dying in

23  prison, doing whatever the fuck I'm gonna do.  I am what I am,

24  and I'm gonna be what I am, you mother-fucking lying coward

25  pig bitch.

1    That's what the fuck you are, a lying coward pig

2  mother-fucker.  When you look in the mirror, say, "I'm a lying

3  coward pig mother-fucker," because you're sucking the

4  mother-fucking Attorney General's dick with that bitch shit,

5  you political punk ass mother-fucker.

6    That's what I'm saying.  And without any craziness

7  that follows it, that is what I feel.  I would blow each one

8  of your eyes out with a mother-fucking .357 and your brain,

9  with no fucking hesitation.  I would kill you and your entire

10 family.  I think nothing about you.  I don't give a fuck about

11 a life sentence.  That's what you just sentenced me to.  Suck

12 my dick, bitch.

13    Put that on that fucking record.  Have that down in

14 that sentencing transcript. I'd like to get a copy of that

15 fucking sentencing transcript sent to me.  Okay?  If you can

16 do that, that would be really appreciated, you mother-fucker,

17 you.  Suck my dick, bitch.  You don't do me nothing.

18    Suck my dick, mother-fucker, you.  That's what time

19 it really is.  I don't give a fuck, bitch.  We're done.  I'm

20 done.  Suck my dick.  If you can make it a life sentence,

21 boogie woogie the life sentence, you mother-fucking faggot.

22 That's what time it is, you mother-fucker, you.

23    You're giving me nothing.  You don't take into

24 consideration any fucking thing, you lying coward bitch.  What

25 you took into consideration is some political shit with your

1  finger in your ass.  That's what the fuck you did.

2  Not true.  You did honestly say a lot of things.

3  And, yeah, I have a propensity for some violence, but I did

4  try to do what I said I was going to do.  But yeah, I said

5  what I said, and I meant what I said, and I mean what I say,

6  and I don't give a fuck what you think.  Okay?

7  You -- that mother-fucker over there, lousy Lausch,

8  whatever that faggot mother-fucker is doing, I don't give a

9  fuck what you do.  I don't give a fuck about the Probation

10  lady.  I don't give a fuck about the prison.  I don't give a

11  fuck about any of that shit, period, in life.

12  That's where I am.  Put that down on your record.

13  I'd like a copy of my fucking sentencing transcript.  Send it

14  directly to me, David Walsh, 52186424, MCC.  Send that on to

15  me so I can start the appeal, you mother-fucker.

16  That's what time it is.  I don't give a fuck what

17  you're gonna do, you greedy mother-fucker.

18  THE COURT:  Anything further, Mr. Walsh?

19  THE DEFENDANT:  No, no, not at all.

20  THE COURT:  Okay.  I'm not going to yet impose a

21  sentence.  So, the sentencing hearing is going to remain open,

22  and we're going to continue the sentencing hearing for a week

23  or two.  And I can't give you a date and time right now, but

24  Jackie will give you --

25  THE DEFENDANT:  (Defendant laughing.)  Hey, suck a

1  dick, bitch, with your mother-fucking 96 and your 60.  Stick
2  that in your asshole and twist it around a little bit.  I'm
3  not -- hey, fuck you, and fuck that time, bitch.
4         Guard --
5    (Announcement:  "This meeting is being recorded.")
6         THE DEFENDANT:  You can continue to do, send what the
7  fuck you're going to send in the fucking mail.  Have my
8  attorney call me, and send that fucking transcript to me,
9  mother-fucker.  That's what you do.
10        Other than that, suck my dick, bitch.  Fuck you, and
11  fuck that sentence.  I don't give a fuck about 35 to life or
12  10 life sentences and 3,500 fucking years.  Suck my dick,
13  bitch.  That's it.
14        Mr. Boyle, did you hear what the fuck I had to say?
15        MR. BOYLE:  I did, Mr. Walsh.
16        THE DEFENDANT:  Good.  Listen to me very carefully.
17        MR. BOYLE:  Mr. Walsh, I will put in a request for a
18  legal call with you.  I would suggest just let me speak for
19  you at this stage.  Okay?
20        THE DEFENDANT:  Yeah, yeah.  Do that.  Fuck that pig
21  mother-fucker, piggy ass mother-fucker.  Yeah, cute boy.  I
22  would murder you and your entire fucking family with no
23  fucking hesitation.  You got that right.  I would do that,
24  with no fucking hesitation.
25        I'd come in there and torture and murder your family

1   one by fucking one, you mother-fucker, you.  And I would fuck

2   your old lady in the ass, cut her fucking throat, and I would

3   torture you for days.  That's what I would do for you, you

4   mother-fucker.  That's what I think about you, your laws,

5   rules, and regulations, you fucking filthy pig.

