1    IN THE UNITED STATES DISTRICT COURT
     FOR THE NORTHERN DISTRICT OF ILLINOIS
2    EASTERN DIVISION

3
     UNITED STATES OF AMERICA,            )
4                                         )
                     Plaintiff,           )
5                                         )
     -vs-                                 )  Case No. 18 CR 450
6                                         )
     DAVID WALSH,                         )  Chicago, Illinois
7                                         )  December 17, 2020
                     Defendant.           )  10:30 a.m.
8

9            TRANSCRIPT OF VIDEOGRAPHIC PROCEEDINGS
             BEFORE THE HONORABLE GARY FEINERMAN
10

11   APPEARANCES:

12   For the Government:      HON. JOHN R. LAUSCH, JR.
                              UNITED STATES ATTORNEY
13   (via video conference   BY:  MR. CHRISTOPHER K. VEATCH
     call)                   219 South Dearborn Street, Suite 500,
14                           Chicago, Illinois  60604
                             (312)353-5300
15

16   For the Defendant:      LAW OFFICES OF PATRICK E. BOYLE
                             BY:  MR. PATRICK E. BOYLE
17   (via video conference   155 North Michigan Avenue
     call)                   Suite 562
18                           Chicago, Illinois  60601
                             (312) 565-2888
19

20

21
     Court Reporter:
22
                     CHARLES R. ZANDI, CSR, RPR, FCRR
23                      Official Court Reporter
                     United States District Court
24          219 South Dearborn Street, Room 2144-G
                     Chicago, Illinois  60604
25              Telephone:  (312) 435-5387
             email:  Charles_zandi@ilnd.uscourts.gov

1      (Proceedings heard in open court:)

2              THE COURT:  Good morning, everybody.

3              Jackie, could you please call the case.

4              THE CLERK:  Good morning.  18 CR 450, USA versus

5      Walsh.

6              THE COURT:  Good morning.  Who do we have for the

7      government?

8              You're on mute.

9              MR. VEATCH:  My apologies, your Honor.  Good morning,

10     your Honor.  Christopher Veatch on behalf of the United

11     States.

12             THE COURT:  Defense counsel?

13             MR. BOYLE:  Good morning, your Honor.  Patrick Boyle

14     on behalf of Mr. David Walsh, who's joining us via video from

15     the MCC.

16             THE COURT:  And, Mr. Walsh, is that you?

17             THE DEFENDANT:  Yes, it's me.

18             THE COURT:  Good morning.

19             THE DEFENDANT:  Can you hear me?

20             THE COURT:  I can hear you.

21             THE DEFENDANT:  Okay.  Good, good.

22             THE COURT:  We have -- I believe there was a

23     sentencing hearing set for earlier this month, which I vacated

24     in light of the pending motions.  There's a motion to amend or

25     correct the Presentence Investigation Report; a motion to --

1   for me to recuse myself in light of Mr. Walsh's comments at

2   the October sentencing hearing, which we never finished; and a

3   motion to withdraw the guilty plea.

4           So, I have a response to that motion to withdraw the

5   guilty plea, but no reply.  So, Mr. Boyle, were you just

6   planning on arguing that?

7           MR. BOYLE:  Yes, your Honor.

8           THE COURT:  That's fine.  I believe that the

9   logically anterior motion is the motion to recuse because if

10  I grant the motion to recuse, I shouldn't hear -- I shouldn't

11  be deciding anything else.  And -- so, I've certainly read

12  the motion.  It is docket 120.

13          The government, you're not taking any position one

14  way or the other, or would you like to take a position?

15          MR. VEATCH:  We are not taking a position,

16  your Honor.

17          THE COURT:  That's fine.

18          Mr. Boyle, if you -- I read your motion; and I'm

19  familiar with the authorities that were cited in the motion,

20  and I'm also familiar with other authorities that are

21  pertinent to this precise situation.  If you'd like to make

22  any argument -- any further argument, I'm very happy to hear

23  you out.

24          MR. BOYLE:  Thank you, Judge.  Yes.  We filed that

25  motion asking your Honor to recuse and disqualify yourself

1    from any further proceedings involving Mr. Walsh.  I think the

2    heart of the argument is in our paragraph 7, where we just

3    quote the Seventh Circuit saying, "The standard in any case

4    for a Section 45(a) recusal is whether the judge's

5    impartiality could be questioned by a reasonable,

6    well-informed observer."

7            In other words, Judge, it doesn't come down to

8    whether you yourself can put aside any natural reaction to

9    Mr. Walsh's comments.  It's as if an objective third party --

10   we don't have them these days because of the pandemic, but

11   back in the day, we would have, you know, court watchers,

12   people who would show up for sentencings or trials.  And if

13   one of -- if a person such as that would have been present

14   for that October 6, 2020, sentencing hearing and would have

15   heard the things that Mr. Walsh said, they very well could

16   believe that it would be impossible for you or for any other

17   judge to put those comments aside and then be able to take

18   essentially a deep breath and sentence Mr. Walsh without any

19   particular animus or emotion, just purely on the facts.  And I

20   think that's really what it comes down to.

21           And so for those reasons, and we argue them in the

22   written motion, I think for those reasons, just to maintain

23   the perception of complete objectivity and that Mr. Walsh is

24   being purely sentenced by the law and by the facts, I think

25   it is necessary for you to recuse and disqualify yourself.

1       THE COURT:  Okay.  Thank you, Mr. Boyle.  Again,

2  government, if -- I always give both sides a chance to say

3  whatever they'd like to say.  I don't imagine you're going

4  to say anything, but you may have changed your mind, so --

5       MR. VEATCH:  We appreciate the opportunity, your

6  Honor.  Our understanding, based on the law in the circuit

7  at least, is that this is not something for us to take a

8  position on.

9       THE COURT:  Very good.  Well, I appreciate the

10  motion, and I've given it a great deal of thought.  And the

11  law that Mr. Boyle just articulated and that he set forth in

12  paragraph 7 is the standard, and I'm certainly paying heed

13  to that.

14       And, yes, the -- Mr. Boyle didn't -- and he didn't

15  have to, he didn't repeat what Mr. Walsh said at the

16  sentencing hearing; but I think in order to provide an

17  appropriate context, it's fair to Mr. Walsh that I do so.

18  I'm not going to read everything that Mr. Walsh said at the

19  sentencing hearing, but I'll read just enough to give -- give

20  the flavor of what he conveyed.

21       When Mr. Walsh started this particular aspect of his

22  allocution, on page 45 of the sentencing hearing, he said,

23  "Because you're a filthy stinking pig, you mother-fucker, and

24  I'd blow your fucking brains out.  That was a fucking -- I not

25  only would blow your fucking brains out, you pig, but I would

1   kill your entire fucking family and torture and murder each
2   and every fucking one of them, you filthy, mother-fucking,
3   lying pig mother-fucker, you."

