1

1　　　　　　　　　IN THE UNITED STATES DISTRICT COURT
　　　　　　　　FOR THE NORTHERN DISTRICT OF ILLINOIS
2　　　　　　　　　　　　　EASTERN DIVISION

3
　　UNITED STATES OF AMERICA,　　　　　　)
4　　　　　　　　　　　　　　　　　　　　　)
　　　　　　　　　　　　Plaintiff,　　　　)
5　　　　　　　　　　　　　　　　　　　　　)
　　-vs-　　　　　　　　　　　　　　　　　) Case No. 18 CR 450
6　　　　　　　　　　　　　　　　　　　　　)
　　DAVID WALSH,　　　　　　　　　　　　　) Chicago, Illinois
7　　　　　　　　　　　　　　　　　　　　　) January 14, 2021
　　　　　　　　　　　　Defendant.　　　　) 10:30 a.m.
8

9　　　　TRANSCRIPT OF VIDEOGRAPHIC PROCEEDINGS - Sentencing
　　　　　　　BEFORE THE HONORABLE GARY FEINERMAN
10

11　　APPEARANCES:

12　　For the Government:　　　　HON. JOHN R. LAUSCH, JR.
　　　　　　　　　　　　　　　　　UNITED STATES ATTORNEY
13　　(via video conference　　 BY:　MR. CHRISTOPHER K. VEATCH
　　call)　　　　　　　　　　　 219 South Dearborn Street, Suite 500,
14　　　　　　　　　　　　　　　　 Chicago, Illinois　60604
　　　　　　　　　　　　　　　　　(312)353-5300
15

16　　For the Defendant:　　　　 LAW OFFICES OF PATRICK E. BOYLE
　　　　　　　　　　　　　　　　　BY:　MR. PATRICK E. BOYLE
17　　(via video conference　　 155 North Michigan Avenue
　　call)　　　　　　　　　　　 Suite 562
18　　　　　　　　　　　　　　　　 Chicago, Illinois　60601
　　　　　　　　　　　　　　　　　(312) 565-2888
19
　　Also Present:　　　　　　　 MR. JASON CHRISTIANSEN, U.S. Probation.
20　　　　　　　　　　　　　　　　 (via video conference call)

21
　　Court Reporter:
22
　　　　　　　　　　　CHARLES R. ZANDI, CSR, RPR, FCRR
23　　　　　　　　　　　　Official Court Reporter
　　　　　　　　　　　United States District Court
24　　　　　　　　219 South Dearborn Street, Room 2144-G
　　　　　　　　　　　Chicago, Illinois　60604
25　　　　　　　　　Telephone:　(312) 435-5387
　　　　　　　　email:　Charles_zandi@ilnd.uscourts.gov

1    (Proceedings heard in open court:)

2          THE COURT:  Good morning, Jackie.

3          THE CLERK:  Good morning, Judge.  Today's date is

4    January 14th, 2021, Judge Gary Feinerman presiding.

5          18 CR 450, USA versus David Walsh.

6          THE COURT:  Who do we have for the government?

7          MR. VEATCH:  Good morning, your Honor.  Christopher

8    Veatch on behalf of the United States.

9          THE COURT:  And defense counsel?

10          MR. BOYLE:  Good morning, Judge.  Patrick Boyle on

11    behalf of Mr. David Walsh, who's joining us via video from

12    the MCC in custody.

13          THE COURT:  Okay.  And we had a CARES Act order

14    entered yesterday, I believe.

15          MR. BOYLE:  Yes, your Honor.

16          THE COURT:  And do we have the Probation Office on

17    the line?

18          MR. CHRISTIANSEN:  Yes, Judge.  Good morning.  This

19    is Jason Christiansen with the U.S. Probation Office.  Please

20    forgive me.  I'm having some real connectivity issues.  That's

21    why I called in.

22          THE COURT:  That's fine.  I actually see you on video

23    right now, too.

24          We're here for the continuation of the sentencing

25    hearing.  What I was planning on doing is this; and if you

1   think things ought to proceed in a different way, please let
2   me know, and I'll consider your suggestion.  I was -- the
3   first part, I was going to complete the sentencing as I had
4   intended to complete it before Mr. Walsh's --
5               THE DEFENDANT:  Rant.
6               THE COURT:  -- for lack of a better word,
7   supplemental allocution.  And in that, I was also going to
8   take into account the revision to the PSR and Mr. Walsh's
9   supplemental brief that he filed yesterday.
10              I then was going to address and ask for the parties'
11  input on whether a different sentence is warranted in light of
12  Mr. Walsh's supplemental allocution.
13              Mr. Boyle, would you like to proceed otherwise?
14              MR. BOYLE:  No.  That makes sense to us, your Honor.
15              THE COURT:  Government?
16              MR. VEATCH:  No, your Honor.  We've reviewed the
17  supplemental briefing from yesterday and are prepared to
18  respond orally to the extent your Honor would like to hear
19  from us.
20              THE COURT:  That's fine.  And because the first
21  part -- in the first part, I was going to consider the
22  supplemental briefing, why don't I hear from the government
23  right now, and then I'll bring it back to Mr. Boyle if he has
24  any kind of a reply.
25              MR. VEATCH:  Thank you, your Honor.  The supplemental

1    briefing's focus -- or one of its focuses is on the Court's

2    reliance on the firearm being loaded during the July 14th bank

3    robbery; and defendant argues that there is no evidence of

4    that, and the Court's reliance on the firearm being loaded in

5    reaching its sentence was perhaps overweighted with regard to

6    that.

7          The government argues that the Court was correct the

8    first time around.  While there is no direct evidence, there

9    is no admission by the defendant that the firearm was loaded,

10   we do know, as the Court pointed out at the October 6 hearing,

11   that defendant is a meticulous planner who appears, more than

12   a preponderance of the evidence, to have followed the same

13   game plan, except for the inclusion of a driver in the second

14   robbery, with regard to the items that he used, the tools of

15   the trade that he used in these bank robberies, which were

16   only 10 days apart.

17         Specifically, at the time he was arrested on

18   July 24th, he had in his possession what appeared to be the

19   same hat, the same mask, the same light blue shirt and head

20   covering.  He had door stoppers, sunglasses, items that he

21   appears to have had all during the July 14th robbery, as well

22   as the same firearm.

23         And it lends itself -- or it just makes sense -- it

24   makes less sense to disbelieve that that firearm would have

25   been loaded -- would have been unloaded during the prior bank

1  robbery, where the defendant even said, "I'm not playing," why

2  he would go in unloaded on that day where he was successful

3  and then unloaded on another day, when we know in fact the

4  defendant, from his criminal history as well, when he has

5  possessed actual firearms, as in this case, they have been

6  loaded.  And I point to the prior UUW.  Granted, the

7  conviction was reversed.  The conduct still applies.

8          And so the government would just support your Honor's

9  prior findings that based on the evidence before the Court,

10  it's more likely than not that firearm was loaded on

11  July 14th.  And in the alternative, we would argue even if it

12  wasn't, the Court was absolutely correct with regard to the

13  sentence based on the facts before the Court at that point,

14  that given the nature of the offense and the criminal history

15  of the defendant, the Court was correct in assessing how

16  significant that offense was, loaded or unloaded.

17          THE COURT:  Mr. Boyle?

18          THE DEFENDANT:  He's off on --

19          THE COURT:  Yeah, you're -- I think you're on mute,

20  Mr. Boyle.

21          MR. BOYLE:  No, I -- can you hear me now?

22          THE COURT:  Yes.

23          THE DEFENDANT:  Yeah.

24          MR. BOYLE:  Can you hear me, your Honor?

25          THE COURT:  Yes.

1          MR. BOYLE:  Okay.  Thank you.  Just as I state in the

2  supplemental briefing, as you noted, Mr. Walsh is meticulous;

3  but I think the parties and certainly the U.S. Attorney's

4  Office is also meticulous in the language they use.

5          I mean, I think it's very significant that the

6  counts involving July 14th, there is plenty of language in

7  the superseding indictment regarding the offense in that case;

8  but at no time is the weapon characterized as being loaded.

9          In the written plea agreement that obviously they

10  worked on very carefully, in the two counts involving the

11  July 14th incident, again, the weapon is described.  The

12  actions of Mr. Walsh are described in detail.  At no point

13  is it alleged that --

14    (Audio cuts out.)

15          THE COURT:  You -- Mr. Boyle, I'm sorry to interrupt.

16  Could you go back about 20 seconds?  Because you -- your audio

17  faded out.

18          MR. BOYLE:  Again, Judge, just for the record, I'm

19  perfectly comfortable just pausing this for a minute --

20    (Audio cuts out.)

21          THE COURT:  And you faded out again, Mr. Boyle.  I'm

22  so sorry.

23          MR. BOYLE:  No.  For whatever reason, this case has

24  been giving me issues regarding the connections.  I'm

25  perfectly comfortable calling in with just my audio.  Is that

1  okay with everybody?

2  THE COURT:  Sure.  So, why don't you keep your video,

3  mute yourself on the video, and then call in on the phone.

4  MR. BOYLE:  Okay.  I will try to do that as quickly

5  as possible.

6  (Short interruption.)

7  MR. BOYLE:  Well, I don't know.  Can you hear me now?

8  THE COURT:  Yes.

9  MR. BOYLE:  Okay.  I guess we can try it this way

10  again.

11  THE COURT:  Okay.  Mr. Boyle, I believe you got cut

12  off where you talked about the July 14th -- the written plea

13  agreement, the actions of Mr. Walsh are described in detail.

14  At no point is it alleged that -- and at that point, you got

15  cut off.

16  THE DEFENDANT:  Now you're off again.

17  THE COURT:  Mr. Walsh, I'll direct traffic, please.

18  THE DEFENDANT:  Okay.  Fine.  No problems there.

19  THE COURT:  Yeah, we're having trouble hearing you.

20  MR. BOYLE:  When anyone else starts talking, it

21  becomes completely distorted, and I've tried to call in using

22  the regular phone-in number.  I enter the meeting ID, and

23  nothing happens.

