1

<pre>
 1                 IN THE UNITED STATES DISTRICT COURT
               FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                          EASTERN DIVISION

 3
       UNITED STATES OF AMERICA,      )
 4                                    )
                        Plaintiff,    )
 5                                    )
       -vs-                           )  Case No. 18 CR 450
 6                                    )
       DAVID WALSH,                   )  Chicago, Illinois
 7                                    )  January 20, 2021
                        Defendant.    )  1:00 p.m.
 8

 9           TRANSCRIPT OF VIDEOGRAPHIC PROCEEDINGS - Sentencing
                BEFORE THE HONORABLE GARY FEINERMAN
10

11     APPEARANCES:

12     For the Government:      HON. JOHN R. LAUSCH, JR.
                                UNITED STATES ATTORNEY
13     (via video conference    BY:  MR. CHRISTOPHER K. VEATCH
       call)                    219 South Dearborn Street, Suite 500,
14                              Chicago, Illinois   60604
                                (312)353-5300
15

16     For the Defendant:       LAW OFFICES OF PATRICK E. BOYLE
                                BY:  MR. PATRICK E. BOYLE
17     (via video conference    155 North Michigan Avenue
       call)                    Suite 562
18                              Chicago, Illinois   60601
                                (312) 565-2888
19
       Also Present:            MR. JASON CHRISTIANSEN, U.S. Probation.
20                              (via video conference call)

21
       Court Reporter:
22
                          CHARLES R. ZANDI, CSR, RPR, FCRR
23                            Official Court Reporter
                            United States District Court
24               219 South Dearborn Street, Room 2144-G
                          Chicago, Illinois   60604
25                       Telephone:   (312) 435-5387
                    email:  Charles_zandi@ilnd.uscourts.gov
</pre>

1        (Proceedings heard in open court:)

2              THE CLERK:  18 CR 450, USA versus Walsh.

3              THE COURT:  Good morning.  Who do we have for the

4    government?

5              MR. VEATCH:  Good morning, your Honor.  Christopher

6    Veatch on behalf of the United States.

7              THE COURT:  You know, your mic is not working too

8    well.

9              MR. VEATCH:  Your Honor, Christopher Veatch on behalf

10   of the United States.

11             THE COURT:  Yeah, that was better, but you're still a

12   little faint.  When you were talking a few minutes ago, you

13   were fine.

14             MR. VEATCH:  Hum.  I'll hold the phone up to my

15   mouth, your Honor.  Christopher Veatch on behalf of the United

16   States.

17             THE COURT:  Okay.  Good morning -- or good afternoon.

18             Mr. Boyle, is that you?

19             MR. BOYLE:  Yes, Judge.  Can you hear me?

20             THE COURT:  Yes.

21             MR. BOYLE:  I'm sorry, Judge.  Can you hear me?

22             THE COURT:  Yes, we can, although your audio seems a

23   bit off.

24             MR. BOYLE:  I hope that's better.

25             THE COURT:  Yes.  And then we have Mr. Walsh.  Is

1  that you?

2          THE DEFENDANT:  Yes.  Can you hear me?

3          THE COURT:  Yes.  And then Probation?

4          MR. CHRISTIANSEN:  Yes.  Good afternoon, Judge.

5  Jason Christiansen, United States Probation.

6          THE COURT:  So, this is a continued sentencing

7  hearing.  We first got together on October 6th.  I adjourned

8  that hearing.  We then got together last week -- well,

9  actually, we got together one other time, when I ruled on the

10  recusal motion and the motion to withdraw the guilty plea.

11          And then in terms of the sentencing hearing, we got

12  back together last week on the 14th, and I adjourned the

13  hearing because I wanted to give consideration to what --

14  everything that was said.  And we reconvened for today.

15          Before we get started, I wanted to make some -- a

16  couple of preliminary remarks.  The first has to do with

17  something that I mentioned during the hearing on the recusal

18  motion, which I -- I stated, and this wasn't a necessary part

19  of my ruling, that Mr. Walsh's remarks at the October 6th

20  hearing were designed and intended to force a recusal.  It was

21  just kind of the icing on the cake.

22          And it was, of course, the matter of whether

23  Mr. Walsh audibly said, after a hearing a couple of years ago

24  had concluded, that he had killed a cop; and "cop" was his

25  word, not mine.  I vividly recall it happening as Mr. Walsh

1  was gathering up his papers before being escorted back to the
2  elevator and then to the lock-up.

3      It almost certainly was after Jackie had called an
4  adjournment to the proceedings, so I doubt -- Mr. Boyle, I
5  know you were probably checking for it on a transcript.  It's
6  not going to appear on any transcript.