6            I want a copy --

7            MR. BOYLE:  Your Honor, I apologize for this.  I know

8   that this setting is difficult --

9            THE COURT:  Mr. Boyle, please let Mr. Walsh speak.

10           THE DEFENDANT:  Thank you.  You're a hell of a

11  gentleman, even though you're a lying coward pig.  So go

12  ahead.  You better go ahead and do what you're going to do

13  while you can do it, sweetheart.  That's all the fuck I've got

14  to tell you.

15           Hey, Mr. Boyle, you make sure you get that fucking

16  transcript, and if I've got to go another week to listen to

17  this mother-fucking pig -- because I don't have no respect for

18  no law, rules, and regulations any fucking way, and I never

19  have, and I never fucking will.  I am what I am, and I ain't

20  worried about shit, you mother-fucker, you.

21           MR. BOYLE:  Mr. Walsh, yes, this is all being taken

22  down, and you will get a transcript of this.

23           THE DEFENDANT:  Good.  As far as that fucking

24  transcript goes, I want a copy of that.

25           MR. BOYLE:  You will get a copy of this transcript,

1   Mr. Walsh.

2         THE DEFENDANT:  When is this mother-fucker going to

3 have his final fucking word on a fucking sentence, this creepy

4 mother-fucker?

5         MR. BOYLE:  Mr. Walsh, I think --

6         THE DEFENDANT:  And you acknowledge that you are a

7 creep, you mother-fucker, you.  I would blow your fucking

8 brains out and think nothing of it, man.  You can really rest

9 assured on that.  I'd think nothing about killing you.

10 Cutting your fucking throat and watching you bleed out would

11 give me great fucking pleasure.  That's what the fuck it would

12 do, great pleasure.

13         Under the right circumstances and setting, you're

14 right, I would kill you.  I'd kill that mother-fucker with his

15 good little ass, too, you mother-fucker, you.  I'd kill you in

16 a heartbeat.  I'd feel nothing about killing you.  And that

17 bitch, I'd kill her, too.  I'd cut her fucking throat in a

18 heartbeat.

19         I'd feel nothing for you mother-fuckers, nothing at

20 all, man, because you don't feel nothing for me.  You're in

21 that little bullshit system of yours.  You can suck my dick.

22         Put it all down there on that fucking paper.  I love

23 it.  Do what the fuck you've got to do.

24         Hey, Mr. Boyle, now, let me get this right.  This

25 mother-fucker is going to continue this sentencing shit?

1       MR. BOYLE:  Mr. Walsh, I believe the Court is still

2   in session.  Yes, there will be a date.  I believe we are

3   still in session.  Unfortunately, my video is no longer

4   working, but I believe the Court is still in session.

5       THE DEFENDANT:  What I admitted to this creepy punk

6   mother-fucker.

7       MR. BOYLE:  Mr. Walsh --

8       THE DEFENDANT:  He is what he is, and I am what I am,

9   and I -- it is what it is, man.  The mother-fucker better kill

10  me or make sure I'm dead.  That's what he'd better fucking do.

11  If I get a chance to get out there, I'd kill him and his

12  entire fucking family, and I wouldn't give a shit about a gun

13  charge or a thousand other fucking charges and millions of

14  fucking years, millions and billions of fucking years.

15      Not a fucking -- you ain't worth two dead fucking

16  flies to me.  Put them all down.

17      Thank you.  Thank you.  Thank you, you mother-fucker,

18  you.

19      THE COURT:  Jackie will get in touch with counsel and

20  with Probation, and we'll set this for a continued sentencing

21  hearing in another week or two.

22      THE DEFENDANT:  Good.  I hope to see you.  I hope you

23  die of cancer, you faggot mother-fucker.

24    (Defendant laughing.)

25      THE COURT:  Until we get back together, be well,

1 everybody.

2          MR. BOYLE:  Thank you, your Honor.

3          MR. KERWIN:  Thank you, your Honor.

4          MR. BOYLE:  I will schedule a call with you,

5 Mr. Walsh.  Thank you, everyone.

6          THE DEFENDANT:  Fuck that faggot mother-fucker.

7     (Which were all the proceedings heard this date.)

8                         CERTIFICATE

9     I certify that the foregoing is a correct transcript from

10 the record of proceedings in the above-entitled matter.

11

12 */s/Charles R. Zandi*                *October 7, 2020*

13 _____     _____
   Charles R. Zandi              Date
14 Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25