4               And then there was more of the same in some vivid
5   detail after that.  And then kind of towards the end was the
6   summation where Mr. Walsh said, "He is what he is, and I am
7   what I am, and it is what it is, man.  The mother-fucker" --
8   and I think at this point, he was referring to me -- "the
9   mother-fucker better kill me or make sure I'm dead.  That's
10  what he better fucking do.  If I get a chance to get out
11  there, I'd kill him and his entire fucking family; and I
12  wouldn't give a shit about a gun charge or a thousand other
13  fucking charges and millions of fucking years, millions and
14  billions of fucking years.  Not a fucking -- you ain't worth
15  two dead fucking flies to me.  Put them all down.  Thank you.
16  Thank you.  Thank you, you mother-fucker, you."

17              So, that was certainly something, and something that
18  I had not heard from a defendant or really from anybody in my
19  years as a judge.

20              And the standard is what Mr. Boyle said it was.  And
21  there -- the Seventh Circuit has had occasion -- and the
22  Seventh Circuit has cited other circuit decisions that speak
23  to the particular situation of what happens when a litigant,
24  and in particular a criminal defendant, threatens the judge,
25  a death threat against the judge and the judge's family or

1  some combination thereof, and how is the court supposed to
2  deal with that.

3          So, the Seventh Circuit spoke to this in *In Re:*
4  *Nettles*, that's N-E-T-T-L-E-S, 394 F.3d 1001.  And there, the
5  Seventh Circuit articulated the general standard, which is a
6  judge should recuse if a reasonable observer would think there
7  was a significant risk that the judge would resolve the case
8  on a basis other than the merits.

9          And again, it isn't -- Mr. Boyle is absolutely
10  correct.  It isn't -- the standard doesn't require actual
11  bias.  It just requires that a reasonable observer think that
12  the judge couldn't help but be biased in light of what the
13  defendant did.

14          And the court said where there's a threat made
15  against the judge, the judge has to evaluate whether the
16  threat was genuine and not just motivated by a desire to
17  recuse the judge.  So, if the threat is genuine and it's not
18  just motivated by a desire by the defendant to get the judge
19  to recuse him or herself, then recusal is required.

20          And in *Nettles*, the court held that because there
21  were no proceedings against the person, Nettles, pending in
22  the court at that time, the defendant's actions could not
23  have been taken in order to get the judge to recuse.  So, in
24  that instance, the judge -- the Seventh Circuit held that
25  recusal was appropriate.

1      A different result was reached in a second decision

2  that I'm going to cite, which is *United States versus*

3  *Crawford*, which is 665 Fed. App. 539.  And there, the Seventh

4  Circuit, at page 543 -- well, the defendant there sent a

5  threatening letter to the judge, and then the defendant moved

6  to recuse the judge.  And the judge denied the motion, and

7  then it went up to the Seventh Circuit.

8      And the Seventh Circuit said there that recusal is

9  not required if a defendant has made a threat for the very

10  purpose of forcing the recusal.  And *Crawford* cited *Nettles*.

11  And then the court -- Seventh Circuit said, "And the

12  sentencing transcript suggests that this was Crawford's aim,"

13  that one of the reasons for threatening a judge was in order

14  to prompt a recusal.

15      And so the court affirmed the judge's denial of the

16  recusal motion, and in so doing, the Seventh Circuit cited a

17  couple of decisions.  One is *In Re: Bascaino*, which is a

18  decision from the Second Circuit, and *United States versus*

19  *Holland*, which is a decision from the Ninth Circuit.  And the

20  Seventh Circuit cited those decisions favorably.

21      And I just want to talk a little bit about *Bascaino*,

22  which is 542 F.3d 950 from 2008.  And in pertinent part, the

23  Seventh Circuit held on page 956 to 957, "Although a threat,

24  real or feigned, may create a situation in which a judge must

25  recuse himself, recusal is not ordinarily or routinely

1    required.  Even where a threat is serious, a judge may

2    appropriately decline to recuse himself, at least in some

3    circumstances."

4         And then the court held, "In the situation here,

5    where there is a significant possibility that the defendant's

6    purpose in at least appearing to plot against the judge was to

7    change judges, additional serious concerns arise.  Requiring a

8    judge to recuse himself because the defendant, in an attempt

9    to change judges, has threatened to kill the judge would

10   provide any defendant who wanted a new judge with an effective

11   method to achieve that end.  The defendant should not be

12   permitted to use such a threat as a judge-shopping device."

13        And *Bascaino*, like *Crawford*, cited *Holland*, the Ninth

14   Circuit case.  And *Holland* held that, "That kind of

15   manipulation would subvert our processes, undermine our

16   notions of fair play and justice, and damage the public's

17   perception of the judiciary."

18        So, that's the law in this particular situation.  So,

19   the first thing I have to decide is:  Was Mr. Walsh's threat

20   genuine?  And I think the answer to that is yes, given

21   Mr. Walsh's criminal history, which recently involved an armed

22   bank robbery and in the past involved possession of firearms,

23   including an Uzi, and the murder of a police officer.

24        And I -- we're on video.  I saw Mr. Walsh.  I think

25   he was completely genuine about everything he said, and what

1  he said was what was actually on his mind.  And he said he

2  wanted to kill me and my family, and I think in the moment,

3  he meant it.  And he also expressed his desire to kill the

4  Assistant U.S. Attorney and the probation officer, and I think

5  he meant that.

6          Now, the AUSA has changed out.  I think Mr. Kerwin

7  either is still on the case or not, but the new AUSA is

8  handling matters right now.

9          And then there was his statement -- Mr. Walsh's

10  statements about his view of the law and his being real.  So,

11  I think the threat was genuine, and that -- so, the first

12  hurdle in terms of whether I should recuse myself has been

13  surmounted.

14          But then the next question is, in the words of

15  *Bascaino*, which *Nettles* -- which *Crawford* cited with approval,

16  is there a significant possibility that Mr. Walsh's purpose

17  in orally articulating that threat was in order to prompt a

18  change of judges through recusal?  I think the answer to that

19  question is yes as well.

20          Throughout this case, Mr. Walsh has shown himself --

21  and this is not -- I'm not disparaging him.  I'm just stating

22  a fact.  He's shown himself to be a strategic actor.  He's a

23  planner.  Now, some of it is not -- some of it's not good,

24  like his planning on his criminal conduct.  Some of it is good

25  and speaks favorably of him, his strategic planning in terms

1    of how he's defended himself in this case.