24  THE COURT:  Jackie, any suggestions for Mr. Boyle?

25  THE CLERK:  And you tried calling in and you said it

1    gets -- you don't get a chance to log in?

2    　　　　MR. BOYLE:  I'm going to try to call in again.

3    　　　　THE CLERK:  Yes.  But you seem fine now, though,

4    so --

5    　　　　THE DEFENDANT:  We can hear you now.  I'm almost

6    sure.  I can hear you moving around.

7    　　　　THE CLERK:  No.

8    　　　　MR. BOYLE:  Okay.  Again, I tried to call in on the

9    Cisco meeting landline; but after I entered the meeting code,

10   it didn't go through, or nothing happened.

11   　　　　THE COURT:  Well, right now, we can hear you.

12   　　　　MR. BOYLE:  Okay.  We'll try.

13   　　　　So, again, Judge, I think it's just very significant

14   that nowhere in the superseding indictment in the counts

15   regarding July 14th is the weapon described as being loaded;

16   in the written plea agreement that my client signed off on to

17   and entered into, there's no language anywhere that it was

18   loaded.  At one point in the process of taking the plea,

19   Mr. Walsh himself suggested that that gun wasn't loaded.

20   　　　　So, I think it is a significant factor, and it was

21   never alleged.  It was not pled -- he didn't plead guilty to

22   that significant fact.  It's not contained in the written

23   plea agreement.  He does make that statement, as the

24   government notes, "I'm not playing," but he doesn't say, "This

25   weapon's loaded."  He doesn't have his finger on the trigger.

1  It's not pointed at the tellers.  It's briefly displayed,

2  again, as I think as we previously argued, not to terrorize

3  anyone, but to get quick compliance, get the funds he

4  received, and get out of there as quick as possible.

5  And I think that's the evidence.  And you take all

6  of that together.  I don't think it's fair to make that

7  assumption, and it is an assumption based upon just

8  circumstantial evidence related to the subsequent incident;

9  but it is an assumption, and it's not warranted by the actual

10  language of the superseding indictment or the written plea

11  agreement that Mr. Walsh entered into.

12  So, I would just argue that your Honor would please

13  revisit that analysis and not -- not make that assumption in

14  calculating what is a fair and reasonable sentence for the

15  incident involving July 14th and the possession of that

16  weapon.  So thank you.

17  THE COURT:  Thank you.  So, I'm going to --

18  THE DEFENDANT:  Judge, could I say something?  I

19  wanted to --

20  THE COURT:  Hold on, Mr. Walsh.

21  Mr. Boyle, Mr. Walsh wants to say something.  I don't

22  know if you would like to advise him.

23  MR. BOYLE:  Mr. Walsh, I've briefed the issue in

24  writing, and I've also just argued it orally.  I'm not sure

25  what more can be said on the issue.

1          THE DEFENDANT:  What can be said is that the

2  picture -- I don't care --

3          MR. BOYLE:  I referenced the picture.

4          And, your Honor, yes, we did attach a photograph, a

5  still photograph that was provided by the government which

6  shows the July 14 bank robbery.  It shows Mr. Walsh in

7  possession of the firearm.  His finger's not on the trigger.

8  And Mr. Walsh is suggesting that if you look at the image,

9  you can see the chamber of the weapon, and --

10          THE DEFENDANT:  The chamber is empty.

11          MR. BOYLE:  His argument is that that chamber is

12  empty.  You would not be able to see through, essentially,

13  the chamber if it had been loaded.

14          THE COURT:  All right.  Government, any thoughts on

15  that?

16          You're on mute.

17          MR. VEATCH:  Your Honor, I'm pulling up the picture

18  now.

19          Your Honor, I think -- the issue we have with that

20  assumption is, one, it's a poor picture.  Two, every firearm

21  is different.  We would want some sort of testimony or some

22  sort of example from an actual -- the actual firearm to see

23  whether or not the bullets would be visible or the area that

24  would be not visible.

25          And I apologize, counselor, which -- if I may, your

1  Honor, which part of the firearm are you saying you would be

2  able to see through or not see through if it was loaded?  And

3  I'm looking at your exhibit to the supplemental sentencing

4  memo.

5            THE DEFENDANT:  The chambers --

6            MR. BOYLE:  I assume the argument is that --

7            THE DEFENDANT:  The bullets, where the bullets are

8  located, you can blow that up as much as you want.  They're

9  not going to see any -- you're not going to see any bullets

10  in the gun.  There's no bullets in the gun.

11            MR. VEATCH:  Your Honor, I would just say that based

12  on this image, it is -- and I understand defendant's

13  argument that the cylinders --

14            THE DEFENDANT:  It is my --

15            THE COURT:  Mr. Walsh, it's not your place right now.

16            MR. VEATCH:  We understand the argument that the

17  cylinders would be empty on an unloaded firearm if you were

18  viewing it at the correct angle.  We would argue that this

19  image is not one from which we can draw that conclusion.

20            THE DEFENDANT:  That's not true.

21            THE COURT:  All right.

22            THE DEFENDANT:  You can bank on that, because looking

23  down from that point of view, it would be noticeable.  That's

24  probably why I did what I did.

25            When you buy a gun off the street, they don't give

1   you bullets.  I don't know how many guns you've bought off

2   the street, but any guns I bought off the street, you know

3   what I'm saying, they give you the guns.  You know, you get

4   the ammo later.

5           What I'm saying is there was no bullets in that

6   particular weapon at that time.

7           I know I can't challenge the 924(c)(1)(A) because

8   basically, the plea was withdrawn -- I mean, it was denied

9   on the plea being withdrawn.  I understand that.  I'm just

10  saying I'd like a fair shake.

11          MR. VEATCH:  Your Honor, if I may, counsel pointed

12  out that Mr. Walsh, during the change of plea hearing, noted

13  that the gun did not have any bullets.  We would just remind

14  everybody Mr. Walsh also initially took the position that it

15  was a replica firearm before conceding that, in fact, it was

16  real.  So, as to a credibility issue, there is certainly that.

17  That's on page 66 of the February 20th, 2020, transcript.

18          MR. BOYLE:  That's correct, Judge.  And he withdrew

19  that, and he pled guilty to the two counts involving the

20  July 14th incident and the possession of that weapon.

21          But again, he never pled guilty to being in

22  possession of a loaded weapon on July 14th or engaging in a

23  bank robbery with a loaded weapon.  That's --

24    (Audio cuts out.)

25          THE COURT:  You just faded out, Mr. Boyle.

1       MR. BOYLE:  Reasonable minds can disagree about that,
2    but I don't think we can disagree about what he was
3    specifically charged --
4       (Audio cuts out.)
5       THE COURT:  Yeah, Mr. Boyle, your audio is messed up.
6    I think if you could start again after, "But again, he never
7    pled guilty to being in possession of a loaded weapon on
8    July 14th or engaging in a bank robbery with a loaded weapon,"
9    and then you cut out.
10       MR. BOYLE:  Okay.  That's essentially it, Judge.
11    It's what he was specifically charged with.  It's what he
12    specifically pled guilty to.  And none of that -- I think
13    where I broke off was that Mr. Walsh is suggesting that the
14    photograph that we attached as the exhibit is dispositive on
15    the issue of whether the gun was loaded.  I think reasonable
16    minds can disagree about that.
17       But the bottom line is that no one can disagree with
18    what he was specifically charged with and what he actually
19    pled guilty to.  None of that involved an allegation or an
20    admission of the possession of a loaded firearm on that day.
21    And, therefore, your Honor's assumption, however reasonable
22    that may be, I think it was just given too much weight,
23    considering the actual charge and what he pled guilty to.
24       And again, we would ask you to revisit that and take
25    a fresh look at the aggravating factors that may or may not

1   have existed on that July 14th incident.

2        THE COURT:  All right.  I appreciate both sides'

3   arguments on this.  I'm going to stick with my initial view

4   that the gun was loaded on July 14th.

5        True -- I agree with Mr. Boyle.  He's correct.  The

6   indictment doesn't charge that the weapon was loaded, but it

7   didn't have to charge that the weapon was loaded in order to

8   properly charge a bank robbery.  The plea agreement didn't --

9   didn't admit -- Mr. Walsh didn't admit in the plea agreement

10  that the gun was loaded; but the plea agreement is an

11  agreement, so Mr. Walsh didn't have to admit that.  And there

12  was a factual basis for the plea of guilty of the July 14th

13  bank robbery, even without the gun being loaded.

14        Mr. Boyle also correctly said that the teller told

15  the FBI that she didn't believe it was a real gun, but we have

16  Mr. Walsh's admission in his plea agreement that it was a real

17  gun, a .357-caliber recover --

18        THE DEFENDANT:  After I got browbeat from this

19  statement, right after I told you that the gun wasn't real.

20        "THE COURT:  Sure.  I see our factual basis floating

21  out of the courtroom and down Dearborn Street, which would

22  require that we have a trial on Monday."

23        That's heavy-handed browbeating somebody down.

24        I took that plea in good faith to get 123 months.

25  If you got all three points, you got 123 months for that

1   plea.

2          I'm just saying, I'm sorry for the rant that I did on

3   October 6th.  I truly mean it.  But looking at what I pled to

4   and what the plea agreement is, I didn't expect you to try to

5   go over and raise my category to a category IV and jack me

6   with another three years on top of that other 123 months.  I

7   didn't expect it.

8          I mean, you can do this, but I'm trying to -- what

9   I'm trying to do and what Mr. Boyle and I are trying to do is

10  get you to see that maybe that the 96 months is a little bit

11  harsh for the COVID-19 and all the rest of everything else

12  that's going on.  Maybe you could give a downward departure

13  for my age or whatever.

14         And in that downward departure, you could cut time

15  off of the 96 to maybe 36 months, with the 60 months for the

16  924(c)(1)(A) that I can't do anything about.  That's true.  I

17  can't do anything about that.  You ruled on that.  I accept

18  your ruling.