7      And I vividly recall it for a couple of reasons.
8  First, I recall being surprised that, having killed a law
9  enforcement officer, Mr. Walsh wasn't in prison for life and,
10  therefore, that he was able at that point to be out in the
11  world and be charged with a robbery and an attempted robbery
12  and the gun crimes at issue here.

13      And second of all, I recall being so impressed, but
14  not surprised, by the professionalism of the Deputy Marshals
15  who were escorting Mr. Walsh to the elevator.  And when
16  Mr. Walsh called up, "you know, I killed a cop," those Deputy
17  Marshals didn't bat an eye when he said that he had killed a
18  fellow law enforcement officer.

19      And as I mentioned at the hearing where I denied the
20  motion to recuse, I suspected at the time, albeit incorrectly,
21  that Mr. Walsh was just padding his criminal resume in an
22  effort to intimidate me to get a more favorable decisional
23  environment for certain pretrial matters that were before me
24  that Mr. Walsh was very vigorously arguing.

25      And then I flash forward a couple of years.  I

1 │ vividly recall when I first read the Presentence Investigation

2 │ Report, I was surprised to see that Mr. Walsh had, in fact,

3 │ murdered a police officer some time ago.  So, that's the first

4 │ set of preliminary things I wanted to say.

5 │     And the second has to do with departures and

6 │ variances.  And I want to say -- I want to make clear that

7 │ Mr. Walsh, and of course, his counsel have been given

8 │ sufficient notice of the possibility that I would impose

9 │ departures, which I've already done, and variances, which I

10 │ may do, in this case.

11 │     In terms of the 4A1.3(a) departure regarding the

12 │ criminal history category, III to IV, I announced near the

13 │ beginning of the hearing on October 6th the possibility of

14 │ a departure regarding Mr. Walsh's criminal history, and I

15 │ allowed argument on the point before stating my intent to

16 │ impose that departure from a level III -- from a category III

17 │ to a category IV.

18 │     And then before our January 14th hearing, Mr. Walsh,

19 │ through Mr. Boyle, his extraordinarily able counsel, filed a

20 │ brief regarding that departure; and then I heard further

21 │ argument on January 14th, considered the matter anew in light

22 │ of the new information that was provided regarding the older,

23 │ the much older armed robbery conviction.  And then I

24 │ reaffirmed the departure.

25 │     In addition, in my minute order from October 6th,

1     which was after Mr. Walsh's supplemental allocution on the

2     6th, I announced that I was considering whether I could have a

3     departure or a variance based on that supplemental allocution,

4     and if so, whether I should.  And I heard argument on the

5     first part of that, whether I could, on January 14th, and the

6     government proposed a departure under 3C1.1 for obstruction.

7     And I heard argument from Mr. Boyle, and I'll invite further

8     argument in a moment.

9           And back on the 14th, I decided that the 156-month

10    sentence that I had announced my intention of imposing was

11    not set in stone and that I could consider whether or not

12    to impose a different sentence.

13          So, what I'd like to do now -- and I know that a lot

14    has been said by Mr. Boyle and by the government and by

15    Mr. Walsh.  But to the extent that you had time to -- and I'm

16    sure you have had time to think about this matter, think very

17    deeply about this matter, as I have; and to the extent you

18    would like to make additional arguments as to whether I should

19    impose a sentence that is different from the 156-month

20    sentence that I stated that I had intended to impose back in

21    October, I wanted to give you an opportunity.

22          And then I know Mr. Walsh has already allocuted; but

23    given that there has been some more water that had passed

24    under the bridge, if he wants to further address the Court, I

25    wanted to give him that opportunity as well.

1      So, in terms of the lawyers, Mr. Boyle, why don't I

2   start with you.  Again, I know you've already said a great

3   deal, and you may not have anything else to say; but if you

4   do, I wanted to give you an opportunity, and I'd be very happy

5   to hear what you have to say.

6      MR. BOYLE:  Thank you, Judge.  Following the last

7   hearing, you cited to certain cases that I think spoke more

8   directly to the idea of procedurally, under Rule 35, was when

9   you first orally declared your expected sentence.  Following

10  your full analysis, you thought an appropriate sentence was

11  156 months.  Should that have been the end of it?  And you

12  directed us to certain cases, and I pulled them up.  And I've

13  done additional research on that.

14      And the consensus does appear to be that the mere

15  oral proclamation of the sentence doesn't end the proceeding,

16  but that doesn't mean that you should change that based on

17  what Mr. Walsh said at the October -- at the end -- during

18  the October 6th hearing.