2            With respect to his criminal conduct, he showed

3    himself to be a strategic planner by the meticulous way in

4    which he planned the armed bank robberies, one completed, one

5    not, with the masks and the door stoppers and the change of

6    clothes in a nearby alley.  Mr. Walsh thinks about -- what

7    that reflects is that Mr. Walsh thinks about what he wants to

8    accomplish.  He does not act rashly.  He formulates a plan,

9    and he executes it.

10           That's obviously on the negative side of being a

11   strategic actor, but on the positive side is the way

12   throughout this case up until this sentencing hearing he

13   conducted himself in court.  His arguments in favor of

14   dismissing some of the -- some of the charges against him, the

15   legal research that he did to support his arguments, that

16   reflected a great deal of thought, a great deal of planning.

17   And though I disagreed with Mr. Walsh's legal arguments,

18   throughout these proceedings, Mr. Walsh was thoughtful and

19   deliberate and prepared.

20           And there's an episode that happened at an earlier

21   hearing, which at the time I didn't give much thought to, but

22   whose significance has since become clear.  Now, this also

23   reflects -- what I'm about to say also reflected strategic

24   thought, but it's more on the negative side of the scale as

25   opposed to the positive side of the scale.

1       At the end of a hearing at which certain legal issues
2   were discussed, Mr. Walsh mentioned, seemingly out of nowhere,
3   that he had killed a cop.  And "cop" was his term, not my
4   term.  And I don't know whether Chip caught that on the
5   record, but I know to a moral certainty that it happened
6   because it struck me at the time because I was thinking that
7   if Mr. Walsh killed a cop, why is -- why was he out?  Why
8   wasn't he still in prison?  So, I know for a fact that
9   Mr. Walsh did say that at the end of the hearing at one of the
10  hearings, whether or not Chip caught it or not.

11      And at the time, I took that -- Mr. Walsh saying
12  that as an attempt to intimidate me.  In other words, saying,
13  in so many words, "Judge, I'm somebody who's capable of
14  killing a police officer, so you'd better start seeing things
15  my way on these legal arguments that I'm making to you."

16      And at the time, I thought -- I thought that
17  Mr. Walsh actually hadn't killed a cop because if he had
18  killed a cop, why wasn't he still in prison?  I thought he was
19  just padding his criminal resume.  But I -- as I learned when
20  I first read the Presentence Investigation Report, it turns
21  out that he was speaking the truth.

22      And again, I think what -- Mr. Walsh saying that out
23  of nowhere, apropos of nothing -- I think it was apropos of
24  something.  It was Mr. Walsh trying to do something that
25  created a more favorable decisional environment for himself.

1    And I think --

2            THE DEFENDANT:   That never happened.  You know what,

3    Judge, it's not on no recording because it never happened.

4    So, you go on with your fantasy if you want to.  That's all

5    I'm saying.

6            THE COURT:  That's fine.

7            THE DEFENDANT:  I promised not to use any vulgarity.

8    I promised not to disrespect him, and that's what I'm going

9    to do, period.  So, whether you recuse yourself or not,

10   whether we're going to go on this other issue of withdrawing

11   that guilty plea -- and if we do go to trial, I will -- I

12   promise that I will not be --

13     (Announcement:  "This meeting is being recorded.")

14           THE DEFENDANT:  -- Attorney General's witnesses,

15   anybody in the courtroom, anybody connected with the case.

16   I promise to be civil.  Now, I'm not promising that I might

17   not say something, but I'm not going to say anything that's

18   disrespectful or vulgar or any obscenities.  I'm not going

19   to do that.  I just wanted to get that clear and out of the

20   way.

21           I never said anything like that.  And where you came

22   up with that, I don't know, and I really don't care.  Okay?

23   Now, you go on and do what you're going to do, but I'm telling

24   you that that was never on the transcript.  I never said

25   anything like that.  That came from your imagination, or

1  you're making it up, one of the two.  And it don't make me
2  no difference what you're going to do.  You understand?
3  That's reality.

4          There's reality and common sense.  Now, why would I
5  say something like that when I'm trying to be as civil as
6  possible throughout the whole thing until we come on with you
7  going off this deep end with this change in my category and
8  all of this nonsense?  You know it's nonsense, and I know it's
9  nonsense.  It's political.

10         How would you consider a letter, a 32-year-old
11 letter, you understand, as being anything but overkill?
12 They tried to kill me with time.  So, that didn't happen.
13 But what you're doing, in effect, with 156 months, is I could
14 have a possible death sentence with that.  That's what I'm
15 looking at.

16         Now, if you were to come in with something lower than
17 that, I could understand -- I could understand; but whether I
18 agree or disagree, this and that, or what was in that plea, I
19 don't understand that.  There's other stuff here that I'll
20 bring up when we go through this withdrawal of the guilty
21 plea, and I'll explain further.

22         But I never said anything like that, so by you saying
23 that doesn't make that so.  You understand that, right?  It's
24 not on no record, and it's -- period.  So, if it ain't on the
25 record, it's not there.  That's what it is.

1            Now, you go on and do what you're going to do.  I'm

2  going to lay here and give it -- do this withdrawal because

3  that's what's important.  I'm going to let Mr. Boyle

4  articulate for me because he's better at it than I am.

5            MR. BOYLE:  Your Honor, could I just interject?  Do

6  you recall the date of the proceeding that you were

7  referencing?

8            THE COURT:  I don't.  I will say this --

9            THE DEFENDANT:  That's because it didn't happen.

10           THE COURT:  I will say this.  I know to a moral

11  certainty that it happened.  It was at the very end of a

12  hearing where -- in fact, Mr. Boyle, I think it was before

13  you were on the case, if that helps you get the time range.

14  And it was when Mr. Walsh brought his papers to court.  He was

15  gathering his papers.  The defense attorney was gathering his

16  papers.  The AUSA, Mr. Kerwin, was gathering his papers.

17  Standing up, the Marshals were approaching Mr. Walsh, and

18  Mr. Walsh is a talker, as we've all seen over the past couple

19  of years.  And he absolutely said that as he was standing up

20  gathering his things and before he was taken --

21           THE DEFENDANT:  There's no way that didn't get on no

22  recording.  That is not --

23           THE COURT:  But I'm sorry, I can't give you an exact

24  date.

25           THE DEFENDANT:  You can't give any exact words,

1    either, because I didn't say that.  You're making this

2    nonsense up as you go along.  That's what it is.  That's

3    what's happening.  I'm not --

4           THE COURT:  So, there's another example of Mr. Walsh

5    acting strategically, and I'm not laying this at all at

6    Mr. Boyle's feet, so please do not think that from what I'm

7    about to say.

8      (Loud noise in background.)