19         All I'm trying to do is trying to not die in prison,

20  okay, over something that -- what I'm charged with and what

21  happened and what went down is not worth dying in prison over.

22         I can see your point of view where you feel that

23  I'm just going to go out there and do the same thing again.

24  I understand this.  By my record, I see it.  But I did try

25  out there as hard as I could.  Okay?  I was out there nine

1   times longer than I was at any other time.  I know nine months
2   doesn't seem like anything.  It could have been -- whatever.
3   I got into financial distress.  I did what I did.  All right.
4          That being said, I didn't want to hurt anybody.
5   I never had no intention on hurting anybody.  If I had
6   intentions on hurting anybody, with or without a loaded gun,
7   I would have acted entirely differently.  I had all the
8   chances in the world at blowing people away and everything
9   else.  I don't -- I'm not a nut.  I'm not on that.
10         I'm 74 years old.  I'm kind of tired of the whole --
11  the whole thing.  All I want to do is do the minimum amount
12  of time that I can and get out and get vocational training.
13  That's all.
14         If I had the vocational training, I wouldn't even
15  be in here.  It would be -- I wouldn't be in this courtroom.
16  We wouldn't be having this.  If I had had a livable wage out
17  there, I wouldn't be here.  That's what I was trying to impart
18  to you the whole time.
19         I can understand where you could look at my
20  background and you can say, "Well, hey, I feel that he never
21  learned anything and that he's just going to go out there and
22  repeat offender again and do these things."  All I'm asking
23  for is a chance to get back out into the free world at some
24  reasonable time.
25         156 months is beyond what I might be able to do.  I'm

1    74 years old.  I'm not a kid no more.  If I just had the

2    60 months for the 924(c), I could probably lay out here,

3    finish this time, get some culinary training while I'm inside,

4    and come out and do this thing.  I could be a cook.  I could

5    drive a truck.

6         I don't want to die in prison.  Should I die in

7    prison over -- because of my past record?  My past record's

8    got nothing to do with this other.  I know you can look at it,

9    but it really shouldn't be looked at like that.  A 32-year-old

10    letter that you looked at is not like it was yesterday.  This

11    was 32 years ago.  I spent 60 months in prison.  I was out of

12    contact, no training, nothing.  I got a GED.  You know that.

13         All I'm saying is that -- I took a couple of courses

14    while I've been in here on budgeting and credit and stuff

15    like that, financing.  All I'm trying to do is say that I'm

16    truly sorry for any inconvenience I might have caused you or

17    inconvenience.  Okay?  I'm truly sorry about it.

18         If I could do everything over again, I would have had

19    culinary training, and I wouldn't have been in the position

20    that I'm in, period.  Trust me, I just -- I'm just -- I don't

21    know what to say.  You know?

22         I kind of went off because I was looking at some

23    sentence disparity on a couple of other cases, and I realize

24    when I look at them now that their backgrounds are not my

25    backgrounds.  My case is an entirely different case from

1  anybody else's case, period.

2      I realize that I've got a terrible past and that I
3  got -- and it looks like repeat performances over and over
4  again.  I did try, and I did try really hard.  Physically,
5  what happened with my knees and my hands in them freezers is
6  what made me realize that I can't keep doing what I'm doing
7  and maintain it.

8      And I should have -- I don't know.  I panicked, I
9  guess.  I had bad thoughts, and the old thoughts came back,
10  and I went on with that bad thought.  The thoughts were wrong.
11  I shouldn't have done it.  I see the errors of my ways.

12      You know, if I'm given a chance for vocational
13  training, I believe I can do some type of good, really,
14  seriously.  If I'm sentenced to 156 months, that's an awful
15  long time.  I might not survive 156 months.  I'm looking at
16  it truthfully.  That -- and all that together with what I was
17  looking at, the sentence disparity and you upping my category
18  to a category IV when you were basing something off of a 1964
19  conviction when, in fact, that conviction did not involve a
20  firearm, you agreed on that in the last court appearance.  I
21  would argue that putting me in a category IV is just not the
22  thing to do.  You could do it under statute.

23      It's like this.  Guidelines are advisory.  I realize
24  this.  You could take and give me anything that you want to.
25  It's your power to do that.  I realize that.  I was just upset

1　with the sentence because I'm looking at 154 months, and I'm
2　74 years old right now.  I don't know if I've got that much
3　time left in my body.  And to sentence me to that would be
4　like a life sentence for me to die in prison.

5　　　　Now, my past caught up with me in the 1987 armed
6　robbery.  They gave me 30 years, in all reality, to kill me
7　so that I would die in prison.  I'm looking at that reality.

8　　　　I got out.  Instead of sentencing me -- or sending
9　me to a halfway house, they sent me to a transition center
10　where they don't even feed you.  So, immediately I had to
11　start, you know, doing other things to get money to get food
12　and stuff.

13　　　　Then I had to start -- they'd parole me from one
14　false identity to a new identity.  That was my fault, my --
15　also, daily.  It took me over a month or so to get that
16　straightened out so that I could finally get my ID to go
17　to work.

18　　　　I started going to work every day, early in the
19　morning, way early in the morning, late at night.  I kept
20　going to the -- to work.  I kept going to work to get my
21　apartment together, to get the rent together, to get furniture
22　together, to get everything together.  I had to work hard to
23　do this, and I was working hard to do it.  I'm not trying to
24　be a smart-ass and clever and all the rest of the -- anything
25　deceitful.

1       I realize what I said to you was bad.  I realize how

2   I felt at that time.  It just -- it just made me go off into a

3   different mindset because 156 months, to me, I might not

4   live -- we don't know how long we've got left to live.  The

5   COVID-19 is real.  It's very real.  People are dying in

6   prison.

7       I realize that you could sentence me to anything you

8   want to sentence me to because you could have done so just by

9   statute.  You could just say, "The Guidelines say this, but I

10  feel this, and on the statute, I could sentence you to

11  whatever it is that I want to sentence you to anyway."

12      THE COURT:  Okay.  Mr. Walsh, one second.

13      You know, I -- I've reminded you on probably a dozen

14  occasions during this case that whatever you say, even if you

15  think you may be helping yourself, could end up hurting

16  yourself; and, therefore, I advised you to let your lawyer

17  speak for you rather than have you speak for yourself, other

18  than at allocution, which, of course, is your statement.

19      So, I didn't feel the need to remind you again, but

20  you've been going on for so long that I thought I would step

21  in and remind you of that again.

22      THE DEFENDANT:  Is there anything I've said so far

23  that seems to be harmful that I've said so far to you?

24      THE COURT:  Mr. Walsh, I'd advise you to not go any

25  further.  I'm going to give you a chance to give a statement

1  during the second half of the sentencing hearing if I decide

2  that a sentence higher than the one I was going to give you

3  is warranted.  So, I'd advise you to stop right now.

4          THE DEFENDANT:  All right.  I'm stopping.

5          THE COURT:  But it's up to you.  I'm not going to --

6          THE DEFENDANT:  I've said all that I need to say.

7  I'm pretty -- you know where -- you know -- you know what I --

8  I've tried to communicate to you, so, hey, I've done the best

9  that I can do.

10         Now, my lawyer, you're going to have to try to get in

11  touch with him.  I don't know how this is working out.  He

12  keeps having technical difficulties.

13         THE COURT:  Are you still with us, Mr. Boyle?

14         MR. BOYLE:  Yes, Judge.  I don't know if you can see

15  me.  I'm on the audio call now, which is a much better

16  connection for me.

17         THE COURT:  I can see you and hear you.

18         MR. BOYLE:  Okay.  Thank you.

19         THE COURT:  So, in looking at the gun, the photo of

20  Mr. Walsh during the July 14th robbery, he's holding a gun;

21  and the gun looks -- well, he admitted it was the .357

22  revolver in the plea agreement, and that admission is

23  confirmed by comparing the photo of the weapon at doc 134-1

24  at page 1, which is July 14th, and comparing that with the

25  photo of the firearm that was recovered on July 24th, which

1  is docket 101 at page 36.  That's the same weapon.

2  I do not see any indication from this photo that the

3  firearm -- the photo of the July 14th robbery, that the

4  firearm was not loaded.  Mr. Walsh has been telling us that

5  the firearm was not loaded.  I find that that's not credible.

6  As the government pointed out, for quite some time, Mr. Walsh

7  was saying, this was before his plea, that it was a replica

8  weapon, which, of course, it wasn't.  So, that was a

9  misrepresentation of the facts.  And I would find by a

10  preponderance of the evidence, well over a preponderance of

11  the evidence, that the gun Mr. Walsh had at the July 14th

12  robbery was a real gun and that it was loaded.

13  When Mr. Walsh was arrested before he was able to

14  complete what would have been the July 24th robbery, he was

15  found with a loaded .357 revolver.  The most logical

16  inference, and I think the only logical inference, is that

17  Mr. Walsh had the same weapon also loaded for the July 14th

18  robbery.  I can think of no reason why Mr. Walsh would have

19  brought a loaded .357 to the July 24th robbery, or what would

20  have been the July 24th robbery, but not to what actually was

21  the July 14th robbery, which took place.

22  And Mr. Walsh's criminal history shows that he has a

23  great comfort with and a great affinity for firearms, loaded

24  firearms, and willingness to use them.

25  At the end of the day, this particular issue does not

1  move the needle -- would not have moved the needle on the

2  ultimate sentence I imposed because it's undisputed that

3  Mr. Walsh was bringing a loaded .357 to the -- what would

4  have been July 24th robbery, and that's extremely serious

5  conduct; and even if I had found that he didn't bring the

6  loaded weapon -- that the weapon wasn't loaded at the

7  July 14th robbery, it would not have made a difference to my

8  determination of the sentence, as I intended to give it back

9  in October.