19      You did adjourn it, so I think again, procedurally,

20  the sentence wasn't final at that point.  We hadn't discussed,

21  you know, the issues regarding supervised release, so I think

22  the sentencing was still continued, and I don't think we

23  dispute that.

24      THE COURT:  May I interrupt just for one moment?

25      Let me ask the government and Probation to put your

1    computers on mute for a moment.  Okay?

2                    MR. BOYLE:  Thank you.

3                    THE COURT:  And I'm going to do the same.

4                    MR. BOYLE:  So, I think putting the procedural issue

5    aside, and I think what's significant is because the hearing

6    was continued -- and for various reasons, Mr. Walsh wanted to

7    be heard and you allowed him to be heard, and he took

8    advantage of that.  And I think at every proceeding subsequent

9    to the first sentencing hearing, Mr. Walsh has demonstrated

10   that he can be calm and rational and polite and respectful to

11   your Honor and to this Court.  And I think that's very

12   significant.

13                   On the last hearing, again, without trying to

14   rationalize or justify anything that was said by Mr. Walsh, it

15   was just an idea of trying to put this into context.  For a

16   criminal defendant, a sentencing is a very emotional day.

17   It's a day that they are -- I don't know if looking forward to

18   is the proper word, but you're certainly -- that's all you're

19   thinking about, presumably.

20                   Not to make a bad metaphor, but for a criminal

21   defendant, about the only thing I could compare it to would

22   be a wedding day.  And emotions run very high, and people

23   sometimes say things and react to things that they would not

24   react to in a different context.

25                   And the context I tried to put Mr. Walsh's reaction

1  in was again, looking forward to this day, accepting

2  responsibility for his actions, pleading guilty, and yet

3  having certain hopes and having certain expectations for

4  how the sentencing would go; and unfortunately, none of it

5  went the way he was hoping for.  So, it's somewhat

6  understandable that he would have an emotional outburst.  He

7  has also himself tried to explain, without rationalizing it,

8  but -- so, that's the context of that.  And I would ask you

9  to take all of that into consideration.

10       As far as the idea that the government suggested on

11  the last hearing that you could look to another section of

12  the Guidelines and enhance his sentence essentially for an

13  obstruction of justice, I wish I did have a transcript of

14  the last hearing because I think what Probation -- how they

15  responded to that was very eloquent --

16  (Audio cut out.)

17       THE COURT:  I'm sorry.  Mr. Boyle, your camera just

18  froze, and we stopped hearing you.

19       MR. BOYLE:  I'm not hearing anyone.

20       THE COURT:  Can you hear me?

21       MR. BOYLE:  I'm sorry.  I can't.  I'm not hearing

22  anyone.

23       THE COURT:  Okay.

24       MR. BOYLE:  I don't see anything I can change.

25       THE COURT:  So, anyway --

1    MR. BOYLE:  Can we pause this, and I can call in?

2    THE COURT:  Yes, let's do that.

3  (Pause.)

4    MR. BOYLE:  Good afternoon again.  This is attorney

5  Boyle.

6    THE COURT:  Okay.  You're back.  And we can see you.

7    MR. BOYLE:  Okay.

8    THE COURT:  So, when you cut out the last time --

9    MR. BOYLE:  Good afternoon again.  Attorney Boyle.

10    THE COURT:  Can you hear us?

11    MR. BOYLE:  Yes, I can.

12    THE COURT:  When you cut out, you said, "I wish I did

13  have a transcript of the last hearing because I think what

14  Probation -- how they responded to that was very eloquent."

15  And at that point, you cut out.

16    MR. BOYLE:  Okay.  Thank you, Judge.  So, again, I

17  don't think the obstruction enhancement --

18    THE COURT:  Okay.  Mr. Boyle, I'm sorry to interrupt.

19    MR. BOYLE:  I know what you're going to say.  I know

20  what you're going to say.

21    THE COURT:  Yes.  Put your computer on mute.

22    MR. BOYLE:  Hopefully that's better.

23    THE COURT:  No.  We're still getting the feedback, so

24  I think your computer may not be on mute.

25    MR. BOYLE:  I know.  That's the issue I have every

1    time, so -- and I can't get it less than zero.

2            THE COURT:  Well, actually, you know what you can

3    do, on your computer, put your mouse over one of the two

4    people on the bottom of your screen, and there should be

5    a -- something that looks like a microphone with a slash

6    through it.