9           THE DEFENDANT:  Are you on the video or what?  Can

10   you hear me?

11          THE COURT:  Yes.

12          (Continuing) -- is Mr. Walsh's motion to withdraw

13   his guilty plea.  As I'll explain when I get to that motion,

14   Mr. Walsh is acting strategically with respect to that motion.

15   He waited to see which way the wind was blowing.  It wasn't

16   blowing in his direction, and then he takes action in an

17   effort to improve the decisional environment.

18          And that brings us to the sentencing hearing.

19     (Loud noise in the background.)

20          THE COURT:  Do you know whose computer that is?

21          MR. BOYLE:  I don't, Judge.  I'm sorry.  I heard

22   that, too.

23          THE DEFENDANT:  There's some noise in the background

24   over here.  Somebody's working on something, but there's

25   nothing here.

1    THE COURT:  Understood.  So, Mr. Walsh certainly

2  didn't have much time to think about and plan a threat

3  designed to prompt a recusal from me, but he certainly had

4  enough time to do so.  And Mr. Walsh, being the strategic

5  actor that he was, if his sole goal was actually to kill me

6  and my family, he would have kept his thoughts to himself

7  and then tried to implement his plan upon his release from

8  prison; but he articulated his threat in great detail, and --

9    THE DEFENDANT:  It could just be an emotional

10  outburst, too.  An emotional outburst is what it was.  That's

11  it.  Whether you recuse yourself or you don't, whatever you're

12  going to do, you're going to do.  But I'm telling you, hey, a

13  lot of times things happen.

14    And like I say, I'm going to be not -- nonchalant

15  about it or thinking everything is just fine and dandy, no

16  matter what you're going to do.  So, I'm going to sit back and

17  relax.  That's what I'm going to do.  Right?

18    THE COURT:  But Mr. Walsh articulated his threat in

19  great detail, and the most plausible reason for a strategic

20  actor like Mr. Walsh to do so would be to prompt recusal, in

21  the hopes that a different judge would give him a better

22  sentence.

23    Accordingly, this is a situation like that presented

24  to the courts in *Crawford* and *Bascaino*; and I'm, therefore,

25  going to deny the motion to recuse.

1    (Defendant laughing.)

2         THE DEFENDANT:  You had a further motion, also,

3    Defendant Walsh's motion to correct, supplement the

4    Presentence Investigation Report.

5         THE COURT:  Okay.  Mr. Walsh, I'm going to ask

6    that -- if Jackie can, to please mute Mr. Walsh's microphone

7    because he's interrupting the proceedings, and not in a

8    productive way.

9         So, the next motion is the motion to withdraw the

10   guilty plea, which is docket 127.  There was a motion filed

11   and a response.  The government was last heard in writing,

12   so, Mr. Boyle, would you like to make a reply?

13        MR. BOYLE:  Thank you, Judge.  Again, I think what's

14   important to emphasize was -- I know you've just talked about

15   Mr. Walsh's strategic actions --

16     (Brief audio interruption.)

17        MR. BOYLE:  (Continuing) -- but it's important that

18   Mr. Walsh first raised his desire to withdraw his guilty plea

19   well before, certainly, you articulated what you intended the

20   sentence to be.  It was most clearly articulated, I would say,

21   by Mr. Walsh after you had concluded that those four levels

22   should be added to the offense level because of the attempted

23   robbery.  That is when he first spoke up.  And I'm sorry.  I'm

24   just pulling up the motion now.

25        Again, this is the October 6, 2020, first sentencing

1   hearing.  After you concluded -- and again, as you will
2   recall, Mr. Walsh contested that attempted robbery --
3      (Brief audio interruption.)
4          THE COURT:  Mr. Boyle, you just froze there.
5          MR. BOYLE:  -- responsible for that.
6          THE COURT:  I'm sorry to interrupt you, Mr. Boyle.
7   You just froze there, so if you could start again with, "As
8   you will recall, Mr. Walsh contested that attempted robbery,"
9   and then go on from there.
10          MR. BOYLE:  Again, yeah, I hope we don't have further
11   trouble as far as the audio and video.
12          He had challenged the attempted robbery throughout
13   the pretrial proceedings.  That was a reason why he would not
14   even consider a guilty plea in the case because the government
15   was insisting that he -- if there were to be a plea, it would
16   be to all four counts.  It was only when shortly before trial,
17   as I talk about in the motion to withdraw the guilty plea, the
18   government came back.  He would not have -- it would be a plea
19   agreement, and it would not entail him pleading guilty to the
20   attempted robbery, and then that count would be dismissed.
21          So, it's understandable, despite, again, my best
22   efforts or the Court's best efforts, that Mr. Walsh was
23   confused about that.  He saw that as a very significant event,
24   the fact that the government was finally acknowledging that
25   they were not going to have him plead guilty or convict him

1  of the attempted robbery.  That's why he agreed to then plead
2  guilty.

3          And I do think there was a misunderstanding, and that
4  misunderstanding again, as we stated in the written motion,
5  his belief was that by pleading guilty, that the attempted
6  robbery would not be used against him in any way, not only as
7  an actual conviction, but in any way.

8          And then when your Honor talked about the fact of
9  the attempted robbery, applied the preponderance standard at
10 sentencing, and then concluded that, "I am going to hold that
11 against you.  It is going to have a negative effect on you and
12 your anticipated sentencing.  It's going to increase your
13 offense level by four levels" -- again, you were not
14 articulating what your actual sentence was going to be at
15 this stage; we were just talking about the offense level --
16 Mr. Walsh immediately responded to this, I quote, "I would
17 like to say something about that.  The agreement, okay, the
18 agreement in the plea agreement that said out of the way,
19 period.  All of that four-level enhancement is not going to
20 apply, which I'm not going to go for.  We can go for a jury
21 trial is what we can do, and I don't care what happens.
22 Okay?"

23         And again, he continues on.  Again, I think I tried
24 to make some explanation.  Your Honor tried to make some
25 explanation.  But Mr. Walsh still wasn't understanding.  He

1    clearly thought that despite his guilty plea, the use of the
2    government and your Honor's use concluding that it should
3    increase the offense level was violating his plea agreement.

4         Mr. Walsh stated, "Well, it should have been that way
5    from the very beginning because that's the plea agreement.
6    That's all I'm saying. What do I know? I know if you want to
7    violate the plea agreement or want to enhance things, we can
8    go to a jury trial. How about that?"

9         And then as I state, so, again, these statements of
10   Mr. Walsh seem to suggest that if the attempted robbery was
11   going to be used against him in any way, that he saw that as
12   a violation of his guilty plea and that he would rather
13   proceed to a jury trial.