10         There's also the second issue in Mr. Walsh's

11  supplemental brief, which has to do with the 1964 armed

12  robbery involving not a firearm, as I had initially thought,

13  but rather, just a knife.  And the brief argues that because

14  the 1964 robbery, which is reflected at paragraph 55 of the

15  PSR, involved just a knife rather than a gun, I should revisit

16  my determination that there was an appropriate 4A1.3(a)

17  departure raising Mr. Walsh's criminal history from III to IV.

18  And of course, the -- that 1964 armed robbery didn't carry any

19  criminal history points.

20         So, I don't know if the government has any thoughts

21  on that.

22         You're on mute.

23         MR. VEATCH:  Thank you, your Honor.  Your Honor

24  actually addressed this issue during the October 6th hearing,

25  according to the transcript at 21, going into 22.  When the

1    issue was raised about whether this was, in fact, an armed

2    robbery or how significant it would have been or not, the

3    Court made clear that with or without that armed robbery, the

4    prior murder plus the conduct in which Mr. Walsh was found

5    with a loaded .38-caliber revolver, loaded 12-gauge shotgun,

6    and loaded Uzi, along with numerous rounds of ammunition, and

7    I'm quoting, "The murder plus that one certainly more than

8    warrant an upward departure of one criminal history category

9    level."

10          The government would agree with the Court's prior

11    finding, as well as adding the additional criminal conduct as

12    reflected in the PSR that did not receive criminal history

13    points, including the obstruction of justice that involved

14    Mr. Walsh having a handcuff key or having been found with a

15    handcuff key or contraband at a penal institution, as well

16    as -- now, this was -- as well as even if the Court did not

17    depart upward with regard to criminal history, under 3553(a),

18    the ultimate result the Court resulted in, in light of the

19    other conduct described, especially the non-criminal

20    violations while in custody, in addition to the conduct

21    we've discussed, would certainly warrant where the Court

22    landed.

23          THE COURT:  Mr. Boyle?

24          MR. BOYLE:  Well, Judge, again, hopefully you all

25    can hear me.

1          THE COURT:  We can.

2          MR. BOYLE:  Thank you, Judge.  I mean, as we state

3   in our pleading, I do think it is significant.  I don't -- I

4   don't think anyone would question your Honor being troubled

5   if there was another incident where Mr. Walsh had used a

6   firearm to engage in some kind of theft or robbery.

7          I think even from the beginning, we knew because

8   of the disposition of the case, the fact that he received

9   supervision would suggest that a firearm wasn't involved; and

10  then luckily, we were able to confirm that with the help of

11  the Probation Office.  And everyone's in agreement that the

12  Presentence Investigation Report will ultimately be corrected

13  once Mr. Walsh is sentenced and a final amended and corrected

14  Presentence Investigation Report will be prepared.

15         But I do think it is significant; and the fact that

16  we now know that a firearm wasn't involved in that case, that

17  wasn't another incident with Mr. Walsh having a firearm, I

18  think again, we're asking you to revisit the issue.  Again,

19  the serious convictions that Mr. Walsh has in his background,

20  he was significantly punished for those.  It's not like he was

21  getting away with anything.  And I think that's something also

22  to consider.

23         A lot of times a judge might move someone into

24  another category because they feel like they haven't suffered

25  the consequences of these -- of his prior bad acts and prior

1  convictions and that that should be at least reflected in an
2  enhanced criminal history category, but that isn't the
3  situation we have here, clearly.  Mr. Walsh was convicted of
4  the crimes he committed and received very substantial
5  sentences.

6          The second sentence he received was -- again, was
7  maxed out.  It was a 6-to-30-year range.  The judge maxed him
8  out, gave him 30, and then doubled it because of his prior
9  conviction, so gave him an extraordinarily high sentence.

10         So, this is an individual who does have certainly
11 those two cases, very significant, but he was thoroughly
12 punished for them, served his sentences.  And now we know
13 that one of the cases your Honor did use to take him out of
14 category III, we now know the actual facts; and again, we
15 would suggest that this isn't -- again, this is an individual
16 who pled guilty to an original plea agreement, the
17 expectation, even knowing all of these cases in his criminal
18 history, the parties agreed that the appropriate and fair
19 category was category III.  The Probation Office, after they
20 did their analysis, also concluded, again, recognizing the
21 seriousness of the cases in his history, that he should be a
22 category III.

23         So, now that we know that that case when he was
24 17 years old, now that we know it didn't involve a firearm,
25 we should certainly keep him -- as was anticipated in the

1  plea agreement, we should keep him in category III.  And that
2  does make a difference on the Advisory Guideline range that
3  your Honor has to consider when imposing a sentence.

4         THE COURT:  Thank you, Mr. Boyle.  Again, I
5  appreciate both sides' arguments.  They're very well stated.
6  I'm going to stick with my upward departure that placed
7  Mr. Walsh in criminal history category IV.

8         Mr. Walsh received zero criminal history points for
9  the murder of the police officer.  That's paragraph 57.  And
10  that -- that crime, in and of itself, was sufficient to
11  support the upward adjustment to category IV.  Given the
12  murder of the police officer, for which he received zero
13  criminal history points, given the possession of the loaded
14  Uzi, for which he received criminal history points, the
15  robbery in paragraph 55 was just a cherry atop an already-iced
16  cake in terms of the 4A1.3(a) departure.

17         So --

18         THE DEFENDANT:  Even though --

19         THE COURT:  Well, back -- I want to pick up where I
20  left off back in October.

21         I wanted to justify the sentence that I gave, which
22  is the 96 months on Count 4, the 96 months on Count 1
23  concurrent to the Count 4, and the 60 consecutive months on
24  Count 2, for a total of 156 months.  And I was going to
25  explain why I arrived at that sentence when Mr. Walsh gave

1   his continued allocution and we decided to adjourn -- I
2   decided to adjourn.

3          I would emphasize all the aggravating factors that
4   I mentioned in discussing the 3553(a) considerations, and I
5   would just emphasize the following:  The seriousness of the
6   crimes of conviction, Mr. Walsh's criminal history.  It's been
7   a true revolving door.  And that's a cliche, but it's very apt
8   in this case.

9          Mr. Walsh has shown an incorrigibility throughout
10  his life; and he cannot be outside of prison for much time
11  without committing further crimes, and not just any crimes,
12  but either deadly, in the case of a murder, or potentially
13  deadly crimes.

14         There's the matter of incapacitation, which is part
15  of subsection (a)(2) of 3553(a), the need to protect the
16  public from further crimes of the defendant.  If Mr. Walsh
17  gets out of prison while he's physically capable of committing
18  an armed robbery or another violent crime, it's likely -- his
19  history shows that it's likely that he will do so.  For the
20  sake of the people who could come into harm's way, that's a
21  risk that I'm unwilling to take.

22         Mr. Walsh is a person who, despite having earned a
23  20-to-40-year indeterminate sentence for murder and then a
24  60-year sentence for armed robbery, went out and committed
25  another armed robbery, the bank robbery, and was about to do

1  a second, with a loaded .357 revolver.  And Mr. Walsh is

2  somebody who's shown himself capable of putting five bullets

3  into another person's chest, killing that person, and the

4  person happened to be a police officer.

5       Mr. Walsh's criminal history, his inability to be out

6  of prison without committing violent crimes, his in-court

7  behavior prior to the sentencing hearing, the October

8  sentencing hearing all show somebody who is unable or

9  unwilling to govern himself accordingly.

10      And I -- I've been a judge for 10 years, over

11 10 years, and I've always bent over backward to avoid giving

12 a sentence that would carry a non-trivial risk of effectively

13 being a life sentence; but Mr. Walsh has -- has backed me and

14 the criminal justice system into a corner.

15      And again, I'm putting myself back to what I was

16 going to say in October.  My giving Mr. Walsh the 156-month

17 sentence is the only appropriate course in light of his

18 criminal history, the seriousness of his offenses, present

19 offenses, and the danger he poses to the community.  And I

20 would go so far as to say that it would be irresponsible of

21 me not to impose that 156-year sentence.

22      And I do that while fully recognizing -- I was going

23 to do that back in October while fully recognizing that the

24 156-month sentence, the 13-year sentence, which would result

25 in Mr. Walsh being released in his early 80s, given that he's

1  already served about two-and-a-half years of his sentence,
2  could be a life sentence.  But I believe, for the reasons I
3  gave, that that's not just an appropriate sentence, but the
4  only appropriate sentence, again, putting myself back in the
5  October time frame.

6          A $300 special assessment is mandatory.  Restitution,
7  the $3700 to the bank that was robbed on July 14th, I'm going
8  to impose.  I wasn't going to impose a fine on Mr. Walsh,
9  given his inability to pay.

10         In terms of supervised release, I believe there is a
11  five-year maximum term of supervised release; and I was going
12  to impose a five-year term of supervised release, given the
13  need to deter Mr. Walsh from committing further crimes upon
14  what would have been his release had I -- if I give him a
15  156-month sentence, and the supervision and the benefits --
16  and the services that the Probation Office can provide.

17         I believe I asked Mr. Boyle at the beginning of this
18  hearing on October 6th whether he was going to have any
19  objections to the conditions of supervised release recommended
20  by the Probation Office, and I believe he said no.

21         Mr. Boyle, I could be misremembering.

22         MR. BOYLE:  Well, no, Judge.  And we filed a written
23  response.  I think it would be Document 115 on the docket.
24  Our -- it was titled, "Sentencing Response."  And I'm just
25  reviewing it again for my benefit.

1    THE COURT:  Oh, you know what, you're right,
2  Mr. Boyle.

3    MR. BOYLE:  And I'm just confirming what you had
4  stated.  I think the only -- we don't have any objections to
5  the mandatory conditions.  We do not -- well, we do set forth
6  with some specificity which conditions we do not object to,
7  but then there are other various discretionary conditions that
8  they should not be imposed as they have no relevance to this
9  defendant or the nature of his offense and would serve no
10  purpose.