7            MR. BOYLE:  Right.  Is that better?

8            THE COURT:  Click on that.

9            MR. BOYLE:  I have muted that.

10           THE COURT:  Okay.  You're good.

11           MR. BOYLE:  Okay.  Thank you, Judge.  Okay.

12           So, again, I don't think the application to the

13   obstruction would be appropriate in this situation; but I did

14   look at the cases you cited, and I thought most significantly,

15   the case of *United States versus Gerezano*, G-E-R-E-Z-A-N-O,

16   *Rosales*, from the Fifth Circuit, 692 F.3d 393, where again, as

17   your Honor noted, they did find that under Rule 35 you could,

18   based upon a perceived contempt or contemptuous language or

19   behavior by a defendant, revisit the sentence.

20           And while the opinion found that that can be done, at

21   least in some concurring opinions, which I found compelling,

22   they found that it should be discouraged, that there are other

23   avenues that a sentencing court could pursue, such as a

24   contempt proceeding and -- but of course, the issues with that

25   is that it would have to be charged separately.  I think

1    beyond recusal, I think probably if the punishment is beyond a

2    possible six months, I think it would have to be transferred

3    to a different sentencing judge.

4         And again, in another case that your Honor cited,

5    *United States versus Ochoa*, O-C-H-O-A, 809 F.3d 453, the Ninth

6    Circuit, again, while finding that procedurally a sentencing

7    judge can revisit an orally pronounced sentence based upon an

8    outburst by a defendant or a perceived contempt, again, it was

9    discouraged.  And they found that the enhancement to the

10   sentence was unreasonable.

11        And again, they state, "If the district court felt it

12   necessary to punish Ochoa for his purported disrespectful

13   courtroom behavior, it should have initiated contempt

14   proceedings rather than rashly increase his term of

15   incarceration for the underlying offense."

16        Now, obviously, because of your Honor's demeanor and

17   I think everyone's demeanor since that first sentencing

18   hearing, no one is accusing you or anyone else of rashness.

19   It's just I think the concern that those opinions address and

20   the concern I have is that ultimately, your Honor will be

21   sentencing Mr. Walsh for not the offense that he pleaded

22   guilty to.  You're sentencing him for all aspects.

23        And obviously, every sentencing involves your

24   sentencing the person, for better or for worse.  Their history

25   comes into play.  There are many factors.  And as a defense

1  attorney, I encourage that.  But I think in this situation, we

2  are in danger of having an extreme cumulative effect that

3  Mr. Walsh is being sentenced for so many other things than his

4  actual conduct that he pled guilty to.  And it's things that

5  have been emphasized before.  Obviously, his murder conviction

6  that he, you know, served his sentence for, a subsequent armed

7  robbery that he was convicted of and served a very significant

8  sentence for.

9       Again, this is not a defendant whose prior criminal

10  acts are not being counted against him because he somehow

11  escaped justice and wasn't punished and, therefore, they don't

12  qualify.  He served very significant prison terms, especially

13  for the second offense; and they were just timed out, and

14  that's the only reason they didn't count.

15       And again, I feel like that was addressed by your

16  Honor with taking him out of that other category.  And I just

17  think there are -- we've reached the point that there is a

18  danger that if this sentence is increased any more, I think

19  the inevitable conclusion will be that too much negative is

20  being emphasized for Mr. Walsh; and we will ultimately have

21  a sentence that greatly overstates his actual conviction, and

22  he will be being punished, rightly or wrongly, for many, many

23  other things.

24       Obviously, I feel legally it would be wrongly, and

25  that's why we've been objecting to it throughout.  This isn't

1   really a moral question at this stage.  I know those are

2   issues that we grapple with all the time in criminal court,

3   and I know you grapple with in sentencing.  But again, it may

4   be procedurally correct, but the fear is if you increase this

5   sentence even more, I think it would be improper, and it does

6   not serve the purposes of sentencing.  And if you think some

7   punishment should be brought for that outburst, it should have

8   been brought via a contempt proceeding.

9           So, thank you, Judge.

10          THE COURT:  Thank you, Mr. Boyle.

11          Government?

12          MR. VEATCH:  Thank you, your Honor.  Your Honor, can

13  you hear me?

14          THE COURT:  Yes.  And if -- Mr. Boyle, if you could

15  mute your phone.  Great.  Thank you.

16          MR. VEATCH:  Your Honor, just very briefly, we'd just

17  point to a couple of things.  Mr. Boyle, as always, did an

18  excellent job arguing and advocating on behalf of his client.