14        And the government emphasizes a great deal the timing
15   of this, and again, I think it kind of goes in hand with this
16   idea that Mr. Walsh is a strategic actor. I really don't
17   think it is in this situation. I think he's been consistent,
18   and it always goes back to the attempted robbery. He's been
19   consistent about his misunderstanding. And I think the
20   government in their reply even quotes that.

21        I mean, going back to his guilty plea hearing, at a
22   certain point, you know, you were kind of explaining just how
23   we make an educated guess about what we expect the Advisory
24   Guidelines range to be; but then it's only after Probation
25   does their work and prepares the presentence report and then

1    you consider all of that, then you conclude what you believe

2    the Advisory Guidelines range will be, and it could very well

3    be higher than what our good faith predictions have been.

4         And Mr. Walsh immediately said, "Well, I don't

5    understand that.  I don't get that.  How can things ever get

6    worse?  I'm pleading guilty because they're not going to be

7    able to use that attempted robbery against me, and I know it

8    can only be so bad."  Was that the correct understanding?  I

9    don't believe so.  But I do think it was his genuine

10   understanding -- misunderstanding, I should say, despite

11   everyone's best efforts.  And for those reasons, his guilty

12   plea was not made knowingly.

13        For those reasons, he should be allowed, and you do

14   have that discretion to allow him to withdraw his guilty plea

15   at this stage; and we're asking you that you allow him to do

16   so.  Thank you.

17             THE COURT:  Thank you, Mr. Boyle.

18             Government, anything you'd like to add?

19             MR. VEATCH:  Your Honor, just briefly, we'll mostly

20   just rest on our pleadings.  We think the -- the record in

21   this case, the transcript, all the paper documents that have

22   been filed consistently show that since -- well, let me take

23   one step back.

24        From the plea agreement itself, which makes clear

25   that this enhancement was an issue, to the change of plea

1   hearing, in which the defendant admitted he read and discussed

2   the plea agreement with his counsel and the Court took the

3   time to discuss the -- that there was a controversy between

4   the parties as to the enhancement, and Mr. Boyle took a moment

5   off the record to discuss with the defendant when he raised a

6   concern; and the Court came back and made clear that the

7   defendant did understand that ultimately, the Court would be

8   the one who would decide the sentence, and the Court's

9   thorough questioning of the defendant's understanding that

10  even if he disagreed with the Court's finding, it could be a

11  basis for appeal, but not for withdrawing his plea, and that

12  the defendant understood that there were no side agreements

13  or other agreements outside the four corners of the plea

14  agreement, all show that with the defendant's sworn

15  statements, that he did understand, you know, to be generous

16  to the motion, at the time of the plea, certainly.

17          And as the Court has pointed out, the defendant has

18  been an active participant in this litigation.  He was further

19  put on notice that this was an issue in the government's

20  sentencing position, the Presentence Investigation Report,

21  and in his own sentencing filings.  I think it would be

22  incredible to believe that he didn't review those things with

23  counsel and that counsel wouldn't have reviewed these filings

24  with him.

25          As the Court also pointed out with regard to the

1  motion to recuse, this very much appears to be just another

2  strategic measure on the defendant's part to game the system.

3  And so we would say that, your Honor, the motion to withdraw

4  should be denied.

5        It is clear on the face of the papered complaint.

6  The defendant understood it, again, at least at the time he

7  entered it.  Seven-and-a-half months have passed.  A lot of

8  emotions have flared.  He may not remember that he understood

9  it at the time, but he certainly was on notice and understood

10 it at the time he entered into the agreement.

11       THE COURT:  Mr. Boyle, I'll give you the last word,

12 if you'd like to take it.

13       MR. BOYLE:  Thank you, Judge.  And I understand

14 Mr. Walsh was muted because of the interruptions; but I do

15 think with this motion in particular, you know, this is really

16 kind of his motion, really, and it's really his understanding

17 and it's his beliefs that are important.

18       I've articulated everything that I can articulate

19 based on, you know, the transcripts we have and the prevailing

20 law; but, you know, again, I do think there is -- there was a

21 genuine misunderstanding by Mr. Walsh of the nature of the

22 plea agreement.

23       And again, it goes back to the use of the attempted

24 robbery.  He was consistent in that, that that -- "I'm

25 pleading guilty because that should never be used against me

1   in any way," and as it turns out, it was being used against

2   him.  And that is when he expressed his desire, "Since you

3   guys are violating my plea agreement, let's just have that

4   jury trial."

5       THE COURT:  Okay.  Jackie, could you please unmute

6   Mr. Walsh's microphone, at Mr. Boyle's request.

7       UNIDENTIFIED MALE VOICE:  Is the second floor open?

8       THE COURT:  Okay.  Jackie, I'm not sure it's been

9   unmuted.

10      THE CLERK:  Oh, I'm sorry.  Yes, Mr. Walsh, you can

11  unmute yourself.

12      MR. BOYLE:  And, Mr. Walsh, this is specifically to

13  give you the opportunity to articulate what you believe was

14  your misunderstanding.

15      THE COURT:  He's trying to do it.  He's just --

16      THE CLERK:  Mr. Walsh, you will have to maybe tap on

17  the door and have someone show you where the unmute button is.

18   (Long pause.)

19      THE CLERK:  Can you unmute Mr. Walsh?

20      THE DEFENDANT:  Am I on here?

21      THE COURT:  Yes.

22      THE DEFENDANT:  Okay.  Can you hear me?  Do I need to

23  press anything?

24      THE COURT:  No.

25      Go ahead, Mr. Walsh.

1      THE CLERK:  We just lost his video, it looks like.

2      UNIDENTIFIED FEMALE VOICE:  There's some good

3  looking, skinny mini Marshal walking up and down the hallway.

4      THE COURT:  Okay.  Hang on.  If you called in to this

5  hearing, please mute your phone.

6      UNIDENTIFIED MALE VOICE:  I'm going to go do my

7  presentation.

8      UNIDENTIFIED FEMALE VOICE:  You doing your

9  presentation?

10      UNIDENTIFIED MALE VOICE:  Yeah.

11      UNIDENTIFIED FEMALE VOICE:  Good luck.  You'll be

12  great.

13      THE COURT:  Okay.  There's some folks who have phoned

14  in who are not on video.  If you can please mute your phone.

15      THE DEFENDANT:  Mute the phone?

16      THE COURT:  Not you, Mr. Walsh, not you.  The other

17  people who called in, if you could please mute your phone.

18      All right.  Mr. Walsh, Mr. Boyle wanted you to have

19  an opportunity to say your piece, so please go ahead.