11    I guess we can go through them individually, or if
12  you want me to just put on the record the ones that we don't
13  have an objection to.

14    THE COURT:  Yes.  I see that you don't have an
15  objection to any of the mandatory conditions.

16    MR. BOYLE:  Correct.

17    THE COURT:  Discretionary conditions 4, 6, 8, 14
18  through 18, and 22 to 23.  And in terms of the special
19  conditions, you have no objection to 5 through 7 or 10 and 11.

20    MR. BOYLE:  Right.

21    THE COURT:  You do object to the others.  So, let's
22  go through the ones that there's an objection to.

23    MR. BOYLE:  Well, if we need to, Judge.  We're --
24  just kind of in an excess of caution, I don't think we're
25  objecting to any that Probation has actually recommended.

1  There's just obviously this whole assortment of ones that
2  can be recommended.

3         THE DEFENDANT:  Three years.

4         MR. BOYLE:  But we are -- we were just suggesting
5  that the ones that aren't recommended should not be imposed
6  because they just -- and I think Probation was correct in
7  their analysis.  They don't apply to this defendant.  And we
8  might have stated that because the government might be seeking
9  conditions that Probation are not seeking, but I don't want to
10 speak for them.

11        THE COURT:  You know what, I think -- that's what I
12 recall, but I just want to confirm that Probation has not
13 recommended -- has not recommended anything that you would
14 be objecting to.

15        MR. BOYLE:  That is --

16        THE COURT:  And the mandatory, it's just 1, 2, and 5,
17 which you don't object to.  Discretionary, we have 4, 6, 8,
18 14 through 18, 22 and 23, which you don't object to.  And then
19 special, we have 5 through 7, 10 and 11, which you don't
20 object to.

21        So, it turns out my recollection was correct that --
22        MR. BOYLE:  That is correct, Judge.  The one
23 objection the defendant does have would be to imposing the
24 maximum five-year term of supervised release.  As an
25 alternative, we suggested a total of three -- three years of

1  supervised release on each count to run concurrently.

2        THE COURT:  Okay.  On that, given Mr. Walsh's

3  criminal history and given what he has consistently said

4  is his need for job training and services, I think the

5  five-year maximum term is appropriate, again, for deterrence

6  purposes because if Mr. Walsh were to re-offend upon release,

7  he'd face a sentence not just in the new case, but a

8  revocation sentence in this case.

9        And again, the Probation -- on the positive side, on

10  the non-punitive or non-deterrent side, the Probation Office

11  provides services to defendants who are released; and I think

12  Mr. Walsh, if he were to be released, could avail himself of

13  those services.

14        So, I'm going to go with the full five years.  Under

15  *United States* --

16        MR. CHRISTIANSEN:  Your Honor --

17        THE COURT:  Yes?

18        MR. CHRISTIANSEN:  I'm very sorry, Judge.  This is

19  Jason Christiansen from Probation.  Looking through my

20  paperwork and documentation here, with specific regard to

21  Count 4, I believe there may be a supervised release range

22  that tops out at three years, both statutorily and under the

23  Guidelines.

24        So, I realize that's a distinction without a

25  difference because of the other counts of conviction, but

1    may I --

2         THE COURT:  Yes, right.

3         MR. CHRISTIANSEN:  So, would it be possible for it to

4    be five years on the other two counts, but three years on

5    Count 4?

6         THE COURT:  Yes.  It would be five years on Counts 1

7    and 2, and three years, which is the maximum, on Count 4.

8         MR. CHRISTIANSEN:  Thank you, Judge.

9         THE COURT:  And I misspoke when I said there was a

10   five-year maximum on all three counts.

11        Mr. Boyle, under *United States versus Anglin*, the

12   defendant -- which is 846 F.3d 954 at 969 to 970, the

13   defendant has the option.  If the defendant would like for me

14   to read all the supervised release conditions on the record,

15   I'd be happy to do so.  Alternatively, if Mr. Walsh would

16   like to waive the reading of those conditions, that's his

17   option as well.

18        MR. BOYLE:  Well, Mr. Walsh, we've filed a written

19   pleading wherein we did not object to the various conditions

20   as recommended by Probation.  I think the judge has indicated

21   that he's only going to impose the conditions that were

22   contemplated by Probation.

23        Do you understand those conditions and would waive

24   the formal reading of each specific condition?

25        THE DEFENDANT:  I'll waive the formal reading.

1       MR. BOYLE:  Thank you, Judge.

2       Thank you, Mr. Walsh.

3       THE COURT:  Sure.  The government has a motion for

4  preliminary order of forfeiture as to the .357 revolver.  Any

5  objection to that, Mr. Boyle?

6       MR. BOYLE:  No, your Honor.

7       THE COURT:  Okay.  I'll grant that motion and enter

8  the preliminary order of forfeiture.

9       Under *United States versus Harris*, 718 F.3d 698 at

10  703, footnote 2, I'm supposed to say whether I would have

11  given the same sentence -- and again, I repeat I'm putting

12  myself back in the October time frame -- would have given

13  the same sentence had I agreed with the defendant on the

14  disputed Guideline issues.  And there are times when I answer

15  that question yes, but in this instance, I'm going to answer

16  the question no.

17       With respect to one of the Guideline issues, even if

18  I found that the felon in possession, which was Count 4, was

19  not in connection with an attempted bank robbery for purposes

20  of 2K2.1(b)(6)(B), I would have imposed the same sentence

21  because even if Mr. Walsh's conduct did not technically

22  qualify as an attempted bank robbery, he clearly was about to

23  commit an armed bank robbery.  So, the conduct was the same,

24  and the conduct would have resulted in the same sentence, with

25  or without that offense level enhancement.

1    Second, even if I did not give an upward departure

2  under 4A1.3(a), I still would have imposed the same sentence

3  because Mr. Walsh's actual criminal history is what it is.

4  So, instead of it being a departure under 4A1.3(a), it would

5  have been a variance under 3553(a).

6    The criminal history amply demonstrates that

7  Mr. Walsh needs to be incapacitated.  Here's somebody who was

8  in his early 70s who committed one very well-planned armed

9  bank robbery and was about to commit another.  He certainly --

10  as somebody in his 70s, certainly has his aches and pains and

11  ailments that people get when they advance in age, when they

12  reach their 70s; but he's in relatively decent shape.

13    And a 156-month sentence would -- if he earns his

14  good time, would have resulted in him being released in his

15  early 80s, at which point the risk of his being able to commit

16  more crimes would have been diminished, not eliminated by any

17  stretch, but diminished.

18    So -- and then there were various admonishments about

19  appeal rights and the like that I was going to do at the

20  October hearing, but before I do that -- well first, we've

21  been going for about an hour 10 minutes.  Does anybody need

22  to take a break?

23    MR. BOYLE:  No, thank you, your Honor.

24    MR. VEATCH:  Not the government, your Honor.

25    THE COURT:  In the minute order that I entered on

1  October 6th, I asked the parties to address whether a

2  departure or a variance based on Mr. Walsh's remarks, his

3  supplemental allocution at that hearing is permitted, and if

4  so, whether it's warranted.

5  Probation, I don't know if you have a view on this;

6  but I'd ask for your views, if you have them and would like

7  to share them.

8  MR. CHRISTIANSEN:  Judge, subsequent to having this

9  case reassigned to me from a former presentence investigation

10  officer, I went through the Sentencing Guidelines.  I looked

11  at potential offense level adjustments and potential departure

12  grounds; and I didn't find anything, either specifically

13  within the Sentencing Guidelines or case law that I reviewed,

14  that necessitated a variance or a departure.

15  I guess to my way of thinking, Judge, your Honor is

16  in a unique position to assess what has taken place in this

17  case; and I do not advocate on behalf of the Probation Office

18  any departure or variance based on what has occurred, with

19  full appreciation for the fact that your Honor is in a unique

20  position to assess whether that's an appropriate path forward.

21  THE COURT:  Government, what are your thoughts?

22  MR. VEATCH:  Thank you, your Honor.  Your Honor,

23  recognizing the defendant has attempted to display some

24  explanation for his conduct on October 6th, the fact is he

25  made some very specific threats to harm your Honor, your

1    Honor's family, the prosecutor, and the Probation Office.

2    I was not the prosecutor at that time, but having read the

3    transcript even cold, there are some very harsh threats that

4    appear to indicate at the very least the defendant was

5    attempting to obstruct his sentencing, to the extent that he

6    was attempting to influence your Honor, the Probation Office

7    that would be supervising him if he was to be released, or

8    the prosecutor who still had arguments to make, or your Honor,

9    who still had portions of the sentence to impose.

10    We think that the Court would be well-justified,

11    under 3C1.1, if it sought to increase the offense level by two

12    levels for attempted obstruction of the sentencing proceeding

13    relating to the instant offense and relating to the

14    defendant's offense of conviction or offense conduct.  That

15    would result at a high end sentence -- or a sentencing range

16    of 92 to 115 months, plus a 60-month for the 924(c) charge,

17    which would get you to a 152-to-175-month range.

18    We do believe that the Court would be well-justified

19    were it to increase the defendant's offense level, either

20    under 3C1.1, or by analogy, through a variance, to reflect

21    the fact that defendant made those incredibly threatening,

22    prolonged statements that, unlike most allocutions, allowed

23    the Court to actually see what was going on inside the

24    defendant's head.

25    You know, it is something that he was being honest

1    in portraying to the Court his true feelings and his true

2    inability to control himself, even in the most controlled

3    settings, even when it was completely against his best

4    interest, which is a big concern.  As the defendant has less

5    to lose, if you will, as he gets older and perhaps has less

6    opportunities, there is that concern that he will give in to

7    his less-controlled impulses.

8              THE COURT:  Thank you.

9              Mr. Boyle?

10             MR. BOYLE:  Yes, Judge.  In making this argument,

11   I'm not in any way minimizing or rationalizing anything that

12   was said by Mr. Walsh at that original sentencing hearing.