19          We would just say that in the *Ochoa* case, the

20  in-court comment or the in-court conduct was the defendant

21  laughing at the imposition of the sentence, which the court

22  found disrespectful, which is a far cry from the conduct that

23  we see with Mr. Walsh.

24          We have learned that words have meaning.  Words have

25  importance.  The words Mr. Walsh used, while we won't speak on

1  behalf of your Honor, he threatened to kill and do great harm

2  to public servants, including the probation officer and the

3  AUSA involved directly in his case and involved directly with

4  his supervised release.

5  　　　　You know, there is not an application note within

6  3C1.1 dealing specifically with this, but we say by analogy,

7  in Note 4-A, an example given is, "threatening, intimidating,

8  or otherwise unlawfully influencing the codefendant, witness,

9  or juror directly or indirectly, or attempting to do so."  So,

10  certainly the provision contemplated situations in which the

11  defendant is threatening people that are critical to their

12  case.  And who more so than the court itself and the

13  prosecutor and probation officer?

14  　　　　So, without going on and on, we do believe that

15  obstruction would be an appropriate enhancement or, again, a

16  variance by analogy.

17  　　　　Thank you, your Honor.

18  　　　　THE COURT:  Thank you.  Probation, I don't know if

19  you have anything to add, but if you do, I wanted to give you

20  an opportunity.

21  　　　　MR. CHRISTIANSEN:  Judge, I think that I spoke to

22  this issue the last time, and I don't know that I have

23  anything to add, unless there is something that you would

24  like me to directly address.  Thank you.

25  　　　　THE COURT:  Okay.  Thank you.

1     Mr. Boyle, I'll give you the last word in terms of
2  the attorneys, and then we'll turn it over to Mr. Walsh.

3     MR. BOYLE:  No, Judge.  I think I've said everything
4  that I wanted to say, so thank you.

5     THE COURT:  All right.  Mr. Walsh, if you would like
6  to make any further statements, I want to give you the
7  opportunity to do so.  You're not obligated to do so; but if
8  you would like to do so, now is your chance.

9     THE DEFENDANT:  I let my attorney speak for me.

10    THE COURT:  All right.  So, the question before me
11  is whether Mr. Walsh's, and I'm calling it a supplemental
12  allocution, -- I think one of the appeals courts referred to
13  it that way -- or continued allocution at the October 6th
14  hearing warrants a higher custodial sentence than the
15  156 months that I had planned to impose.

16    I think the answer to that question is yes, and the
17  only difficult question before me is:  How different?  How
18  much higher?

19    I appreciate Mr. Boyle stating on the record
20  something that I had read in those decisions that I had cited,
21  *Gerezano* and *Ochoa*, and he was right to bring that to my
22  attention and to put it on the record.  *Gerezano* says that at
23  least some of the concurring opinions stated that district
24  judges should be discouraged from -- from raising a sentence
25  based on something that a defendant says at the sentencing

1    hearing.  And I take that very seriously.

2           And of course, I didn't know about *Gerezano* on

3    October 6th, but I needed to take a break on October 6th

4    to make sure that I had fully thought through everything,

5    which is why I ordered a continuation of the sentencing

6    hearing.

7           And I actually did the same on -- after reading

8    *Gerezano* on January 14th.  I -- before I finally decided

9    whether or not a higher sentence was warranted and if so,

10   by how much, I wanted to give it further thought, and the

11   reasons are those set forth in the *Gerezano* opinion.

12          In terms of *Ochoa*, yeah, I completely understand what

13   the Court of Appeals said in *Ochoa*, which is if a defendant

14   shows contempt of court in the course of a sentencing, it's

15   more appropriate to deal with that through a contempt

16   proceeding, a separate prosecution, than by raising the

17   sentence, increasing the sentence.

18          That's not our situation.  What Mr. Walsh did at the

19   October 6th sentencing goes well beyond contempt because it's

20   not that -- the trouble -- and trouble is putting it mildly,

21   is not that Mr. Walsh showed disrespect for a court proceeding

22   or for a judge on October 6th.  It's what his statements

23   revealed about himself, about what he truly thinks, about who

24   he truly is.

25          And I'll read some portions of what Mr. Walsh said

1  in order to illustrate what I had in mind.  At one point,

2  Mr. Walsh said, "I don't give a fuck what you're gonna do,

3  bitch.  That's what the fucking reason is.  I don't give a

4  fuck; and I don't give a fuck about coming home, dying in

5  prison, doing whatever the fuck I'm gonna do.  I am what I am,

6  and I'm gonna be what I am."  "I am what I am, and I'm gonna

7  be what I am."