20      THE DEFENDANT:  Okay.  Now, on February 20th, on

21  page 60:

22      "THE COURT:  And it could be the government's asking

23  for one thing and you're asking for another.  It could be that

24  information -- new information comes in or we view the current

25  information under a new lens, and it could end up being

1    some -- you're arguing or the government's arguing.  It could
2    end up being" --
3      (Audio breaking up.)
4            THE DEFENDANT:  -- (continuing) "what the government
5    is arguing."  Defense was not understanding --
6      (Audio breaking up.)
7            THE DEFENDANT:  Can you hear me?
8            THE COURT:  It's very hard, Mr. Walsh.  You're kind
9    of going in and out.
10           THE DEFENDANT:  Let's try it again.
11           THE COURT:  Go ahead.
12           THE DEFENDANT:  Page 60:
13           "THE COURT:  And it could be the government's asking
14   for one thing and you're asking for another.  It could be that
15   information -- new information comes in or that we view the
16   current information under a new lens."
17           Are you hearing me?
18           THE COURT:  Yes.
19           THE DEFENDANT:  Okay.
20           "And it could end up being something different from
21   what you are arguing and what the government is arguing.  It
22   could end up being higher than what the government is arguing.
23   Do you understand that?
24           "THE DEFENDANT:  No, I do not understand that at
25   all."

1          Okay?

2          I just went on with the thing, you understand,

3    answering yes because I was confused.  I don't understand

4    "agree to disagree" in the plea agreement.  That doesn't mean

5    anything to me.  It's like a double-speak.  Okay?

6          Also, on page 66 -- well, hey, it starts on -- yeah,

7    it starts on page 65.  It starts on page 65.

8          "Okay.  I could plead guilty to Counts 1 and 2 --

9    I could plead guilty to Counts 1 and Counts 4, and Counts 2

10   has been reversed by the *Davis* case in the Supreme Court, is

11   a defunct statute; thereby nullifying the 924(c) statute.

12         "If the statute can't stand -- well, here's a better

13   one.  Here's something just a little bit more better.  I could

14   have had a replica weapon during that time that that bank was

15   robbed.  I didn't have the money to get a real -- a gun, but I

16   got a gun similar to that.  And the fact that you could see in

17   the -- in the video the way I came up with the gun and went

18   down real quick, and I didn't point it at anybody, I didn't

19   put my finger on the trigger, I did that purposefully because

20   it was a replica weapon, and it didn't have any bullets in the

21   gun, the gun itself."

22         Okay.

23         "MR. BOYLE:  Can we have a moment, Judge?

24         "THE COURT:  Sure.  I see our factual basis floating

25   out of the courtroom and down Dearborn Street, which would

1    require that we have our trial on Monday."

2         And you're browbeating me into saying and doing
3    something else that I didn't even want to really do; but
4    I went ahead with it because I talked to counsel, and we had
5    decided that 123 months is kind of a good deal, and maybe we
6    can get something less.

7         So, I went ahead and I said that, "All right.
8    Mr. Boyle made some good points, that the gun was real, and
9    if I were going to have to go through this, I would have to
10   go through the jury trial and everything else."  But that gun
11   wasn't real.  There was no bullets in the gun.  And despite
12   what you might think, it is what it is.

13        So, you're asking me if I understood that plea
14   entirely?  No, I don't understand a lot of that.  So, how
15   can I understand something that I don't understand.  That's a
16   good point.

17        I don't understand that at all.  If you make a plea
18   agreement, 99 percent of the plea -- I'd say 95 percent of the
19   pleas that are made, I'm listening to people, I'm seeing what
20   they're pleading to, what they're getting on the Guidelines,
21   they're usually getting a little under the Guidelines,
22   especially for this COVID-19 stuff that's going on.  You've
23   got people in here that get pleas all the time.  They're going
24   beneath the Guidelines.

25        You started with an upward departure and cracking me

1   over the head and taking my category, which was a good

2   category, that it was for over two years or better, you know

3   it was a category III.  There was no mistake there.  You came

4   with (audio breaking) and sped it up to a category IV, and

5   then you gave me the high end of the category IV.

6           Of course I'm going to be disturbed and upset by it.

7   Who wouldn't be disturbed and upset by it.  Only a moron would

8   do that.  You know what, I'm just saying what it is.  You

9   know?

10          No, I don't understand none of that on this plea

11  agreement.  The plea agreement should have been for 123 months

12  if you were going to give me three points.  Two points were

13  already given.  Anybody in his right mind would have gave me

14  that 123 months.  Somebody was playing political games and

15  playing with the DA between you and Mr. Lausch.  That's what

16  was going on with that.  You know what I'm saying?

17          You know what I'm talking about.  That's reality.

18  You're --

19          MR. BOYLE:  Your Honor, could I --

20          THE DEFENDANT:  You have the possibility of killing

21  me with this time.  They tried to do that back in 1987.  And

22  did I learn my lesson?  Yeah, I learned my lesson really well

23  because I was trying to do the right thing out there.  I was

24  trying for the first time in my life to do the right thing,

25  but that went in one ear and out the other.

1           If I was out not doing things that I like, then that

2  means that I was trying to do something positive.  I'm trying.

3  I've pulled on hard times.  It happened.  It happened, man.

4           But, you know, you pushed the wrong button, man.  You

5  pushed the kill button.  You pushed that kill button, man,

6  because -- you did that.  I didn't do that.  You did that.

7           If you'd have laid there, I would have never had two

8  words to say to you.  At the worst, we'd have hit 123 months,

9  you'd have given me that other point, 123 months, I'd have not

10  liked it, but I would have lived with it.

11           I wouldn't have had nothing to say to you.  I didn't

12  have nothing to say crazy to you in the whole -- the whole

13  proceeding, period, I never had anything crazy to say to you,

14  ever.  I never said nothing crazy to you, period, nothing.

15  You made that happen.  I didn't make that happen.  You made

16  it happen.

17           About emotional outburst?  Certainly.  Who wouldn't

18  have an emotional outburst when you're taking that category

19  I'm in and you're just going to up that and your coming in at

20  the high end of that category?  Because you feel that I'm a

21  repeat offender.  Okay.  I understand that.  But the thing of

22  it is, my age and everything else, you're not taking into

23  consideration my age.  You're not taking into consideration

24  about the COVID.  You're not doing no downward departure on

25  anything.  Why not do a couple of downward departures and

1  cut that time down to about half?  That's what you need to do.

2          That way, I can do my time, and I can try to get some

3  culinary art training type thing, commercial driver's license

4  type thing, something that I can do in my old age.  You want

5  me to come out, what, another 10 years from now, for the

6  same -- same thing, man.  What's it going to be?

7          That's all I'm saying.  You know?  You're the man in

8  charge.  You've got -- you've got my life in your hands.  I --

9  hey, what can I say?  You know?  What can I say?