13   I would just -- my only attempt would be to try to put it

14   into some context, which I think Mr. Walsh has done himself

15   already.

16             I think that's really a good starting point, the fact

17   that Mr. Walsh has come back before your Honor to continue his

18   sentencing and has shown no behavior like that, has not been

19   disrespectful, has not shown any anger.  He has been polite.

20   He has been thoughtful.  He has made further arguments on his

21   own behalf in mitigation.  And I think that should tell us all

22   something, tell your Honor something, that that was an

23   uncharacteristic outburst.

24             Obviously, any defendant who is anticipating his

25   sentencing, there's hopes.  There's expectations.  And again,

1   this is -- I think he was -- I think he's 73 now.  I think he

2   was 72 back in October.  And he had hopes that by accepting

3   responsibility, by pleading guilty, by waiving his right to

4   a trial, he would be receiving some benefit.

5           We also had hopes, as you've already referenced,

6   of convincing your Honor not to impose the four additional

7   points for the attempted bank robbery that he did not plead

8   guilty to, but now he's finding out during the sentencing

9   that that is going to be used against him.  It is going to

10  be used to increase the offense level and call for a higher

11  sentence than he had hoped for.  That's a disappointment.

12          And again, none of this -- I mean, we are going to,

13  I assume, have an appeal.  We are going to challenge some of

14  your Honor's findings, as we've articulated orally and in

15  pleading.  It's just putting yourself in Mr. Walsh's shoes,

16  again, you have hopes and expectations when you finally get

17  your day in court and you're going to be sentenced, and it

18  was, frankly, one disappointment after another.

19          The attempted robbery is going to be used against

20  him to enhance his sentence.  He's going to be taken out of

21  his anticipated criminal history category and put in a higher

22  criminal history category.  And essentially, about -- you

23  know, worst-case scenario, as far as the Guideline range

24  sentence, it sounded like that's going to be imposed, and

25  that was greatly disappointing, greatly frustrating, and

1   greatly upsetting.

2          That's -- I can't speak to the actual things
3   Mr. Walsh or -- said.  I am just trying to put it in context.
4   And then he has his outburst, but then he has come back again
5   before your Honor and has conducted himself, I think, in an
6   entirely appropriate way.

7          You have indicated you're going to impose a sentence
8   of 156 months.  Even with the enhancement that the government
9   has suggested, that would fall within that range that they've
10  spoken of.  But even if you were to consider that, you're
11  essentially already at that kind of a number with 156 months,
12  and so obviously, we feel that that 156 months is more than
13  necessary in this case.  So, you're already there.  So, I
14  don't think you need to find any other enhancement to
15  Mr. Walsh's sentence.

16         Thank you, Judge.

17         THE COURT:  Thank you.  What I'm going to do now
18  is -- well, why don't I -- why don't I ask -- there are two
19  questions I have to resolve.  The first is:  Is the Court able
20  to, am I able to impose a sentence different than 156 months,
21  given that that was the sentence that I said I was going to
22  give?  And then the next question -- if the answer to the
23  first question is yes, I am able to give a different sentence,
24  the question is:  Should I?

25         And I was going to address both of those questions.

1  Obviously, the first is logically anterior to the second.  But

2  before I -- before I do that, I probably should turn the mic

3  over to Mr. Walsh to see if he has anything that he would like

4  to say in addition to what he has already said in October and

5  earlier this morning.

6          THE DEFENDANT:  I'd like to say that any outburst

7  that I made like that, it was just like spontaneous

8  combustion.  You know?  It was something that was not really

9  thought out.  It wasn't planned.  I didn't do it

10  intentionally.  It just happened.

11          And I don't know you.  You don't really know me.

12  You know?  You know me by a record, but you don't really

13  know me.  I don't really know you.

14          I don't -- I wouldn't have seeked to do anything, I

15  wouldn't have said anything had -- from my understanding,

16  123 months -- okay.  There was two points.  It went to

17  138 months.  If I had got the other point from you, it would

18  have been 123 months, according to the plea.  That's what I

19  was thinking.

20          You didn't allude to any of that.  You never alluded

21  to that.  You never -- you get what I'm saying?  So, I'm

22  thinking, "Now where's he going?"  Then you throw in an upward

23  departure, and you're taking stuff that's well older and

24  should have no bearing on what's going on at this time.

25          You seem to think it does.  I understand your

1    reasoning.  Looking at my record, I -- and I went over it.
2    I've looked at it.  I could see your assessment of my record
3    and the fact that I've been back and forth through this entire
4    system too many times.

5           I'm trying to plead with you to get a sentence much
6    less than 156 months, seriously.  I -- 123 months, which is
7    what I would have gotten without anything, if you'd have gave
8    me that point and said, "Well, listen, according to the
9    Guidelines, I'm going to sentence you to 123 months," I
10   wouldn't have made no protest.

11          If you would have said, "I'm not going to give you
12   that point, but I'm going to give you 138 months according to
13   the plea," I would have said not -- nothing.  You understand?
14   I would have said nothing.

15          But when you went to use something that you're going
16   to take off anyway, namely the attempted bank robbery, it's
17   coming off the sentence.  Why would you use those points
18   against me and then under that other statute go for an upward
19   departure?

20          Now, to me, it seemed like that was the original plea
21   that was offered to me on the first time go-around.  It had
22   156 months or something like that, 13 years, on the original
23   first plea that was offered.  I turned that down.  I didn't
24   turn down the 123 months and the fact that I could appeal
25   the 924(c).

1    I wouldn't have had anything to say, but you went

2    with an upward departure, and you upped my category to a IV.

3    To me, it just -- it just made -- it unhinged me from there.

4    My thoughts just went absolutely crazy from there.

5    And then when you were going to give the

6    justification for the high end, I just -- I threw the verbal

7    bag of shit in your face is what I did.  I realize that.

8    (Audio breaks up) -- had no -- there was feelings there.

9    It was feelings -- my hurt, my pain, that I did what I did.

10   You know?  Should I be punished for it?  I don't know.

11   I'm thinking that you're in a position you can do

12   what you want to do with my sentence.  If you feel I should

13   get whatever I'm going to get, that's your feelings.  I

14   can't -- I'm trying to influence you to give me something

15   under the Guidelines so that I can get out and do something

16   right.  You know?  I'm not trying to stay in prison the rest

17   of my life.

18   I'm 74 years old.  Nobody knows how long they're

19   going to live.  I don't know how old you are, but, hey, nobody

20   lives forever.  People die.  I don't need to die in prison or

21   over this thing that I never intended to hurt anybody with.

22   Yeah, my background's bad.  Yeah, I did what I did

23   with that police officer.  There was a lot of other things

24   that were involved with that that you don't know anything

25   about.  I don't really want to get off into that.  That was

1    something that was 52 years old or better back.

2           Was it justified?  No, it probably wasn't justified.
3    Did I pay for it?  Yes, I paid for it.  Did I pay for the
4    other thing when they tried to kill me with time?  Yeah, I
5    paid dearly for that.

6           I was out of focus when I came out after -- if you
7    do that much time, you're going to be out of focus.  Trust me.
8    Doing more time is -- I don't know.  All I'm trying to do is
9    say that I'm not going to -- I'm not going to do anything like
10   that.  If I get the vocational training, I'm going to stay
11   clear of the law, period.  I don't want to be coming back in.

12          I get out at a reasonable time, I'm going to try to
13   do the best that I can do.  That's all I can do.  That's all
14   I can say.  I'm going to try to do the best that I can, the
15   best of my ability.  That's all I can do.

16          Like I say, I apologize for that.  I was in a bad
17   frame of mind.  I was looking at those other two cases that --
18   and I realized later that, yeah, those two cases you went
19   under the Guidelines, but their criminal history is not my
20   criminal history.  That was them.  That's not me.  And I could
21   understand your justification by law to do that.

22          Now, it's not going to make any difference to anybody
23   else out there listening or anything else if I got five years
24   or 50 years.  It's not going to make any difference to anybody
25   else but me.  Yeah, you've got a -- how would you say, it's

1   almost like a procedure to look out for the welfare of the

2   public.  I understand this.  And I understand that you can

3   be justified and give me whatever sentence you wish to give

4   me, period.

5           I'm saying that I would like to get a second chance

6   on this one.  You know?  I'm a little bit older now, and I

7   just don't want to be dying in prison over something that

8   shouldn't be an offense to die over.  Okay?  I don't believe

9   that dying in prison is going to benefit anybody else.  It's

10  going to kill me, but it's not going to benefit anybody else.

11          Now, if I was really that far out of control, I

12  wouldn't have had control ever since then.  I made the

13  emotional outburst, sure, because I was super upset because

14  you were giving me something well beyond the Guidelines, and

15  it wasn't what I pled to.  You know?

16          If you sign -- 95 percent of the people, when they

17  sign a plea, they get usually what they're -- they're at, or

18  they get below the Guidelines a little bit, a little leeway

19  for accepting responsibility, that whole nine yard thing.

20          With my background, I could see the justification and

21  almost the necessity for you to impose the sentence that you

22  did.  What I'm trying to do is to get you to impose a sentence

23  that's far less than that, and -- because I am as old as I am,

24  and I'm not truly trying to die in prison.  Okay?  Not over

25  that.

1     If I had done really some other bad thing and took
2   hostages or really, you know, did something crazy, I'd
3   understand it.  I wouldn't have said anything -- or I wouldn't
4   say because saying anything, that would really tip the balance
5   one way or another.  I'm just trying to live like a normal
6   human being.  That's all.  That's all I was trying to do.

7     I know I stepped off the mark, but I can step right
8   back on the mark if I get the proper training.  If I get an
9   over amount of time, I could die in prison.  What's that going
10   to serve?  That's going to serve, well, hey, you killed this
11   guy with time.  That's what that's going to serve.  It's not
12   going to serve any real justice at all.