8          Later in the supplemental allocution, after he had

9  said other things, Mr. Walsh said to me, "You did honestly say

10 a lot of things.  Yeah, I have a propensity for some violence.

11 But yeah, I said what I said, and I meant what I said.  And I

12 mean what I say.  And I don't give a fuck what you think.  I

13 don't give a fuck what you do.  I don't give a fuck about the

14 Probation lady.  I don't give a fuck about the prison.  I

15 don't give a fuck about any of that shit, period, in life."

16         And then later on, he said, "Fuck you and fuck that

17 sentence.  I don't give a fuck about 35 to life or 10 life

18 sentences and 3500 fucking years."

19         And then he made some threats, and then he said,

20 "That's what I think about you, your laws, rules, and

21 regulations."

22         And then he stated that he wanted to make sure that

23 his remarks were being taken down on the transcript.  "Hey,

24 Mr. Boyle, you make sure you get that fucking transcript,

25 and if I've got to go another week to listen to this

1   mother-fucking pig -- because I don't have no respect for no
2   law, rules, or regulations any fucking way, and I never have,
3   and I never fucking will.  I am what I am, and I ain't worried
4   about this shit."

5          And then he threatened the AUSA and the probation
6   officer.  "I'd kill that mother-fucker with his good little
7   ass, too, you mother-fucker, you.  I'd kill you in a
8   heartbeat.  I'd feel nothing about killing him.  And that
9   bitch," which was the probation officer, "I'd kill her, too.
10  I'd cut her fucking throat in a heartbeat."

11         And then a moment later, he said, "What I admitted to
12  this creepy punk mother-fucker," I think he was referring to
13  me, "he is what he is, and I am what I am.  And I -- it is
14  what it is, man."

15         Mr. Walsh was angry.  I believe -- this was a video
16  hearing.  It wasn't in person; but it was in video, and I was
17  able to see everything that was going on.  Mr. Walsh was
18  angry, but it was a controlled anger.

19         Mr. Walsh was not raving.  He was calm.  He had his
20  mental faculties.  And what he was doing in that supplemental
21  allocution was provide more information about his actual state
22  of mind.  And what he said undermined what -- what he had said
23  about himself and about his plans in his first allocution,
24  which is that he wanted to live out his days in a law-abiding
25  manner.  What we saw in the second allocution was the real

1  David Walsh.

2      And as I said in denying the recusal motion,

3  Mr. Walsh revealed -- his revealing his true feelings and true

4  state of mind, while being honest about himself, it was also

5  strategic in order to try to knock me off the case because I

6  had announced my intention to impose a sentence that Mr. Walsh

7  said was too high.  But those were true feelings.

8      And I know Mr. Boyle argued that what Mr. Walsh did

9  was an emotional outburst.  I just -- I don't think that that

10  accurately captures what it was.  An outburst is something

11  that happens, and you say things that you don't mean.  I think

12  Mr. Walsh meant every word he said about what he thinks about

13  laws, rules, and regulations and who he has been and who he

14  always will be.

15      When Mr. Walsh delivered his rather lengthy remarks

16  at the January 14th hearing, he did apologize for what he said

17  on October 6th, but he did not once say that his supplemental

18  allocution on October 6th did not accurately reflect what he

19  was thinking or how he thought about himself or his views

20  about the law or his ability and willingness to comply with,

21  as he said it, laws, rules, and regulations.

22      Rather, at -- on July -- January 14th, as he did

23  during his first allocution at the October 6th sentencing

24  hearing, he spent much of his time contextualizing and

25  justifying his commission of the bank robbery, the attempted

1  bank robbery, or what I found to be the attempted bank

2  robbery, and his gun crimes.  He said if only he had received

3  job training, if only he had obtained a job that paid $20 an

4  hour or $30 an hour, rather than 12 or 13 or 15, he wouldn't

5  have committed those crimes.

6         So, we have to ask ourselves:  What happens?  What

7  happens if Mr. Walsh is released from his prison sentence in

8  this case, and then with or without vocational training, he

9  for whatever reason, whether it's his doing or whether it's

10  just the economy or society or whatever, he can't obtain a

11  job paying a wage that he believes is sufficient?

12         We know what he will do because he did it before and

13  he explained why he did it.  And he told us what he thinks of

14  the laws, rules, and regulations; and he told us what he

15  thinks of himself, that he is what he is, and he'll always be

16  what he is.

17         So, there's a substantial risk that if he's released,

18  he's not going to be able to earn the hourly wage, the 20 or

19  $30 hourly wage that he thinks is necessary to forestall him

20  from committing further crime.