10         I already explained everything pretty well to you as

11 to the way it really is, and I never said that other thing

12 about that other thing.  It just might have been in your mind,

13 but it never happened.  It never happened.

14         THE COURT:  All right.  Mr. Boyle --

15         THE DEFENDANT:  That's all I'm saying.  I'm going to

16 lay back.  I'm going to relax.  I said what I was going to say

17 on this stuff because in the plea agreement itself, when you

18 agree to disagree, that's double-talk to me.  That's -- I

19 don't understand it.  I don't understand that you could take

20 that and go over that.

21         Now, you're doing the DA's job for him.  You're

22 taking the part of the DA.  I understand my background.  I

23 understand everything.  It's just, hey, a little consideration

24 might go a long way.  You know what I'm saying?

25         I mean, I'm only going to live so long.  I'm going

1　to be 74 tomorrow, 74 years old.  I tried to do some things.
2　It didn't work out.  I'm here in front of you, and I'm just
3　trying to live.  That's all.

4　　　　　Now, you want to give me a sentence to 156 months,
5　that could be a living death sentence to me.  That's a roll
6　of the dice if I live out that time.  And what am I going to
7　have at that time, as opposed to if I got 60 months for the
8　924(c)(1)(A) and I got a day for the other stuff?  Within five
9　years -- I got almost three in now.  Within five years, I
10　could have culinary training.  I could get out, and I could --
11　I can cook.  I can do certain things.  You know what I'm
12　saying?  I can do certain things in my old age.

13　　　　　I couldn't keep working in them freezers, and I
14　couldn't keep working for that minimum wage like that.  I was
15　not going to survive like that.  You get sick, you're out of
16　there.  You know?  I'm not 25 years old no more.  You know?
17　I'm 74 years old.  You know?

18　　　　　I don't need to die in prison because somebody else
19　wants to play some political move.  It's not on me.  Just give
20　me a fair sentence and let me go on.  That's all I'm asking.
21　That's it.

22　　　　　If you -- if you can't do that, grant me that, let me
23　go with a jury trial; and whatever happens, I promise, I will
24　not be disrespectful.  I won't be disruptive.  I promise that.
25　That's my promise, that I will not be disrespectful to

1  anybody.

2          You can come -- you want to crucify me, you can
3  crucify me the right way.  We'll go with a jury trial on all
4  four counts.  I'll plead not guilty.  Whatever happens will
5  happen, and I'll accept whatever -- whatever punishment comes
6  my way.  That's the way it is.  You want to play it that way,
7  then I'm pleading not guilty of all four counts, and let's
8  just go with this thing and do what you're gonna do.

9          I never had no animus towards you.  I didn't know you
10  before starting this thing.  I don't have no animus toward
11  anyone, as far as that goes.  It's just that, hey, you made it
12  seem like it was a political thing, that you were coming on
13  this political act.  It's like you and Mr. Lausch were laying
14  there, "Well, hey, we got this like this.  We can use this,
15  use this, hand him his time, and give him 156 months," which
16  was the first original plea agreement was for 13 years.
17  That's everything on all four counts and everything done up
18  and out, 156 months.  That's what it was on the first thing.

19          So that kicked in my mind also.  I said, "They're
20  going right back to kick me with 13 years, man."  13 years?
21  I'm 74 years old, man.  I'm 74 years old.  13 years is going
22  to be -- going to be devastation, man.  You're devastating me.

23          All I'm asking for is an even chance to live like a
24  normal human being.  That's it.  I know I might be asking a
25  lot, but that's what I'm asking for.  If I got that training

1  like that, I wouldn't be sitting here now.  I wouldn't be

2  sitting here.  I didn't want to come back.  I don't want to be

3  in this nonsense.  I don't need this drama on me.  I'm tired

4  of it.

5        Hey, I'm at the end of my rope, man.  I can only --

6  you've got -- my life is in your hands, so I'm going to let

7  you decide what you're going to do, and I'm not going to say

8  anything.  I'm done with saying anything.  I'm going to let it

9  go right from here, right from now.  That's it.

10        THE COURT:  Okay.  Mr. Boyle, would you like to add

11  anything in reply?

12        MR. BOYLE:  No, thank you, Judge.  Thank you for

13  giving Mr. Walsh the opportunity to articulate his lack

14  of understanding.  I think he said obviously a lot of -- a lot

15  of things there; but really, the essence of it was his

16  representation of his lack of understanding when we used the

17  phrase "agree to disagree."

18        He did not -- I do not think he understood that

19  despite his guilty plea, that the attempted bank robbery could

20  still be used against him.  That is the essence of his lack of

21  understanding, and he did articulate that again today.  Thank

22  you, Judge.

23        THE COURT:  Okay.  Thank you.

24        Well, there's a motion to withdraw a guilty plea in

25  front of me.  It's docket 127.  The motion is governed by

1   Criminal Rule 11(d)(2), which provides that a guilty plea can
2   be withdrawn for a fair and just reason; and among those fair
3   and just reasons is that the plea was not made knowingly and
4   voluntarily.
5           And Mr. Walsh is -- is asserting in conjunction with
6   this motion that his plea was not knowing and voluntary
7   because he didn't understand that he was subject to a
8   four-level enhancement under 2K2.1(b)(6)(B) on Count 4, the
9   felon in possession charge, due to that crime, the felon in
10  possession, being committed in conjunction with --
11    (Phone connection cut out.)
12          THE COURT:  So, I'll pick up where I left off.  I
13  have your realtime here, so I know where you cut off.
14          Mr. Walsh is asserting --
15    (Audio feedback.)
16          THE COURT:  That's all right.  Well, I'll start that
17  sentence again.
18          Mr. Walsh is asserting in conjunction with this
19  motion that his plea was not knowing and voluntary because he
20  didn't understand that he was being subject -- or that he was
21  subject possibly to a four-level enhancement under
22  2K2.1(b)(6)(B) on Count 4, the felon in possession charge, due
23  to that crime, the felon in possession, being committed in
24  conjunction with an attempted bank robbery.
25          Now, the attempted bank robbery had been charged in

1  Count 3.  Mr. Walsh did not plead guilty to that, and the

2  intent expressed at the plea hearing was that Count 3 was

3  going to be dismissed.  And the motion also argues that

4  Mr. Walsh did not know that he would not get a third

5  acceptance point or a third acceptance level under

6  Guideline 3E1.1.

7          I've reviewed all the transcripts and briefs, and I'm

8  going to deny Mr. Walsh's motion.  In terms of the attempted

9  bank robbery, the record's very clear that Mr. Walsh

10  understood at the time precisely what he was agreeing to.