13     If you're looking at even-handed justice, as opposed
14   to something that -- you know, you could -- yeah, certainly,
15   you can do that.  You can do -- under that -- under the
16   Guidelines and under whatever you wish, you can impose
17   whatever sentence you wish to impose.  I have no control over
18   that.  I'm just trying to plead that you give me a less
19   sentence than 156 months.  That's what I'm trying to plead,
20   something that's -- that I can do -- that I can get out, a
21   good chance.

22     60 months would have done that.  If you were -- would
23   have came with the 10 years, we could have tried to argue down
24   to getting the five years, so that -- 60 months is blown up.
25   I've got 30 months in now.  In 30 months' time, I can obtain

1  the vocational training that I need to get, and I can get a

2  livable wage out there, and I don't have to be coming back

3  to this again.

4      If I had a livable wage out there, I wouldn't have

5  been back here after 30-some years.  Believe me.  I was trying

6  to do the best I could, and I failed; but I realize my failure

7  is not getting the vocational training.

8      I did try to take -- I took two job readiness courses

9  when I was out of work.  One was for a truck driver -- not

10 truck driver, but a forklift driver, and the other was for a

11 porter.  Okay?  Now, I received certificates for those that I

12 never made any mention about.  Okay?

13     The one, they didn't tell me anything about anything.

14 I had to go 16 weeks, that's four months, with no pay to

15 learn -- to be a forklift driver.  That would have only got

16 me 14, $15 an hour more -- I mean, 14, $15.  It would have

17 been a couple of dollars more than I was making.

18     I put in another job readiness course somewhere else

19 for a janitor's job.  Again, 16 weeks course.  I couldn't do

20 it.  I had to keep working to keep the rent and keep

21 everything else up.

22     Yeah, I was getting Social Security, but they cut

23 payments.  They cut payments if you're working under that --

24 under that -- under that guidelines that they've got for

25 Social Security, if you get disability from mental or you've

1     been locked up a long time.

2          They took my Link card.  From 192, they put it down

3     to $15 a month because I was working.  This is like a month or

4     so, almost two months after I was out.  They cut that because

5     I was working.  They got a computer company, I guess, and

6     they -- they looked at it, and they said, "Well, we're cutting

7     this."

8          They take the 750, and they cut $75 off of it to

9     where I'm getting 675.  Now I get another notice that says

10    that they're going to cut another 75 over a certain amount,

11    and I made over that certain amount, and they were going to

12    cut another $75.  Now you're starting to see where I'm coming

13    from.  It just all piled up on me all at one time, and I lost

14    it.  I lost it.

15         But I didn't want to hurt anyone.  You can see that

16    by the fact -- if you look at the video, you see how fast I

17    moved.  I just wanted them to see that the gun was there.

18    That's it.  I didn't wish to hurt anybody.

19         Yeah, I said, "I'm not playing," because she laid

20    there and closed the drawer on me.  If you look at the bank

21    robbery and look at clip 5, you'll see that from their point

22    of view, she closed the drawer on me.  First I asked for the

23    money.  She closed the drawer and looked at me.  Yeah, I

24    pulled the gun up and did that and said, "I'm not playing."

25    She said, "Okay.  I'll get the money for you."

1       When I leave, also, the other woman that was in
2    question, when I first came in under clip 5, she's on the
3    phone.  She never gets off the phone.  She's not alarmed.
4    She had me go down to the other tellers.  I go down to the
5    other two tellers.  One of them thinks that the gun is not
6    real.  Okay.  Regardless of that, after I leave, if you're
7    looking at the thing, they're laughing about it because
8    people -- you know, they --

9       MR. VEATCH:  Your Honor, this is the government.
10    The government respectfully objects at this point.  None of
11    this is going to the Court's initial question.

12       THE COURT:  Yeah.  I'm going to -- this is
13    actually -- because there have been changed circumstances,
14    I wanted to give Mr. Walsh a chance to give a further
15    allocution; and so he doesn't really need to confine his
16    remarks to answering the two questions that I had.  This is
17    not legal argument.  Mr. Boyle already presented legal
18    argument.  This is further allocution in light of what
19    happened towards the tail end of the October 6th hearing.

20       Go ahead, Mr. Walsh.

21       THE DEFENDANT:  Is there any way that you could see
22    clear to give me a much lighter sentence than 156 months?
23    That's what I would like to ask, in reality.  I'm 74 years
24    old.  You know all the circumstances of everything because
25    I've put it in front of you.

1          If that fact of that picture would have went in front

2    of a jury, they would not have been able to determine that

3    there were any bullets in the gun, period, from that picture.

4    It would have given reasonable doubt to the 924(c), period.

5    But I can't do anything with the 924(c). I can't do anything

6    with anything. It's all been covered legally.

7          All I can do is try to plead my case to say that my

8    age and the fact that -- the fact that I'm just -- you know,

9    I just want a chance, that's all, at life. I don't want to

10   die in prison because of my background.

11         You know, I mean -- what can I say? You know? Yeah,

12   you're within legal rights to do all that you said you could

13   do. You know? And I have not got -- well, I haven't got

14   anything that I can say against that. You know? Nothing.

15         So, whatever you're going to do, you'll do, and

16   that's it. I have nothing further to say.

17         THE COURT: All right. Thank you. Anything further

18   from Probation?

19         MR. CHRISTIANSEN: No, Judge, unless there are any

20   specific questions that you have for me.

21         THE COURT: Okay. Anything further from the

22   government?

23         MR. VEATCH: Your Honor, I guess the question, as

24   your Honor posed it, is whether you now have the authority to

25   impose a different sentence; and I think much of that hinges

1   on whether -- certainly, you could have after the October 6th

2   hearing, as the sentencing was still in motion.  You were

3   still receiving argument on issues.

4        I think the greater issue now becomes whether, in

5   your Honor's recitation of the conditions of a sentence that

6   you would have imposed is the question of whether that was

7   your -- the Court, in fact, imposing a sentence in that moment

8   and now after the fact seeing whether the imposed sentence

9   needs to be modified.

10       If the Court was merely indicating its intention of

11  what it anticipated imposing, I think arguably, that's a

12  different story.  But to the extent that the Court has already

13  imposed a sentence, now that it has gone through all the

14  factors, the motions, the forfeiture motions, the conditions,

15  if the Court views that as having imposed the sentence, I

16  believe we are past that; and now, you know, modification

17  would have to be under Rule 35 for clear error.  I think much

18  of it hinges on the Court's intent in relaying the terms of a

19  sentence.

20            THE COURT:  Mr. Boyle?

21            MR. BOYLE:  Yes, Judge.  I think I have a similar

22  analysis.  I've been looking at Rule 32.  I think you have --

23  you essentially imposed the sentence back in October.  You

24  have re-articulated the same sentence and have re-articulated

25  your reasoning and the reasons why you're imposing that

1   156-month statement -- sentence.

2          So, I think there were, I guess, various approaches

3   or things that could have been done in response to Mr. Walsh's

4   statements back in October, but I don't think those steps were

5   taken.  I think -- I think both parties looked at the idea as

6   if you could somehow use that as a possible enhancement.

7          The government today has suggested that possibly

8   under Section 3C1.1, an enhancement to the offense level could

9   be imposed; but again, even if you were to do that, a

10  156-month motion is already within that range.

11         And again, what Mr. Walsh has said in subsequent

12  court appearances and what he has just stated again today,

13  it's just -- he was -- had great hopes for a lower sentence;

14  and apparently, again, your Honor apparently imposed --

15  essentially sentenced him to 156 months back in October, and

16  now we've just kind of -- I think certain things have changed

17  that were in Mr. Walsh's favor, such as the amendments and

18  corrections to the Presentence Investigation Report.

19         And for the first time in my career, I filed a

20  sentencing memorandum where I asked for a higher sentence

21  than I did in the original pleading, and I think that also

22  suggests that Mr. Walsh has come a bit down the road as far

23  as understanding the seriousness of his criminal history and

24  the reasons why what we originally asked for was the 60-month

25  sentence and one day served, we have now come back and we're

1    asking for a 96-month sentence, which for various reasons,

2    your Honor is not prepared to impose.

3         Instead, you've stated you plan on imposing the

4    sentence of 156 months, and I think that is where you

5    should -- we're objecting to that sentence, obviously, and I

6    anticipate Mr. Walsh will want to appeal that sentence; but I

7    think -- I think it encompasses all of the things that you

8    have carefully considered, and that's why you're imposing

9    that sentence.  And I don't think Mr. Walsh's outburst back

10   in October should change that, or perhaps can't change that.

11   I think the sentence has been imposed.

12        THE COURT:  Okay.  Thank you.

13        MR. CHRISTIANSEN:  Your Honor, this is Probation

14   again.  I feel I need to clarify for myself and for Probation

15   a little bit more.  May I do that, sir?

16        THE COURT:  Of course.

17        MR. CHRISTIANSEN:  Okay.  I guess from the standpoint

18   of the application of the Sentencing Guidelines, the Probation

19   Office, the way we're trained to sort of approach things is to

20   use the relevant conduct analysis, and the most simple way in

21   looking at it vis-a-vis my approach is that we look at conduct

22   that occurs in preparation for an offense of conviction, net

23   conduct that obviously spans the offense itself, and then any

24   attempts by a defendant to avoid responsibility for their

25   conduct.

1        I guess the way that I view this situation, at least

2   in terms of whether or not there's propriety in the realm of

3   adjusting his offense level based on his statements during

4   that supplemental allocution is that I can only imagine what

5   he was thinking at the moment, but it's almost as though the

6   penalty has been imposed, at least in his mind.  So, he wasn't

7   avoiding responsibility for anything at that point because the

8   penalty had already been imposed.

9        I can't know for sure exactly what he was thinking

10  when he was saying the things that he was saying, but that is

11  my rationale in suggesting that the Court may not be required

12  to revisit the offense level computations or to revisit issues

13  pertaining to variances or departures.  That's the reason for

14  my saying that I think the Court is in the unique position to

15  assess the propriety of those types of adjustments.

16       I hope that makes it -- things a little bit more

17  clear.