21         And I want to talk about one other thing from both

22  the initial October 6th allocution and that on January 14th.

23  He said he didn't intend to hurt anybody during either the

24  bank robbery that happened and the attempted robbery, what I

25  found to be the attempted bank robbery.  I know Mr. Walsh

1    disagrees with that characterization, and that's fine.  But
2    we'll just call it the second incident.

3          It's implausible that he didn't intend to hurt
4    anyone.  A bank robber who does not intend to hurt anybody
5    brings a note to the bank, makes an oral threat; and if that
6    person brings a gun, it's unloaded.  But Mr. Walsh brought a
7    loaded gun to what would have been the second bank robbery.
8    We're 100 percent certain of that.  And as I found by a
9    preponderance of the evidence, he did the same thing for the
10   first bank robbery.

11         A person who brings a loaded gun to a bank robbery
12   does so because he is ready, willing, and able to shoot
13   people, to wound them or to kill them.  And we know that
14   Mr. Walsh is eminently capable of using a firearm to shoot
15   and to kill because he did so with the police officer.

16         So, what Mr. Walsh's supplemental allocution on
17   October 6th showed about himself is that he will commit
18   violent crimes, violent gun crimes, which of course, carry
19   the possibility of severe injury and death, until he draws
20   his last breath.

21         And the allocution, the supplemental allocution was
22   not idle chatter by a person who lost his cool.  Rather, it
23   reflects who Mr. Walsh truly is and the deadly risk that he
24   poses.  This is a person who murdered a police officer, who
25   possessed an Uzi submachine gun, who committed an armed

1  robbery, tried to escape from state prison by acquiring

2  handcuff keys, and then committed a bank robbery, an armed

3  bank robbery, and was on the cusp of committing another, not

4  with a note, not with an unloaded weapon, but with a loaded

5  .357 revolver.

6       So, on October 6, when I announced my intention to

7  impose a 156-month sentence, I was wrong.  I was wrong when

8  I calibrated that sentence with the thought that Mr. Walsh

9  would be released in his early 80s and live out the rest of

10  his life in a peaceful manner, in a law-abiding manner.

11       And I just return again to something that Mr. Walsh

12  said on October 6th that has resonated in my mind since he

13  said it, in a calm way and with the utmost sincerity.

14  "I don't have no respect for no law, rules, and regulations

15  any fucking way; and I never have, and I never fucking will.

16  I am what I am, and I ain't worried about shit."

17       There's a temptation to take the course urged by the

18  government here, which is to add on a couple of offense

19  levels, increase the 156-month sentence to 175 months, a

20  sentence that Mr. Walsh very much could, but would be less

21  likely to survive.  And there's an equivalent temptation to

22  do that and then vary upward from that adjusted sentence by

23  adding some more years on top of that 175-month sentence,

24  based on 3553(a)(1), history and characteristics of the

25  defendant, and 3553(a)(2)(C), protecting the public from

1 further crimes of the defendant, which would make the
2 sentence, while technically a fixed term of years, likely to
3 be an effective death sentence -- I'm sorry, an effective
4 life sentence.

5 And that temptation lies in two impulses. The first
6 is a strong reluctance that I have and I'm sure most, if not
7 all, people have to find that a fellow human being is beyond
8 redemption. And what a fixed term would do, by leaving open
9 the possibility that Mr. Walsh would survive the sentence and
10 be released, would arguably manifest a belief that there is
11 some chance for redemption, and that's a very strong
12 temptation.

13 And the second impulse, which is even stronger, is
14 the impulse -- is the strong reluctance to do something I've
15 never done, never thought I would do, never wanted to do,
16 dreaded doing, which is to impose explicitly, and not
17 implicitly in light of the calendar and an actuarial table,
18 a life sentence.

19 But there's only one appropriate sentence here. On
20 Counts 1 and 4, I'm going to impose a 96-month sentence, which
21 is the same sentence I imposed last time, concurrently to one
22 another. And on Count 2, the 924(c) conviction, I'm going to
23 impose a term of life imprisonment consecutive to the two
24 concurrent 96-month terms.

25 This is a substantial upward variance, to say the

1   least.  I'm looking at subsection (a)(3) of 3553.  It's a
2   lawful sentence.

3        I'm looking at subsection (a)(1), the history and
4   characteristics of the defendant.  He has shown himself in
5   both word and deed to be an incorrigibly violent offender and
6   a capable and strategic one at that.