11          In the plea agreement, the parties -- the plea

12  agreement sets forth the parties' disagreement over whether

13  there was going to be a four-level enhancement on Count 4

14  based on the firearm being possessed in conjunction with an

15  attempted bank robbery.  Mr. Walsh had to have known that.

16  It was in his plea agreement, and he said under oath at the

17  plea hearing that he had read the plea agreement and discussed

18  it with counsel.

19          And then I discussed with Mr. Walsh at the plea

20  hearing the parties' disagreement over the offense level and

21  thus the Advisory Guidelines range.  I told him that I could

22  rule against him on the parties' disagreement and that, in

23  fact, the Advisory Guidelines range could be different from

24  what either the government or he was proposing, that he could

25  appeal if he did not agree with the Guidelines range or the

1  sentence, but he couldn't withdraw his guilty plea if he was
2  disappointed in either.

3          Mr. Boyle is right, and Mr. Walsh is right.  At one
4  point in the hearing, Mr. Walsh said that he didn't
5  understand.  But what happened immediately after that is it
6  was explained to Mr. Walsh.  The situation was explained to
7  Mr. Walsh.  The disagreement between the government and
8  Mr. Walsh about the Guidelines calculation was explained to
9  him after that.  It was explained to him in a different way,
10  and then he conveyed, when I asked him, that he understood
11  what the situation was.

12          So, Mr. Walsh's argument that he did not understand
13  that the dismissal of Count 3 would not take the armed robbery
14  off the table for purposes of sentencing, and in particular
15  purposes of a possible four-level enhancement, that can't be
16  reconciled with what actually happened at the plea agreement.

17          And the point was clear at the plea hearing, and the
18  point was reinforced during -- during the briefing on the
19  sentencing.  The Presentence Investigation Report, which at
20  the sentencing hearing Mr. Walsh acknowledged that he had
21  received, recommended that four-level enhancement.  The
22  government argued for it in its brief.  Mr. Walsh argued
23  against it in his brief.  I have no doubt, based on
24  Mr. Walsh's very attentive and active participation in this
25  case, that he reviewed those filings.

1    So, he knew at the plea hearing.  He knew between
2   the plea hearing and the sentencing hearing that that
3   four-level enhancement based on the attempted bank robbery
4   was potentially on the table -- was on the table and could
5   potentially be imposed.

6    So, I can't find with respect to the attempted bank
7   robbery that the guilty plea was not made knowingly and
8   voluntarily.  And as I said in denying the motion to recuse,
9   I think this is a strategic maneuver by Mr. Walsh.

10    And I understand Mr. Boyle's argument that Mr. Walsh
11   expressed a desire to withdraw his guilty plea before I
12   announced my intention to impose a 156-month sentence and
13   that he announced his intention after I decided that -- to
14   impose that four-level enhancement on that particular issue.
15   That's factually correct, but I don't think it makes a
16   difference in terms of whether Mr. Walsh was acting
17   strategically or not because at the time that I said that I
18   would accept the Probation Office's recommendation to impose
19   that four-level enhancement, Mr. Walsh knew that his Advisory
20   Guidelines range was going to reflect those four levels and
21   that that was not a positive sign for him in terms of the
22   sentence that was ultimately going to get imposed.  So, I
23   still think that Mr. Walsh, by coming in at this point to
24   withdraw his guilty plea, is acting strategically in an
25   effort to provide a better decisional environment for him.

1    As to the third acceptance point, same thing.  It was

2  very clear at the plea hearing that the parties disagreed on

3  the third point.  I told Mr. Walsh that he could argue for a

4  third point and I would make the decision at the sentencing

5  hearing.  The decision could possibly go against him, and that

6  if it went against him, he could appeal his sentence, but he

7  couldn't withdraw his guilty plea.

8    So, for those reasons, I'm going to deny the motion

9  to withdraw the guilty plea.

10    There's one more motion.  This is the motion to

11  correct the PSR, the Presentence Investigation Report, which

12  is docket 119.  I'll grant that motion.  That motion is

13  well-taken.  So, I will direct the Probation Office to -- by

14  the way, do we have anybody from the Probation Office on the

15  line?

16    We do not.  So, I will direct the Probation Office

17  to correct paragraph 55 of the PSR in the manner that the

18  motion suggests.

19    We do need to reset the sentencing hearing.  Jackie,

20  would you like to propose a date, and then we can see if

21  counsel is available?

22    THE CLERK:  Sure.  One moment, Judge.  Sorry.

23    THE DEFENDANT:  I'd go for that today.  We couldn't

24  do that today?

25    THE COURT:  I had vacated the sentencing hearing, and

1  I don't want to impose on the government or defense counsel in
2  terms of their arguing and presenting their positions at the
3  sentencing hearing when I've told them that there wasn't going
4  to be a sentencing hearing.

5          THE CLERK:  How about January 14th, 10:30 a.m.?

6          MR. VEATCH:  That works for the government, your
7  Honor.  Thank you.

8          MR. BOYLE:  That appears to work for the defendant,
9  your Honor.

10         THE COURT:  Okay.  Thanks to both sides for your
11 arguments and for your presentations.  We'll get back together
12 on the 14th.

13         MR. BOYLE:  All right.  Thank you, Judge.  Happy
14 holidays.

15         Mr. Walsh, I'm going to put in an e-mail requesting
16 a legal call with you.  Okay?  So, let's not talk about the
17 facts right now.  We'll be prepared for sentencing, and I will
18 be, again, scheduling a legal call with you as soon as I can.
19 Okay?

20         THE DEFENDANT:  Okay.  Listen.  I need a copy of
21 this -- today's proceedings, too.

22         MR. BOYLE:  Okay.  I will order it.  I'll get it to
23 you.  Did you receive a copy of the government's reply?  I
24 mailed that to you.

25         THE DEFENDANT:  Yes, I did.  Yes, I did.

1       MR. BOYLE:  Okay.  Thank you, sir.  I will talk to

2  you very soon.  Happy birthday, by the way.

3       THE DEFENDANT:  All right.  Hey, and Merry Christmas

4  and Happy New Year.

5       MR. BOYLE:  Yes, sir.  Okay.  Take care.  Bye-bye.

6       THE DEFENDANT:  Have a couple of drinks for me.  You

7  know?

8       MR. BOYLE:  I'll try.  Thank you.

9    (Which were all the proceedings heard.)

10                      CERTIFICATE

11   I certify that the foregoing is a correct transcript from

12  the record of proceedings in the above-entitled matter.

13

14  */s/Charles R. Zandi*              *February 5, 2021*

15  Charles R. Zandi                Date
    Official Court Reporter

16

17

18

19

20

21

22

23

24

25