18            THE COURT:  I understand what you're saying.

19            That was kind of directed towards the government's

20  argument, so I don't know if the government has anything in

21  addition that it would like to say.  You don't have to, but

22  if you would like to, go ahead.

23            MR. VEATCH:  Certainly, your Honor.  And I agree with

24  Probation's sentiments -- I should say Probation certainly

25  raises a very interesting way of looking at the statements.

1  We would just disagree that sentence was imposed during the
2  October 6 proceeding.

3          THE COURT:  Right.  The first question is whether
4  the 156 months that I articulated, but did not fully justify
5  at the October 6th hearing, and what I did at the beginning
6  of today's hearing is I said what I was going to say at the
7  October 6th hearing, with a couple of adjustments, the
8  adjustments being to what the armed robbery was in
9  paragraph 55 and whether or not that would impact the upward
10  departure from category III to category IV, and then whether
11  or not the gun was loaded in the first robbery.

12          So, the question is:  Having uttered the words
13  "156 months," is that it?  Is that something that is set in
14  stone?

15          The answer to that question is no, at least in my
16  view.  Criminal Rule 35(c) refers to the oral announcement of
17  the sentence, and the Seventh Circuit has held that the oral
18  announcement of a sentence means that all components of a
19  sentence must be stated in the oral sentence.  And that's
20  *United States versus McMillan*, 777 F.3d 444 at 451.

21          That obviously didn't happen on October 6th.  I
22  didn't -- well first, I didn't fully -- I didn't give my
23  complete justification for the 156 months; but even more than
24  that, I didn't say anything about supervised release, about a
25  fine, about the forfeiture.  So, I didn't come close to giving

1   all components of a complete sentence.  And I recognize that

2   at page 47, lines 20 through 24 of the October 6th transcript.

3           Just moving on, in *United States versus Cheatham*,

4   527 Fed. App. 556 at 557, the Seventh Circuit stated that a

5   district court may spread out the sentencing process over more

6   than one date.  And *Cheatham* didn't address the particular

7   situation that I'm facing right now, that we're facing right

8   now; but the *Cheatham* unpublished decision does cite a Tenth

9   Circuit decision that does speak to our circumstances.

10          It's *United States versus Luna-Acosta*, 715 F.3d 860,

11  where the Seventh Circuit -- I'm sorry, where the district

12  court imposed one sentence, and then -- custodial sentence,

13  and then imposed a different sentence.  And the -- and then

14  got cold feet, and the district court went back to the

15  original sentence on the ground that the district court was

16  stuck with the originally articulated sentence.

17          And the Tenth Circuit held that that was not the

18  case, that the district court could have, over the course of

19  the sentencing hearing, imposed what the district court had

20  articulated in the second sentence.  And the Tenth Circuit

21  explained that Rule 35(c) defines sentencing as the oral

22  announcement of the sentence, and that nothing in the rule

23  requires or suggests that whatever term or terms of

24  imprisonment the district court first utters during a hearing

25  is to be treated as the sentence for purposes of the rule.

1    And that's at page 865.

2           And then the Tenth Circuit held that despite the

3    continuance in the hearing, the sentence was not final until

4    the end of what the district court -- until the end of the

5    second hearing that the district court conducted.  And the

6    Tenth Circuit said, which is very pertinent here, "Most

7    important is the very fact that the district court continued

8    the first hearing without finalizing all the terms of the

9    sentence."

10          The Tenth Circuit cited with approval the Fifth

11   Circuit's decision in *United States versus Gerezano-Rosales*,

12   which is 692 F.3d 393.  In that case, the district court

13   announced a sentence of 71 months.  The defendant made

14   remarks that were much milder than Mr. Walsh's remarks on

15   October 6th, and then the district court said, "Okay.  I'm

16   going to give you a 108-month sentence."

17          And the Fifth Circuit affirmed the 108-month

18   sentence, reasoning that the district court's initial oral

19   announcement of the defendant's sentence did not constitute a

20   binding sentence and, therefore, did not strip the court of

21   its ability to change the initial formulation and that the

22   court changed its initial formulation before it adjourned the

23   sentencing hearing.  And that's the situation we have here.

24          And the Tenth Circuit, in *Luna-Acosta*, also cited a

25   First Circuit case, *United States versus Burgos-Andujar*,

1  275 F.3d 23 at 30 to 31, which presented a very similar

2  situation to the Fifth Circuit circumstances in

3  *Gerezano-Rosales* and to the circumstances we face here, where

4  the sentencing judge initially said 40 days, the defendant

5  interrupted and made inadvisable comments to the court, and

6  then the court raised the sentence to 60 days.

7       And the First Circuit said the sentencing judge was

8  fully justified in considering the defendant's full

9  allocution, which included her comments during the second part

10  of the allocution.  And because of the way the hearing

11  developed, the 40-day sentence was functionally a tentative

12  sentence.

13       And to the same effect is *United States versus Ochoa*,

14  809 F.3d, 453 at 458, which is the Ninth Circuit.

15       So, that's our situation here, and Mr. Walsh's

16  remarks towards the end of the October 6th hearing was a

17  continued allocution under Rule 32.1(4)(A)(ii).  So, it is

18  within my discretion under the rules to impose a sentence

19  different than the 156-month sentence that I initially

20  articulated.

21       As to whether I will do so, we've been going for

22  two hours right now.  There's been a lot said during this

23  hearing.  And in fairness to Mr. Walsh, and in fairness to

24  the government, and in fairness to the public, and in the

25  interests of justice, I need to reflect on what was said,

1    rather than simply process it on the fly and decide right now.

2             And the last thing I wanted to do coming in to this

3    sentencing hearing was to continue the hearing once again

4    because we've been with each other a lot and it's time to

5    bring this matter to a close; but I think I would be doing a

6    disservice to Mr. Walsh, to the government, to the interests

7    of justice if I didn't take time to reflect on everything

8    that was said during this hearing.  And I don't have the

9    opportunity to do so on the fly.

10            So, Jackie, I don't know if we can propose a time

11   next week when we can get together, or the week after.

12            First let me ask the lawyers, are there any dates

13   over the next two weeks that you're not available?

14            You're on mute.

15            MR. VEATCH:  Not from the government, your Honor.

16   Thank you.

17            MR. BOYLE:  Judge, I have something virtually every

18   morning, but I can usually make a little bit later in the day

19   work on every day.  I do have a continued evidentiary hearing

20   on the 22nd before Judge Lee, so I'd prefer not that day.

21            THE CLERK:  I'll look at our calendar.

22            THE COURT:  Yeah, Jackie, I could do it any afternoon

23   other than the late afternoon on the Thursday of next week and

24   of the following week.

25            THE CLERK:  Okay.  How about January 20th at

1    1:00 p.m.?

2          MR. BOYLE:  That works for the defendant.

3          MR. VEATCH:  Works for the government, your Honor.

4          THE COURT:  All right.  Then we'll get back together

5    on January 20th.  And I want to thank counsel for your -- and

6    the Probation Office for all of your arguments and input on

7    these difficult matters.

8          MR. BOYLE:  And, Judge --

9          MR. VEATCH:  Your Honor --

10         MR. BOYLE:  -- can I just ask for a little clarity?

11   I mean, you've already determined that you can -- you're not

12   saying you will, but that you could impose a greater sentence

13   based upon Mr. Walsh's statements.  Is there anything else we

14   should be thinking about?

15         THE COURT:  No.  I'll certainly -- if you have more

16   to say on whether I should, I'm happy to hear you out on the

17   20th.

18         MR. BOYLE:  Okay.  I mean, that would be over our

19   objection, and we will revisit that, I suppose, when we

20   reconvene.

21         THE COURT:  Yeah.  And you're not -- if you do make

22   arguments on that point, you're not waiving your position that

23   I'm stuck with the 156-month sentence.

24         MR. BOYLE:  Thank you, Judge.

25         MR. VEATCH:  Your Honor, on behalf of the government,

1  I should have made clear, certainly, I was telling the Court

2  what the range would be if the acceptance -- I'm sorry, if the

3  obstruction came in.  The government's position is that it

4  should be increased to that high end of whatever the Guideline

5  range would be with the obstruction enhancement, or as of

6  right now preliminarily, 175.

7              THE COURT:  Right.

8              MR. VEATCH:  I just wanted to make clear that that

9  was on the record, your Honor.

10             THE COURT:  I understand.

11             MR. CHRISTIANSEN:  And, your Honor, is there anything

12  that you require from the Probation Office at present?

13             THE COURT:  No.

14             THE DEFENDANT:  Could I say something, just --

15             THE COURT:  Again, I'd advise you not to.  I'm not

16  going to stop you.

17             MR. BOYLE:  Mr. Walsh --

18             THE DEFENDANT:  Okay.

19             MR. BOYLE:  Mr. Walsh, if you have anything you want

20  to say to me, I will request a legal call as soon as we hang

21  up.

22             THE DEFENDANT:  Okay.

23             MR. BOYLE:  I think you've been heard today; and we

24  will confer, and we'll get prepared for the next hearing.

25             THE DEFENDANT:  The thing that's happened, what I'm

1    trying to do is -- remember, I had just had that information

2    from two --

3              MR. BOYLE:  Mr. Walsh, we can address that together

4    on a legal call, and if you provide me with that

5    documentation, I can submit it to the Court.

6              THE DEFENDANT:  All right.

7              MR. BOYLE:  Thank you.

8              THE COURT:  All right.  Thank you.

9              MR. BOYLE:  Thank you, everyone.

10             MR. VEATCH:  Thank you.

11             THE DEFENDANT:  Thank you.

12       (Which were all the proceedings heard.)

13                         CERTIFICATE

14       I certify that the foregoing is a correct transcript from

15    the record of proceedings in the above-entitled matter.

16

17    */s/Charles R. Zandi*              *February 5, 2021*

18    Charles R. Zandi                 Date
      Official Court Reporter

19

20

21

22

23

24

25