7        And I'm looking at subsection (a)(2)(C), the need
8   to protect the public from further crimes of the defendant.
9   Mr. Walsh has shown in both word and deed that the only way
10  to protect the public from his further crimes is to imprison
11  him, to incapacitate him for the rest of his life.  Any lesser
12  sentence would not be sufficient to fulfill the purposes of
13  3553(a), and particularly 3553(a)(2), and it would be the
14  height of irresponsibility for me to impose a lesser sentence.

15       Mr. Boyle, pursuant to *United States versus Lewis*,
16  823 F.3d, 1075 at 1083 to 1084, let me ask whether you would
17  like a further explanation, elaboration, or justification for
18  the term of imprisonment or for the term of supervised release
19  and the supervised release conditions that I announced on
20  January 14th?

21       MR. BOYLE:  No, Judge.  Obviously, the sentence is
22  over our objection and over all the arguments that we've made
23  throughout the sentencing, but I think -- I think it's
24  sufficient.

25       THE COURT:  Okay.  And I'm -- one may wonder why I'm

1    keeping the term of supervised release, and I'm doing so in

2    the event that Mr. Walsh is relieved of the life sentence,

3    either by way of a motion for a reduced sentence under

4    3582(c)(1)(A), executive clemency, or by way of appeal.

5           Government, do I have your motion to dismiss Count 3

6    of the indictment -- superseding indictment?

7           MR. VEATCH:  Yes, your Honor.  Thank you.

8           THE COURT:  Count 3 is dismissed.

9           Mr. Boyle, would you like for me to recommend any

10   particular place of incarceration?

11          MR. BOYLE:  Oxford, Wisconsin.

12          Is there any other designation, Mr. Walsh?

13          THE DEFENDANT:  None.

14          THE COURT:  I don't know if I'm going to make a

15   recommendation.  I'll consider that.

16          Any objection to the motion for forfeiture,

17   Mr. Boyle?

18          MR. BOYLE:  No, your Honor.

19          THE COURT:  I'll grant that motion and enter the

20   preliminary order of forfeiture.

21          Mr. Walsh, when you pleaded guilty, you waived a

22   number of your rights; but you appealed your right -- I'm

23   sorry, you retained your right to appeal the validity of your

24   guilty plea, your sentence, and the Court's denial of your

25   motion to dismiss Count 2, which is the 924(c).

1          If you would like to exercise your right to appeal,

2   you absolutely should do so, and I expect you'll do so; but

3   your notice of -- you have to make your decision rather

4   quickly because your notice of appeal must be filed within

5   14 days of the day that the sentencing order is entered on

6   the docket.

7          Do you understand that?

8          THE DEFENDANT:  Yep.

9          THE COURT:  Mr. Boyle, will you discuss with

10   Mr. Walsh his appeal rights?

11          MR. BOYLE:  I have, Judge, and I will renew that

12   following today's proceedings.

13          THE COURT:  Okay.  And if Mr. Walsh would like to

14   appeal any one of those matters or any other matters that he

15   possibly could appeal, will you be able to get the appeal --

16   notice of appeal on the docket in a timely manner?

17          MR. BOYLE:  Yes, I will, your Honor.

18          THE COURT:  Okay.  Government, anything further?

19          MR. VEATCH:  No, your Honor.  Thank you.

20          THE COURT:  Mr. Boyle?

21          MR. BOYLE:  No, Judge.

22          Mr. Walsh, again, I'll be putting in a request for a

23   legal call with you to discuss your appellate rights, so let's

24   talk then.  Okay?  Thank you.

25          THE DEFENDANT:  Yes.

1        THE COURT:  Probation, anything further?

2        MR. CHRISTIANSEN:  Judge, yes.  I will be generating

3   a corrected Presentence Investigation Report pursuant to your

4   prior order regarding the content regarding the prior criminal

5   history.

6        Do you also want me to create any form of statement

7   of corrections modifying the offense level computations, or

8   no, Judge?

9        THE COURT:  No.  I think the offense level

10  computations stand.  It's just the criminal history that's

11  changed.

12       MR. CHRISTIANSEN:  I will take care of that today,

13  Judge.  Thank you.

14       THE COURT:  Okay.  Counsel and probation officer,

15  Thank you.

16       MR. BOYLE:  Thank you, your Honor.

17       MR. VEATCH:  Thank you, your Honor.

18    (Which were all the proceedings heard.)

19                         CERTIFICATE

20    I certify that the foregoing is a correct transcript from

21  the record of proceedings in the above-entitled matter.

22

23  /s/Charles R. Zandi              February 5, 2021

24  _____        _____
    Charles R. Zandi                 Date
    Official Court Reporter
25